## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ROBERT P. STORCH; MICHAEL J.
MISSAL; CHRISTI A. GRIMM; CARDELL
K. RICHARDSON, SR.; SANDRA D.
BRUCE; PHYLLIS K. FONG; LARRY D.
TURNER; HANNIBAL "MIKE" WARE;
   2100 Pennsylvania Avenue N.W.
   Washington, D.C. 20037

                 Plaintiffs,

     v.

PETE HEGSETH, *in his official capacity as
Secretary of Defense*;
   1400 Defense Pentagon
   Washington, D.C. 20301

DOUGLAS A. COLLINS, *in his official
capacity as Secretary of Veterans Affairs*;
   810 Vermont Avenue N.W.
   Washington, D.C. 20420

DOROTHY A. FINK, *in her official capacity
as acting Secretary of Health and Human
Services*;
   200 Independence Avenue S.W.
   Washington, D.C. 20201

MARCO RUBIO, *in his official capacity as
Secretary of State*;
   2201 C Street N.W.
   Washington, D.C. 20520

DENISE L. CARTER, *in her official capacity
as Acting Secretary of Education*;
   400 Maryland Avenue S.W.
   Washington, D.C. 20202

GARY WASHINGTON, *in his official
capacity as Acting Secretary of Agriculture*;
   1400 Independence Avenue S.W.
   Washington, D.C. 20250

Civil Case No. __1:25-cv-415____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

VINCENT MICONE, *in his official capacity*
*as Acting Secretary of Labor*;
    200 Constitution Avenue N.W.
    Washington, D.C. 20210

EVERETT M. WOODEL, JR., *in his official*
*capacity as Acting Administrator of the Small*
*Business Administration*;
    409 3rd Street S.W.
    Washington, D.C. 20416

DONALD J. TRUMP, *in his official capacity*
*as President of the United States*;
    1600 Pennsylvania Avenue N.W.
    Washington, D.C. 20500

                    Defendants.

## INTRODUCTION

1.      In this action, the duly appointed Inspectors General of eight major U.S. agencies—the Departments of Defense, Veterans Affairs, Health and Human Services, State, Agriculture, Education, and Labor, and the Small Business Administration—seek redress for their unlawful and unjustified purported termination by President Donald Trump and their respective agency heads. The purported firings violated unambiguous federal statutes—each enacted by bipartisan majorities in Congress and signed into law by the President—to protect Inspectors General from precisely this sort of interference with the discharge of their critical, non-partisan oversight duties.

2.      Inspectors General, or IGs, are non-partisan officials appointed by the President with the advice and consent of the Senate. IGs—who regularly remain in office across multiple presidential administrations—serve as independent watchdogs, playing a vital role in ensuring the effective and efficient operation of government. They do so by auditing and investigating their agencies' operations and personnel in order to detect and prevent waste, fraud, and abuse, and by making recommendations for improved agency operations. Over the years, IGs' non-partisan work

has saved American taxpayers billions of dollars; helped safeguard U.S. national security; stopped fraud (and helped to both recover the fruits of such fraud and put fraudsters in prison); helped to end mistreatment of some of the nation's most vulnerable citizens; and ensured that veterans, farmers, senior citizens, disaster victims, and other Americans receive the support and services to which they are entitled by law.

3.    Underscoring IGs' non-partisan function, federal law requires that IGs be appointed without regard to political affiliation, i.e., solely on the basis of their integrity and relevant expertise.  IGs also must inform Congress as well as their agencies about issues they identify in their work.  And further confirming IGs' status as apolitical watchdogs, presidents of both parties—including President Trump in his first term—have, upon taking office, retained the IGs that were nominated and confirmed during prior administrations.

4.    Just four days into his current term, however, President Trump, acting through a two-sentence email sent by the director or deputy director of the Office of Presidential Personnel, purported to remove from office (supposedly on account of "changing priorities") nearly a score of IGs (while retaining only two cabinet-level IGs).  These officials, who collectively have many decades of IG experience, were appointed by and/or served under presidents of both parties—including President Trump himself during his first term.

5.    Among the IGs purportedly removed were the eight plaintiffs here: the Inspectors General of the Departments of Defense, Veterans Affairs, Health and Human Services, State, Education, Agriculture, and Labor, and the Small Business Administration.  Together, these IGs are charged by law with conducting and facilitating oversight with respect to more than $5 trillion dollars of appropriated funds annually (the vast majority of the annual federal budget) and more than 3.5 million federal employees (approximately 80% of the federal workforce).

6.      As explained by the Chair of the Council of the Inspectors General on Integrity and Efficiency (CIGIE), in a letter in response to the emails purporting to remove the IGs, the attempted removal was contrary to law and therefore a nullity.  The Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101 (IG Act), as amended most recently in 2022 by the bipartisan Securing Inspector General Independence Act, Pub. L. No. 117-263, Title LII, 136 Stat. 3227, provides that although the President may remove an IG, he must first (i) notify Congress about a planned removal at least 30 days before it occurs, and (ii) provide a substantive, case-specific rationale (which need not necessarily rise to the level of "for cause") for the termination.  *See* 5 U.S.C. §403(b).  Neither condition was satisfied here as to any of the purported removals.

7.      Despite the obvious illegality of these purported terminations, the head of each affected agency—including the eight heads of plaintiffs' respective agencies—effectuated and continue to effectuate the purported removals.  For example, the eight agencies saw to it that their IGs lost access to their government email accounts and computer systems, government-issued phones, Personal Identity Verification cards, and computers.  The IGs were also physically disabled from entering the government buildings where they are assigned to work.  These actions have had their intended effect of making it impossible for the IGs to perform their lawful duties.  Because the purported removals were illegal and hence a nullity, the actions just described constituted illegal interference with the IGs' official duties.

8.      Neither President Trump nor anyone else in his administration has claimed that the purported removals complied with the IG Act.  Instead, President Trump falsely claimed after the fact that such removals were "a very common thing to do" and "a very standard thing to do, very

much like the U.S. attorneys." *Press Gaggle By President Trump Aboard Air Force One En Route To Miami, Florida*, The White House (Jan. 25, 2025).[1]

9.      President Trump is wrong to claim these actions were "common" or "standard." To the contrary, since 1980, there has been a bipartisan consensus that it is improper for a new presidential administration to remove IGs *en masse*. In fact, in every transition to a new administration beginning in 1989, presidents of both major political parties—including President Trump during his first term—uniformly refrained from removing IGs upon taking office.

10.     President Trump's attempt to eliminate a crucial and longstanding source of impartial, non-partisan oversight of his administration is contrary to the rule of law.

11.     Plaintiffs are longtime public servants appointed by and serving under presidents of both parties (including President Trump). Each plaintiff has a long record of integrity and a determination to provide effective and strong oversight of the administration of trillions of dollars in federal spending and the conduct of millions of federal employees. Plaintiffs bring this action seeking a declaration that their purported removals were legal nullities, and so they remain the duly appointed IGs of their respective agencies, unless and until the President lawfully removes them in compliance with the statutory procedure set forth in 5 U.S.C. §403(b). Plaintiffs also seek injunctive relief prohibiting Agency Defendants, or anyone working in concert with them, from impeding the lawful exercise of the duties of their offices.

---

[1] https://www.whitehouse.gov/remarks/2025/01/press-gaggle-by-president-trump-aboard-air-force-one-en-route-to-miami-florida.

## PARTIES

**Plaintiffs**[2]

12.    Plaintiffs are non-partisan public servants who have dedicated their careers to serving the American public as "establishment" IGs, 5 U.S.C. §401(1), during both Democratic and Republican administrations.

13.    Plaintiffs are each highly respected, in part because they have always placed paramount importance on IG integrity.  Countless members of the IG community look to plaintiffs for their institutional knowledge, guidance, and leadership.

14.    In addition to conducting oversight of their respective agencies, many of the plaintiffs hold leadership positions on CIGIE, which is "an independent entity established within the executive branch to address integrity, economy and effectiveness issues that transcend individual Government agencies and aid in the establishment of a professional, well-trained and highly skilled workforce in the Offices of Inspectors General," Council of the Inspectors General on Integrity and Efficiency.[3]

15.    Robert P. Storch assumed the role of Inspector General of the U.S. Department of Defense (DoD) in December 2022, following his nomination by President Biden and confirmation by the Senate.  Before becoming DoD IG, Storch served as the IG at the National Security Agency (NSA)—having been nominated for that position by President Trump.  He was a member of the Senior Executive Service (SES) before becoming NSA IG and thus is statutorily entitled to elect to rejoin the SES after serving in a presidentially appointed, Senate-confirmed position.  As DoD IG, Storch leads approximately 1,865 civilian employees in the Office of Inspector General, which

---

[2] Plaintiffs' addresses are filed under seal in accordance with Local Rule 5.1(c).

[3] https://www.ignet.gov (visited Feb. 11, 2025).

is tasked with overseeing DoD's approximately $850 billion budget and nearly 3 million military and civilian employees.  During Storch's tenure as DoD IG, his office has issued approximately 281 reports, made more than 970 recommendations for improvement to DoD programs and operations, and delivered a "monetary impact" of over $10.8 billion.[4]

16.     Storch's public service spans more than three dozen years.  As IG at NSA from 2018 to 2022, Storch worked to enhance the impact and transparency of the office's work, including launching its first-ever public website where unclassified OIG reports were posted. Before that, he served as Deputy IG at the Justice Department, where he led the Whistleblower Ombudsperson program, and spent nearly two dozen years as a federal prosecutor in the Middle District of Florida, the Public Integrity Section of the Criminal Division at the Department of Justice in Washington, and the Northern District of New York.  In the Northern District of New York, Storch served as that district's first Anti-Terrorism Coordinator, following the events of September 11, 2001; as Appellate Chief and Senior Litigation Counsel; as Deputy Criminal Chief; as Counsel to the U.S. Attorney; and as Acting Criminal Chief.  He has also long been active in CIGIE, serving as Vice Chair and then Chair of its Technology Committee, as a member and later the Vice Chair of its Integrity Committee, as a member of its Pandemic Response Accountability Committee, and as a member of its Executive Council.  Storch has also chaired the Defense Council on Integrity and Efficiency, which comprises more than forty Service, Command, and other Inspectors General, Auditors General, the heads of Military Criminal Investigative

---

[4] "Monetary impact" describes the estimated financial savings or losses that could result from implementing recommendations made in an IG's audits, inspections, or evaluations, essentially quantifying the potential cost-benefit of addressing issues like waste, fraud, and abuse in a government agency or program.  *See* CIGIE, *Toolkit for Identifying and Reporting Monetary Impact*, at 1 (June 18, 2024), https://www.ignet.gov/sites/default/files/files/Toolkit%20for%20Ide ntifying%20and%20Reporting%20Monetary%20Impact.pdf.  Some monetary-impact estimates reported herein also consider monetary benefits associated with IG investigations.

Organizations, and others who conduct oversight of different parts of the vast DoD enterprise, much of which is coordinated or overseen by the DoD IG.  Storch has received many awards throughout his decades of public service.

17.    Michael J. Missal assumed the role of Inspector General of the U.S. Department of Veterans Affairs (VA) on May 2, 2016, following his nomination by President Obama and confirmation by the Senate, and remained in that role throughout President Trump's first term and President Biden's term.  As VA IG, Missal leads approximately 1,180 employees in the Office of Inspector General tasked with overseeing the VA's $350 billion budget and over 400,000 employees.  During Missal's tenure as VA IG, his office has issued almost 2,500 reports, made nearly 10,000 recommendations for improvement to VA programs and operations, delivered a monetary impact of over $45 billion, and received numerous awards.  Missal's public service spans nearly 15 years, including time as Senior Counsel at the U.S. Securities and Exchange Commission in the Division of Enforcement, and 6 years as Chair of CIGIE's Investigations Committee, a member of the Pandemic Response Accountability Committee, and a member of CIGIE's Executive Council.  He earlier worked as a lawyer in private practice for 29 years, specializing in government enforcement and internal investigations.

18.    Christi A. Grimm assumed the role of Inspector General of the U.S. Department of Health and Human Services (HHS) on February 17, 2022, following her nomination by President Biden and her confirmation by the Senate.  Grimm's public service spans 26 years, including numerous roles in the HHS Office of Inspector General (HHS OIG) across administrations of both parties (Presidents Clinton, George W. Bush, Obama, Trump, and Biden).  Those roles included Acting Inspector General during President Trump's first term, Chief of Staff, Director of Programs and Operations, and Senior Program Evaluator, all at HHS OIG.  Grimm was a statutory member

of CIGIE's Pandemic Response Accountability Committee and served as both the Vice-Chair and later Chair of the Inspections and Evaluation Committee.  Grimm was a member of the SES before becoming HHS IG and thus is statutorily entitled to elect to rejoin the SES after serving in a presidentially appointed, Senate-confirmed position.

19.    As HHS IG, Grimm leads roughly 1,570 employees in HHS OIG, is responsible for overseeing HHS's $2.3 trillion budget, more than 80,000 employees, and more than 100 programs. During Grimm's tenure as HHS IG, her office has issued over 450 reports, made approximately 1,300 recommendations for improvement to HHS programs and operations, and delivered a monetary impact of over $18.5 billion.  Before joining HHS OIG, she audited contractors for the Health Care Financing Administration (now the Center for Medicare and Medicaid Services). During her tenure, Grimm has received numerous CIGIE and other awards recognizing her and/or her office's work, including work  to: (1) improve the safety and well-being of migrant children in the custody of HHS; (2) identify harm and the costs of harms to Medicare beneficiaries in hospitals, nursing homes, and interim care facilities; (3) improve emergency preparedness in nursing homes and the quality and safety of care provided to residents; (4) quantify and reduce improper Medicaid payments; (5) improve child-safety and well-being, including for children missing from foster care and victimized by sex-trafficking; and (6) document gaps in HHS's response to the COVID-19 pandemic.  She has been recognized by the HHS Secretary and by CIGIE for excellence in management.  And in 2024, *Modern Healthcare* named Grimm a Top Woman Leader in Healthcare.

20.    Cardell K. Richardson, Senior assumed the role of Inspector General of the U.S. Department of State on May 20, 2024, following his nomination by President Biden and his confirmation by the Senate.  Prior to his service at the State Department, Richardson served

throughout the first Trump administration as the agency-appointed IG at the National Geospatial-Intelligence Agency (NGA).  He was a member of the Defense Intelligence Senior Executive Service (DISES) when he was first nominated to become an IG, and he received a memorandum dated December 5, 2023, confirming that he is entitled to elect to return to the DISES following his IG service.  As State IG, Richardson leads approximately 450 employees and 100 contractors in the Office of Inspector General, responsible for overseeing the department's $75 billion budget and more than 70,000 employees.  During Richardson's eight-month tenure as State IG, his office has issued over 44 reports and delivered a monetary impact of over $17 million.

21.     Richardson's public service spans nearly five decades, including 26 years of active-duty military service in the U.S. Air Force, honorably retiring at the rank of colonel.  He also served over 21 years in the senior executive service in numerous roles at NGA, including Deputy Chief Operating Officer, Director of Installation Operations, Director of Source Operations, Deputy Director of Security and Installations, and Director of Diversity Management and Equal Employment Opportunity, and over 6 years as Inspector General.  He has also served as the Chair and Vice Chair of CIGIE's Professional Development Committee.  Richardson has won numerous awards, including winning the Presidential Rank Award for high-performing career senior executives for "sustained extraordinary accomplishment" during President Trump's first term and earlier under President Obama.

22.     Sandra D. Bruce assumed the role of Inspector General of the U.S. Department of Education on December 3, 2021, following her nomination by President Biden and her confirmation by the Senate.  Prior to that, she served as the Acting Inspector General for most of President Trump's first term and the Deputy Inspector General prior to that.  Bruce was a member of the SES before becoming IG and thus is statutorily entitled to elect to rejoin the SES after

serving in a presidentially appointed, Senate-confirmed position. As Education IG, Bruce leads approximately 220 employees in the department's Office of Inspector General and is responsible for overseeing the department's $103 billion budget and over 4,000 employees. During Bruce's tenure as Education IG/Acting IG, her office has issued over 596 reports, made approximately 739 recommendations for improvement to Education's programs and operations, and delivered a monetary impact of over $1.2 billion.

23.    Bruce's public service spans 39 years. Before becoming Education IG, she served in numerous roles at four large, complex agencies across five administrations (including those of President Trump and President Biden). Those roles included the U.S. Department of Education Office of Inspector General, including Deputy IG as well as Acting IG. She also served as Assistant Inspector General for Inspections at the U.S. Department of Energy, a position she also held at the National Geospatial Intelligence Agency. She was a leader in the U.S. Postal Service Office of Inspector General, directing its Law Enforcement and Postal Service Security unit and its Computer Assisted Audit Techniques unit. Bruce served as an audit supervisor at the U.S. Army Audit Agency. She also served as Chair of CIGIE's Employee Engagement and Innovation Committee and Chair of the GAO, State, and Local Subcommittee of the Pandemic Response and Accountability Committee. She has received numerous CIGIE awards, including the Award for Excellence, Special Act Awards, Distinguished Achievement Awards, Exceptional Performance Awards, and Letters of Commendation.

24.    Phyllis K. Fong assumed the role of Inspector General of the U.S. Department of Agriculture (USDA) on December 2, 2002, following her nomination by President George W. Bush and her confirmation by the Senate. Her 22-year tenure as USDA IG thus spanned the George W. Bush, Obama, first Trump, and Biden administrations. Fong was a member of the SES before

becoming an IG and thus is statutorily entitled to elect to rejoin the SES after serving in a presidentially appointed, Senate-confirmed position. As USDA IG, Fong leads the approximately 440 employees in the Office of Inspector General, which is tasked with overseeing USDA's $340 billion budget and 100,000 employees. During Fong's tenure as USDA IG, her office has issued approximately 7,250 reports and delivered a monetary impact of over $19 billion.

25.    In addition to her long tenure as USDA IG, Fong's served simultaneously as Acting IG of the Federal Housing Finance Agency from August 2021 to March 2022. And before President George W. Bush nominated her to be USDA IG in 2002, she served as the Senate-confirmed IG of the Small Business Administration in the Bill Clinton and George W. Bush administrations. After working with Congress to help create CIGIE, Fong was elected by her peers during the George W. Bush administration to serve as the Council's inaugural chair, serving for three consecutive two-year terms. Her service in that critical leadership role spanned the Bush and Obama administrations. Fong has also served on the Council's Pandemic Response Accountability Committee and as a member of the Recovery Accountability and Transparency Board, which oversaw Recovery Act funds following the 2008 global financial crisis. Fong has received numerous awards for her work in the IG community, including the Association of Government Accountant's Frank Greathouse Distinguished Leadership Award for outstanding leadership and contributions to financial management in government. And under her leadership, USDA's Office of Inspector General received CIGIE's 2024 Alexander Hamilton Award—the top award presented in the IG community.

26.    Larry D. Turner assumed the role of Inspector General of the U.S. Department of Labor (DOL) on December 7, 2021, following his nomination by President Biden and his confirmation by the Senate. Turner served as Acting IG at DOL in the first Trump administration

and as Deputy IG before that.  He served 6 years as a member of the SES before becoming an IG and thus is statutorily entitled to elect to rejoin the SES after serving in a presidentially appointed, Senate-confirmed position.  As DOL IG, Turner leads approximately 350 employees in the Office of Inspector General, responsible for overseeing DOL's $25 billion budget and over 16,000 employees.  He oversees essential programs such as unemployment insurance, worker safety and health, training and reemployment services, pension and health care benefits, wage and hour standards, and economic statistics.  He also directs criminal investigations into organized crime influence and labor racketeering corruption in employee benefit plans.  During Turner's tenure as DOL IG, his office issued 137 reports, made over 400 recommendations for improvement of DOL programs and operations, and delivered a monetary impact of over $75 billion.

27.    Turner's public service spans over 46 years, including 23 years of active-duty military service, honorably retiring at the rank of lieutenant colonel.  Turner has served in numerous roles in the IG community across several presidential administrations of both parties, including Deputy and Acting Assistant IG for Communication at Congressional Liaison in the DoD Office of Inspector General; and Acting IG, Deputy IG, Liaison Officer to Army Material Command, and Executive Officer to the Executive Director in the Army Installation Management Command.  Turner was a member of CIGIE and a statutory member of the Pandemic Response Accountability Committee.  He also served on CIGIE's Employee Engagement and Innovation Committee Work Group.  Turner has received numerous awards, including the Civilian Superior Service Award, the Army Civilian Meritorious Service Award, and the Department of Defense Civilian Meritorious Service Award.

28.    Hannibal "Mike" Ware assumed the role of Inspector General of the U.S. Small Business Administration (SBA) in April 2018 following his nomination by President Trump and

confirmation by the Senate.  Since September 2024, Ware has also served as Acting IG of the Social Security Administration, overseeing that agency's $1.5 trillion budget and approximately 60,000 employees.  Ware was a member of the SES before becoming an IG and thus is statutorily entitled to elect to rejoin the SES after serving in a presidentially appointed, Senate-confirmed position.  As SBA IG, Ware oversees approximately 240 employees in the Office of Inspector General, responsible for overseeing the SBA's $220 million budget and roughly 4,000 employees.  During Ware's tenure as SBA IG, his office has issued over 170 reports, made more than 800 recommendations for improvements to the SBA's programs and operations, delivered a monetary impact of over $14 billion, and was responsible for another $30 billion being either seized or returned directly to the U.S. Treasury.  Ware's public service spans over 35 years in the IG community, beginning in 1990 when he began working as an intern auditor for the OIG of the U.S. Department of the Interior.  Ware is also the Chair of CIGIE, and he served as the Chair of CIGIE's Audit Committee for 6 years and the Chair of the Pandemic Response Accountability Committee's audit subcommittee for 5 years.  He has received numerous awards for his commitment to IG principles.

29.    Plaintiffs who are former members of the SES, a designation that carries separate statutory protections from removal based on partisan or personal attacks, *see* 5 U.S.C. §3393(g), are "entitled" to elect to be placed in the SES following their IG service as long as they leave their presidentially appointed positions "for reasons other than misconduct, neglect of duty, or malfeasance," *id.* §3593(b).  There has never been any suggestion (much less actual evidence) that any plaintiff engaged in misconduct, neglect of duty, or malfeasance.

**Defendants**

30.    The heads of the eight Cabinet departments or major federal agencies from which plaintiffs were purportedly removed as IGs are each sued in their official capacities.  These defendants are collectively referred to herein as the Agency Defendants.

31.    Pete Hegseth is the Secretary of Defense.  He and subordinates acting under his authority effectuated and continue to effectuate Rob Storch's purported removal by cutting off Storch's access to agency devices, networks, and buildings.

32.    Douglas A. Collins is the Secretary of Veterans Affairs.  He and subordinates acting under his authority effectuated and continue to effectuate Michael Missal's purported removal by cutting off Missal's access to agency devices, networks, and buildings.

33.    Dorothy A. Fink is the Acting Secretary of Health and Human Services.  She and subordinates acting under her authority effectuated and continue to effectuate Christi Grimm's purported removal by cutting off Grimm's access to agency devices, networks, and buildings.

34.    Marco Rubio is the Secretary of State.  He and subordinates acting under his authority effectuated and continue to effectuate Cardell Richardson's purported removal by cutting off Richardson's access to agency devices, networks, and buildings.

35.    Denise L. Carter is the Acting Secretary of Education.  She and her subordinates acting under her authority effectuated and continue to effectuate Sandra Bruce's purported removal by cutting off Bruce's access to agency devices, networks, and buildings.

36.    Gary Washington is the Acting Secretary of Agriculture.  He and subordinates acting under his authority effectuated and continue to effectuate Phyllis Fong's purported removal, with USDA directing that Fong's access to agency devices, networks, and buildings be cut off.

37.     Vincent Micone is the Acting Secretary of Labor.  He and his subordinates acting under his authority effectuated and continue to effectuate Larry Turner's purported removal by cutting off Turner's access to agency devices, networks, and buildings.

38.     Everett M. Woodel, Jr., is the Acting Administrator of the Small Business Administration.  He and his subordinates acting under his authority effectuated and continue to effectuate Mike Ware's purported removal by cutting off Ware's access to agency devices, networks, and buildings.

39.     Donald J. Trump is the current President of the United States.  He is sued in his official capacity.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction under (1) 28 U.S.C. §1331, because plaintiffs' causes of action arise under federal law, and (2) 28 U.S.C. §1361, because plaintiffs seek writs of mandamus to compel officers and employees of the United States and its agencies to perform duties owed to plaintiffs and required under law.

41.     Sovereign immunity for non-monetary relief is waived by 5 U.S.C. §702.

42.     Venue is appropriate in this judicial district under 28 U.S.C. §1391(b) and (e), because a substantial part of the events giving rise to plaintiffs' claims occurred here.

## FACTUAL ALLEGATIONS

**Inspectors General And The IG Act Of 1978**

43.     By law, Inspectors General are non-partisan officials charged with preventing and detecting waste, fraud, and abuse in agencies of the federal government.  Through audits, investigations, inspections, evaluations, and other reviews of agency programs and operations, IGs uncover malfeasance and mistakes, saving monumental amounts of taxpayer dollars, identifying

wrongdoing and wrongdoers, and ensuring that executive agencies conform to the law and provide the American people with the government services and support to which the law entitles them.

44.    Because IGs serve within government agencies and exercise important investigative authorities, they have unique capabilities to conduct in-depth assessments of agency programs and detect fraud and other malfeasance.  Their oversight also generates findings and recommendations to improve the programs they oversee.  The executive branch and Congress use the findings of IGs to inform their work and improve public administration at the federal level. IGs perform this work without regard to party, politics, or what administration is in office.

45.    Statutory IGs date back to the late 1950s, when Congress created an IG position for the State Department.  President Kennedy created an IG for the Agriculture Department in 1962. And in 1976, Congress created an IG position for what is now HHS.  That agency and others had previously relied on internal audit and investigation units to provide oversight of their spending and public administration.  But Congress's enactment of statutes requiring IGs who operate with some independence from the heads of their agencies reflects a legislative judgment (evidently shared by the presidents who signed the bills into law) that this degree of latitude is critical to ensuring that audit and investigative functions are performed professionally, fairly, efficiently, and effectively.  *See* S. Rep. 95-1071, at 6-8 (1978).

46.    The current statutory framework for federal IGs arose following the Watergate scandal, when Congress—seeking to ensure integrity and accountability in government—passed the Inspector General Act of 1978 on a bipartisan basis.

47.    The IG Act created inspectors general to oversee cabinet departments and major federal agencies.  5 U.S.C. §402(a).  It empowers the IGs and their offices to audit and investigate agency programs, to report the results to Congress and the heads of their respective agencies, and

to make recommendations "to promote economy, efficiency, and effectiveness" and "to prevent and detect fraud and abuse." *Id.* §402(b)(2)(A). Under the act, IGs are appointed by the President, with the advice and consent of the Senate. *Id.* §403(a).

48.    To ensure that IGs work in a scrupulously non-partisan manner, the IG Act requires that IGs be appointed "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U.S.C. §403(a). Historically, presidents have been guided by this requirement in choosing nominees to these positions, and the Senate has ensured fealty to it through the confirmation process.

49.    The IG Act also reflects Congress's judgment that IGs cannot provide effective oversight if they are unduly beholden to the agencies they investigate. The statute therefore provides that IGs do not report to and cannot be supervised by anyone at their agencies other than the agency head or "the officer next in rank below such head"—and even those officials exercise only "general supervision" over the IG. 5 U.S.C. §403(a). This statutory reference to "general supervision" has been interpreted as high-level guidance and not supervision of day-to-day operations or the work of IGs.[5] The IG Act further states that any IG's supervising official "shall [not] prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." 5 U.S.C. §403(a).

50.    The IG Act requires IGs to provide Congress as well as the agency heads semiannual reports "to keep [them] fully and currently informed … concerning fraud and other

---

[5] *See The Inspectors General,* CIGIE, at 4 (July 14, 2014), https://www.ignet.gov/sites/default/fil es/files/IG_Authorities_Paper_-_Final_6-11-14.pdf.

serious problems, abuses, and deficiencies," "to recommend corrective action concerning the problems, abuses and deficiencies, and to report on the progress made in implementing the corrective action." 5 U.S.C. §404(a)(5). The statute specifies categories of information these reports must include and requires IGs to provide the reports to their agency heads (and allow them to prepare a response) before the IG report and responsive agency report are transmitted to Congress 30 days later. *Id*. §404(b)-(c).

51. Apart from "recommend[ations] … for the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in, [their] programs and operations," IGs have no role in policymaking, 5 U.S.C. §404(a)(3)-(4), which is left entirely to elected officials and agency principals.

52. IG investigations may uncover criminal wrongdoing, but IGs do not prosecute violations of federal criminal law. Instead, each IG "shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C. §404(d). IG investigations frequently lead to prosecutions or actions under the False Claims Act or other statutes to redress injuries to the U.S. Treasury.

53. Access to information is vital to IGs' abilities to perform their audit and investigative functions. To that end, the IG Act empowers IGs to directly access the records and information of their agencies' programs and operations, to subpoena information and documents, to administer oaths when conducting interviews, and to receive and respond to whistleblower complaints. 5 U.S.C. §406(a).

54. IGs increase transparency and public awareness by issuing reports that inform the American people about the operations of their government. *See, e.g.*, 5 U.S.C. §420(a)-(b).

55.     IGs' work saves lives.  For example, during the first Trump administration, VA IG Michael Missal investigated reports of mysterious deaths at a VA medical center in West Virginia, identifying a nursing assistant who later pleaded guilty to multiple counts of murder.  During the Biden administration, HHS IG Christi Grimm investigated sub-standard care in nursing homes that resulted in costly medical injury, unsafe conditions, and abuse and neglect of residents—work that led to improvements in staffing levels, employee background checks, and mandatory reporting by nursing homes.

56.     IGs' work supports the national security of the United States.  For example, during the Biden administration, DoD IG Rob Storch investigated hospitalizations of Secretary of Defense Lloyd Austin, identifying multiple instances where notifications required by law were not made. This investigation led Storch to make recommendations to improve DoD's ability to carry out its critical national-security mission in situations where the secretary might be unavailable.  Likewise, in her work as USDA IG during the George W. Bush, Obama, first Trump, and Biden administrations, Phyllis Fong conducted oversight relating to the safety of the food supply and other food-security issues.

57.     IGs' work saves taxpayers billions of dollars from waste and fraud.  For instance, DOL IG Larry Turner, as part of his oversight of the unemployment-insurance fraud program, identified an estimated $191 billion that had been stolen from the pandemic funding Congress had authorized for DOL—an issue that garnered bipartisan interest during the first Trump and Biden administrations.  Similarly, SBA IG Mike Ware, who served in the first Trump and Biden administrations, returned over $30 billion to the Treasury in fraudulent loans and reported on $200 billion in potential fraud in pandemic relief programs.  Likewise, Cardell Richardson's work as State Department IG led to over $16.7 million in savings in a six-month period alone under the

Biden administration.  And as Education Department IG, Sandra Bruce obtained $680 million in taxpayer dollars across the first Trump and Biden administrations through her oversight and investigative work involving federal student-assistance programs.

58.    Congress has amended the IG Act several times since 1978, establishing IGs for additional federal agencies and enhancing IG effectiveness and empowerment.  *See* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515; Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302; Inspector General Empowerment Act of 2016, Pub. L. No. 114-317, 130 Stat. 1595.  Congress has also increased budget appropriations for OIGs over time, recognizing that funding audits and investigations into waste, fraud, and abuse produces an unparalleled return on investment.[6]  In 2023 alone, IGs' work results in savings of more than $90 billion in taxpayer dollars—meaning IGs generate approximately $26 in savings for every dollar invested in their offices.  *See* CIGIE, Annual Report to the President and Congress*: Fiscal Year 2023*, at 2 (Mar. 19, 2024).[7]

59.    In the Inspector General Reform Act of 2008, Congress amended the IG Act to require that the President provide 30 days' notice to Congress before terminating an IG and communicate the reasons for that IG's removal.

60.    As noted, in the last four decades, no incoming President has attempted upon taking office to remove *en masse* the IGs appointed in prior administrations.  (President Reagan fired 16

---

[6] *Compare A Progress Report to the President: Fiscal Year 2003*, CIGIE, at i (June 8, 2004), https://www.ignet.gov/sites/default/files/files/fy03apr.pdf , *and Annual Report to the President and Congress: Fiscal Year 2017*, CIGIE, at i (Jan. 3, 2019), https://www.ignet.gov/ sites/default/files/files/FY17_Annual_Report_to_the_President_and_Congress.pdf, *with Annual Report to the President and Congress: Fiscal Year 2023*, CIGIE, at 2 (Mar. 19, 2024), https://www.ignet.gov/sites/default/files/files/CIGIEAnnualReporttothePresidentFY2023_FINA L.pdf.

[7] https://www.ignet.gov/sites/default/files/files/CIGIEAnnualReporttothePresidentFY2023_FIN AL.pdf.

Inspectors General in 1981 but he reinstated five of them after strong bipartisan criticism that the firings politicized these critical non-political posts.  Clines, *Reagan Reappoints Five To Be Inspectors General*, N.Y. Times (Mar. 27, 1981).[8])  And until January 24, 2025, presidents have sought to remove a confirmed IG only a handful of times.  In each instance, the President—including President Trump in his first term—complied with the IG Act by notifying Congress in advance and articulating a case-specific basis for seeking removal.

61.    For example, in 2024, President Biden provided Congress with the required 30 days' notice that he was removing the IG for the Railroad Retirement Board, providing specific, case-related reasons.  This decision followed an independent investigation by the CIGIE Integrity Committee (one the IG attempted to obstruct) that uncovered misconduct by the IG in connection with specific matters.  *See* Letter from President Biden to Representative Rick Larsen (Mar. 29, 2024).[9]

62.    During his first administration, President Trump dismissed two confirmed IGs.  Rucker et al., *Trump Ramps Up Retaliatory Purge With Firing Of State Department Inspector General*, Wash. Post (May 16, 2020).[10]  He provided 30 days' notice to Congress as required by the IG Act but did not provide specific reasons (which was not yet required by statute), instead referring only generally to a loss of confidence.  *Id.*  Both dismissed IGs had handled issues that led to President Trump's first impeachment.  *Id.*  The removals drew bipartisan calls for President Trump to justify the decisions with specific reasons.  *Id.*

---

[8] https://timesmachine.nytimes.com/timesmachine/1981/03/27/057452.html?pageNumber=36.

[9] https://ble-t.org/wp-content/uploads/2024/04/Biden_removes_RRB_IG.pdf.

[10] https://www.washingtonpost.com/politics/trump-ramps-up-retaliatory-purge-with-firing-of-state-department-inspector-general/2020/05/16/8f8b55da-979a-11ea-82b4-c8db161ff6e5_story.html.

63.     Congress responded in 2022 by further amending the IG Act.  The Securing Inspector General Independence Act of 2022, *see supra* ¶6, enacted by overwhelming margins in both houses of Congress, procedural protections before an IG can be removed or placed on non-duty status, designated that a "first assistant" would automatically replace an IG in the event of a vacancy, and required the President to communicate reasons for not making a formal nomination to fill an IG vacancy after a certain period of time.

64.     The 2022 amendments also strengthened the procedural safeguards on removing an IG.  Prior to the amendments, the IG Act had required the President to provide 30 days' notice to both houses of Congress and "reasons for any such removal."  The 2022 amendments require the President to provide 30 days' notice to both houses of Congress, including appropriate congressional committees, and to "communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal."  5 U.S.C. §403(b).  With the 2022 amendments included, the relevant provisions now reads as follows:

> An Inspector General may be removed from office by the President.  If an Inspector General is removed from office or is transferred to another position or location within an establishment, the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons for any such removal or transfer to both Houses of Congress (including to the appropriate congressional committees), not later than 30 days before the removal or transfer.  Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal.

65.     These procedural provisions ensure that Congress or members of Congress can, if it or they deem it appropriate, seek to persuade the President not to go forward with a noticed removal.  Indeed, the legislative history of the Inspector General Reform Act indicates that Congress added the notice requirement to "allow for an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General."  *See* S. Rep. No. 110-262, at 4 (2008).

66.    The 2022 amendments also strengthened procedural safeguards for placing an IG on non-duty status. Before placing an IG on non-duty status, the amendments require the President to provide 15 days' notice to Congress and "communicate in writing the substantive rationale, including detailed and case-specific reasons." 5 U.S.C. §403(b)(2)(B). Only if the President "has made a determination that the continued presence of the Inspector General in the workplace poses a threat" as defined by statute, and provides "the substantive rationale, including detailed and case-specific reasons for the [threat] determination," can the President provide notice on the day the President places the IG on non-duty leave. *Id.* If the President seeks to remove an IG, he cannot place the IG on non-duty status during the 30-day period preceding the date of removal unless he "has made a determination that the continued presence of the Inspector General in the workplace poses a threat" as defined by statute, and provides a report specifying "the substantive rationale, including detailed and case-specific reasons for the [threat] determination," and other required information about the investigation supporting the determination. *Id.* §403(b)(2)(C). If the President satisfies those requirements, he may provide notice on the day he places the IG on non-duty leave. *Id.* The President may not place an IG on non-duty status without complying with one of these requirements. *Id.* §403(b)(2)(A).

67.    The 2022 amendments to the IG Act also require that if an IG vacancy arises, the "first assistant" automatically performs the IG's duties "temporarily in an acting capacity" for a specified time period. 5 U.S.C. §403(h)(2). The "first assistant" must have been serving in the IG office at the time the vacancy arose. *Id.* §403(h)(1). These requirements are intended to ensure continuity in the important work of the IG office and the integrity of any ongoing work.

68.    As noted, IGs are appointed with the advice and consent of the Senate. And underscoring the importance that Congress places on this legislative role, the 2022 amendments to

the IG Act provide that if the President does not nominate someone to fill an IG vacancy within 210 days of the date on which the vacancy occurred (or a nomination is rejected, withdrawn, or returned), the President must communicate "the reasons why the President has not yet made a formal nomination" and "a target date for making a formal nomination." 5 U.S.C. §3349e. The President must communicate the reasons and target date within 30 days after the end of the 210-day period and by June 1 of each year thereafter. *Id.*

69.    The Securing Inspector General Independence Act of 2022, *supra*, was passed by overwhelming margins in both houses of Congress and signed into law by President Biden.

**President Trump Purports To Remove Inspectors General *En Masse*, Without Giving Notice to Congress or Case-Specific Reasons**

70.    Plaintiffs have served honorably as IGs steadfast in their commitment to rooting out fraud, waste, and abuse in government in a non-partisan manner.

71.    The evening of Friday, January 24, 2025, each plaintiff received a substantively identical email from Sergio Gor, Director of Presidential Personnel, or Trent Morse, Deputy Director of Presidential Personnel, on behalf of President Trump. Each email had the subject line "White House Notification" or "WH Notification" and stated that each plaintiff was terminated as IG "effective immediately" due to "changing priorities."

72.    For example, USDA IG Phyllis Fong received the following email:

**From:**      Gor, Sergio N.
**Sent:**       Friday, January 24, 2025 7:37 PM
**To:**          FONG, PHYLLIS
**Subject:**   White House Notification

Dear Phyllis,

On behalf of President Donald J. Trump, I am writing to inform you that due to changing priorities your position as Inspector General of the United States Department of Agriculture is terminated, effective immediately.

Thank you for your service.

--
Sergio Gor
Director of Presidential Personnel
The White House

73.     No plaintiff has received any direct communication from President Trump regarding the purported removal.

74.     President Trump has not communicated to Congress his intention to remove the IGs at any time.  Nor has he communicated to Congress, in writing or otherwise, any substantive rationale for the removal of any IG—let alone the required detailed and case-specific reasons.  His only public explanation came during a press gaggle on January 25, 2024, when he stated, "I don't know them … but some people thought that some were unfair, some were not doing their job," and falsely asserted that "it's a very standard thing to do."  *Press Gaggle*, *supra* ¶8.  The President did not identify the "people" who supposedly "thought" these things, which IGs any such thoughts pertained to, or how the unidentified IGs supposedly "were not doing their job."

75.     President Trump has made no finding that any plaintiff "poses a threat" to the workplace, 5 U.S.C. §403(b)(2)(C).

76.     In the days after Gor's and Morse's emails, agency employees cut off each plaintiff's access to government systems, collected each one's assigned government equipment—computers, phones, and access badges—and arranged for plaintiffs to collect personal belongings from government buildings under supervision (where plaintiffs had not independently arranged for their personal belongings to be returned to them).

77.     USDA IG Phyllis Fong continued to work after receiving Gor's email, recognizing that her termination was not effective because it failed to comply with the IG Act's requirements.  On Monday, January 27, 2025, she returned to work as normal (i.e., as she had for over two decades), and conducted several meetings before USDA employees cut off her access to IT

systems, took possession of her computer and phone, and deactivated her badge.  After 23 years

of decorated service as USDA IG, she gathered her personal belongings and left the building.

**Bipartisan Concern In Congress Arises About Government Accountability**

78.     Members of both political parties in Congress have sounded the alarm about

defendants' unlawful effort to remove plaintiffs from their non-partisan positions.

79.     For example, Senate Judiciary Committee Chair Charles Grassley (R-Iowa) and

Ranking Member Richard Durbin (D-Ill.) jointly wrote to President Trump days after the purported

removals, stating that "Congress was not provided the legally required 30-day notice and case-

specific reasons for removal, as required by law" and "request[ing] that [President Trump] provide

that information immediately."[11]   The letter emphasized that this is "a matter of public and

congressional accountability and ensuring the public's confidence in the Inspector General

community," because "IGs are critical to rooting out waste, fraud, abuse, and misconduct within

Executive Branch bureaucracy."   Several members of Congress also wrote letters urging the

reinstatement of one or more of the plaintiffs.

80.     President Trump has not publicly responded to the bipartisan joint letter from the

Judiciary Committee.

**The Trump Administration's Purported Removal Of Plaintiffs Harms Them, Oversight Of
The Federal Government, And The American Public**

81.     IGs must be watchdogs, not lapdogs.  The deleterious consequences of the Trump

administration's contrary approach are hard to overstate

---

[11] Letter from Senators Grassley & Durbin to President Trump (Jan. 28, 2025),
https://www.grassley.senate.gov/imo/media/doc/grassley_durbin_to_djt_-_ig_removals.pdf.

82.    For starters, plaintiffs' purported removal harms them, as professionals who have devoted their lives and careers to public service and to the effective oversight of the federal government.

83.    Plaintiffs are harmed because defendants have prevented them from doing the important work that they have worked for decades to earn, been thoroughly vetted to perform, and been duly nominated and confirmed by presidents and Senate majorities to perform.

84.    Plaintiffs have experienced reputational and professional harm, the extent of which is still developing.  Plaintiffs have felt their professional connections strain and shrink since January 24.  Plaintiffs' integrity has been baselessly maligned publicly, with the abrupt and unlawful nature of their purported removals incorrectly implying that plaintiffs have done something wrong when in fact they have each done nothing but uphold the values of their positions and the IG community.

85.    Plaintiffs' purported removals have sent shockwaves and a massive chilling effect through the IG community.  IGs and Offices of Inspector General have been sent a message that non-partisanship and truth-telling will not be tolerated.  That message will have the effect of intimidating the OIG workforce and thus chill their critical work for the American people.

86.    The purported *en masse* removals, coupled with other actions of the new Trump administration, have left members of the IG community uncertain how to move forward with their work and undermines the importance and credibility of the work that IGs do on behalf of the American people.  Defendants' actions have inflicted substantial damage on the critical oversight ethos of transparency, truth-telling without fear or favor, and respect for the rule of law.

**CLAIMS FOR RELIEF**

<u>**Count I**</u>
**Violation of the Inspector General Act, 5 U.S.C. §403(b)**
**(By all plaintiffs against all Agency Defendants)**

87.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

88.    President Trump purported to remove each plaintiff from office on January 24, 2025, through an email sent to each plaintiff by the director of the Office of Presidential Personnel. These emails asserted that each plaintiff was removed, effective immediately.  President Trump has not communicated in writing to Congress any reason (case-specific or otherwise) for the removal of any plaintiff from his or her position as IG.  Nor has he articulated any case-specific (or other specific) reason for his actions.  Nor did he communicate in writing any finding that any plaintiff "poses a threat" to the workplace.  The purported removals thus did not comply with the IG Act's requirements, as set forth in 5 U.S.C. §403(b).  Accordingly, the purported removals of plaintiffs were not legally effective.

89.    In response to the emails purporting to terminate plaintiffs as IGs, Agency Defendants continue to act directly and indirectly to prevent plaintiffs from fulfilling their official duties.  Agency Defendants have done so even though representatives of Agency Defendants and President Trump were informed that, because the President had not complied with the IG Act, the removals were ineffective.

90.    For example, Agency Defendants, acting directly and through other employees of their agencies, cut off plaintiffs' access to their government-issued email accounts, their official files, and their computer networks.  Agency Defendants also deactivated plaintiffs' access to their agency buildings, and thereby physically prevented plaintiffs from entering their offices.  And Agency Defendants have acted to cease payment of plaintiffs for their work as IGs.  These actions were unlawful.

91.    Defendants' noncompliance with the IG Act and their actions in excess of statutory authority are reviewable under the APA and shall be set aside as unlawful.  5 U.S.C. §§702, 704, 706(2).

## Count II
### Common-Law Claim Against *Ultra Vires* Government Action
### (By all plaintiffs against all defendants)

92.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

93.    President Trump has acted *ultra vires* in purporting to remove plaintiffs as IGs.  The purported removals did not comply with the IG Act, *see* 5 U.S.C. §403(b), and thus were *ultra vires* and without legal force or effect.

94.    In response to the emails purporting to terminate plaintiffs as IGs, Agency Defendants, Agency Defendants proceeded *ultra vires* in continuing to act, directly and through agency personnel, to prevent plaintiffs from fulfilling their official duties and acted to cease payment of plaintiffs for their work as IGs.  Agency Defendants have done so despite plaintiffs having informed representatives of Agency Defendants and President Trump that their purported removals were ineffective because the President had not followed the IG Act's mandatory removal procedures.  All of this conduct was *ultra vires*.

## Count III
### Mandamus
### (By all plaintiffs against all defendants)

95.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

96.    The provisions of 28 U.S.C. §1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.  To the extent relief is unavailable under either the APA or a common-law equitable action to enjoin *ultra vires* government action, mandamus lies here.

97.     President Trump, through his subordinates, unlawfully purported to terminate plaintiffs by email without complying with the statutory requirements of 5 U.S.C. §403(b).  And Agency Defendants are effectuating that unlawful act by preventing plaintiffs from carrying out their official duties and acting to cease payment of plaintiffs for their work as IGs.

98.     Plaintiffs have a clear right to remain in office unless and until the statutory requirements for removal under 5 U.S.C. §403(b) have been satisfied.

99.     Because the purported removals were unlawful, defendants have a clear non-discretionary duty to treat plaintiffs as if the purported terminations had no legal effect.

100.     If no other remedy is available through which the purported terminations can be declared unlawful and of no legal effect, plaintiffs are entitled to a writ of mandamus compelling defendants not to obstruct plaintiffs in their exercise of their duties as IGs of their respective federal agencies.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter an order providing the following equitable relief:

A.     Declaring that the email purporting to immediately terminate plaintiffs without providing Congress 30 days' notice and substantial, case-specific reasons contravened the IG Act, 5 U.S.C. §403(b), and was therefore legally ineffective;

B.     Declaring that plaintiffs remain the lawful IGs of their respective agencies unless and until the President lawfully removes them in compliance with the statutory procedure set forth in 5 U.S.C. §403(b);

C.     Enjoining Agency Defendants from taking any further action to obstruct plaintiffs from carrying out their official duties as IGs;

D.    Awarding plaintiffs all back pay and benefits owed as a result of their unlawful

purported removal in violation of 5 U.S.C. §403(b); and

E.    Awarding all other equitable relief that the Court deems necessary and just.

February 12, 2025                                  Respectfully submitted,

                                                   /s/ Seth P. Waxman
_____

                                                   Seth P. Waxman (D.C. Bar No. 257337)
                                                   David W. Ogden (D.C. Bar No. 375951)
                                                   Daniel Volchok (D.C. Bar No. 497341)
                                                   Jamie Yood (D.C. Bar No. 1033919)[*]
                                                   Hillary Chutter-Ames (D.D.C. Bar ID
                                                       D00652)
                                                   Ann E. Himes (D.C. Bar No. 1767647)[†]
                                                   WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP
                                                   2100 Pennsylvania Avenue N.W.
                                                   Washington, D.C. 20037
                                                   (202) 663-6000
                                                   seth.waxman@wilmerhale.com
                                                   david.ogden@wilmerhale.com
                                                   daniel.volchok@wilmerhale.com
                                                   jamie.yood@wilmerhale.com
                                                   hillary.chutter-ames@wilmerhale.com
                                                   annie.himes@wilmerhale.com

                                                   Nicholas Werle[†]
                                                   WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP
                                                   7 World Trade Center
                                                   250 Greenwich Street
                                                   New York, New York 10007
                                                   (212) 230-8800
                                                   nick.werle@wilmerhale.com

                                                   [*]Court admission pending
                                                   [†]Pro hac vice applications forthcoming