IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT P. STORCH; ROBERT P. STORCH; MICHAEL MISSAL; CHRISTI A. GRIMM; CARDELL K. RICHARDSON, SR.; SANDRA D. BRUCE; PHYLLIS K. FONG; LARRY D. TURNER; HANNIBAL "MIKE" WARE;<br><br>      Plaintiffs,<br><br>    v.<br><br>PETE HEGSETH, *in his official capacity as Secretary of Defense;* DOUGLAS A. COLLINS, *in his official capacity as Secretary of Veterans Affairs;* ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of Health and Human Services;* MARCO RUBIO, *in his official capacity as Secretary of State;* DENISE L. CARTER, *in her official capacity as Acting Secretary of Education;* GARY WASHINGTON, *in his official capacity as Acting Secretary of Agriculture;* VINCENT MICONE, *in his official capacity as Acting Secretary of Labor;* EVERETT M. WOODEL, JR., *in his official capacity as Acting Administrator of the Small Business Administration;* DONALD J. TRUMP, *in his official capacity as President of the United States;*<br><br>      Defendants. | Civil Case No. 1:25-cv-00415-ACR |

**MEMORANDUM OF MEMBERS OF THE SENATE
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTERESTS OF *AMICI CURIAE* ............................................................................................... 1

INTRODUCTION .......................................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

I. THE ROLE OF AN INSPECTOR GENERAL IS TO ENSURE THE *FAITHFUL* EXECUTION OF LAWS PASSED BY CONGRESS BY EXECUTIVE BRANCH OFFICIALS ......................................................................................................... 3

II. THE REMOVAL NOTICE PROVISION REQUIRES CONSULTATION WITH CONGRESS BEFORE REMOVAL ....................................................................................... 6

III. NOTHING IN ARTICLE II PRECLUDES CONGRESS FROM CONDITIONING THE REMOVAL OF AN INSPECTOR GENERAL ON NOTICE THAT ENABLES INTER-BRANCH CONSULTATION ..................................................................................... 7

IV. THE REMOVAL OF AN INSPECTOR GENERAL WITHOUT STATUTORY NOTICE TO CONGRESS IS A LEGAL NULLITY ............................................................. 11

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**CASES**

*Bowsher v. Synar*,
   478 U.S. 714 (1986) .......................................................................................................... 9

*Comm. on the Judiciary, U.S. House of Representatives v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020) .......................................................................................... 8

*NASA v. FLRA*,
   527 U.S. 229 (1999) .......................................................................................................... 5

*Seila Law LLC v. Consumer Financial Protection Bureau*,
   591 U.S. 197 (2020) ...................................................................................................... 7, 9

*Trump v. Mazars LLP*,
   591 U.S. 848 (2020) ...................................................................................................... 8, 9

*Walpin v. Corp. for Nat. and Community Service*,
   630 F.3d 184 (D.C. Cir. 2011) ............................................................................... 7, 10, 11

**STATUTES**

5 U.S.C. § 403 .................................................................................................................... 7, 11

**OTHER AUTHORITIES**

Andrew Kent, et al.,
   *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019) .............................. 3

BEN WILHELM,
CONG. RSCH. SERV., IF11546, REMOVAL OF INSPECTORS GENERAL: RULES,
   PRACTICE, AND CONSIDERATIONS FOR CONGRESS (2025) ............................................. 7

Fernando LaGuarda,
   *Challenges to the Independence of Inspectors General in Robust Congressional
   Oversight*, 19 Geo. J. of Law & Pub. Policy 211 (2021) ........................................... 8, 9

Press Release, Office of U.S. Senator Chuck Grassley, Senators: Report Confirms
   Financial Incentives of Physician Owned Distributorships Leads to Increased
   Surgeries (Oct. 24, 2013) .................................................................................................. 6

Press Release, U.S. Senate Committee on the Judiciary, Grassley, Durbin Seek
   Presidential Explanation for IG Dismissals (Jan. 28, 2025) ........................................ 7

Pub. L. 95–452, § 2, 92 Stat. 1101 (1978) ................................................................................ 4

*Safeguarding Inspector General Independence and Integrity:*
  *Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*,
  117th Cong. (2021) .................................................................................................... 5, 6

S. Rep. No. 95–1071 (1978) ................................................................................................ 5

S. Rep. No. 110–262 (2008) ........................................................................................ 2, 6, 10

Sarah Vogelsong,
  *Virginia members of Congress ask for investigation into site pick for new
  FBI headquarters*, Virginia Mercury, (Nov. 15, 2023, 7:57 PM) ........................................... 6

Todd Karp,
Cong. Rsch. Serv., R46762, Congress's Authority to Limit the Removal of
  Inspectors General (2021) ..................................................................................... 5, 7

U.S. Const. Art. II ................................................................................................... 2, 3, 7

**RULES**

D.D.C. Rule 7(o) .............................................................................................................. 1

*Safeguarding Inspector General Independence and Integrity:*
  *Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*,
  117th Cong. (2021) .................................................................................................... 5, 6

S. Rep. No. 95–1071 (1978) ................................................................................................ 5

S. Rep. No. 110–262 (2008) ........................................................................................ 2, 6, 10

Sarah Vogelsong,
  *Virginia members of Congress ask for investigation into site pick for new
  FBI headquarters*, Virginia Mercury, (Nov. 15, 2023, 7:57 PM) ........................................... 6

Todd Karp,
Cong. Rsch. Serv., R46762, Congress's Authority to Limit the Removal of
  Inspectors General (2021) ..................................................................................... 5, 7

U.S. Const. Art. II ................................................................................................... 2, 3, 7

**RULES**

D.D.C. Rule 7(o) .............................................................................................................. 1

**INTERESTS OF *AMICI CURIAE***

*Amici curiae* are United States Senators Charles Schumer of New York, Tim Kaine of Virginia, Chris Coons of Delaware, Michael Bennet of Colorado, Peter Welch of Vermont, Adam Schiff of California, Ben Ray Lujan of New Mexico, Richard Blumenthal of Connecticut, Chris Van Hollen of Maryland, Tammy Duckworth of Illinois, Maggie Hassan of New Hampshire, Catherine Cortez Masto of Nevada, Martin Heinrich of New Mexico, Brian Schatz of Hawai'i, Jean Shaheen of New Hampshire, Sheldon Whitehouse of Rhode Island, Ruben Gallego of Arizona, Elissa Slotkin of Michigan, Elizabeth Warren of Massachusetts, Kirsten E. Gillibrand of New York, Mark Kelly of Arizona, Mazie Hirono of Hawai'i, Amy Klobuchar of Minnesota, Maria Cantwell of Washington, Jack Reed of Rhode Island, Cory Booker of New Jersey, Jacky Rosen of Nevada, Gary Peters of Michigan, and Richard Durbin of Illinois.[1]

*Amici* serve on Senate committees with jurisdiction over the agencies to which one or more of the Plaintiff Inspectors General are assigned. All members of the Senate, and particularly those serving on the relevant committees, have a statutory right to receive notice from the President of his reasons for removing an Inspector General prior to removal. Moreover, the Senate provided its advice and consent to appointment of each of the Inspectors General after concluding that they met the statutory qualifications for a non-partisan position. *Amici* therefore have an interest in this litigation to enforce the statutory notice requirement which provides Congress an opportunity to address the implications of removal of an Inspector General for its constitutional duty of oversight.

---

[1]  Pursuant to Local Rule 7(o)(5), *amici curiae* state that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or other person, other than *amici* or its counsel, contributed money that was intended to fund preparing or submitting this brief.

**INTRODUCTION**

Inspectors General ("IGs") are responsible for uncovering and preventing waste, fraud, and abuse in the administration of federal programs. Their investigations, reports, and audits are crucial tools in uncovering corruption and mismanagement in the executive branch, and IGs are vital to fulfilling Congress' constitutional oversight responsibilities. For those reasons, Congress requires the President by law to provide notice to Congress, and thus an opportunity for inter-branch consultation, *before* removing an Inspector General from his position.

Nothing in the Supreme Court's recent Article II jurisprudence casts doubt on the constitutionality of the notice requirement. *First*, unlike executive branch officials who are responsible for developing or executing presidential policy choices, and who must be accountable to the President, IGs are responsible for ensuring that the executive branch *faithfully* executes the laws passed by Congress. Requiring congressional notice before removal of any IG ensures a degree of independence necessary to carry out an IG's mission.

*Second*, the procedural requirement for mandatory pre-removal notice does not unduly infringe on the implied presidential power to remove an official he has the power to appoint. Notice allows Congress to weigh in on the removal of an officer tasked with monitoring corruption and fraud in the executive branch, in accordance with Congress' oversight responsibilities. It triggers "an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General," S. Rep. No. 110–262, at 4 (2008). The notice requirement also ensures that the President is politically accountable for any decision—like removing an IG—that jeopardizes congressional oversight and good governance. Consultation between the branches is the historic and appropriate way to resolve conflicts between Congress' need for information to conduct oversight and the

prerogatives of the executive branch. Requiring notice is hardly the same as imposing a statutory bar to removal.

Removals of IGs without prior notice to Congress are legally ineffective. IGs who were removed without an explanation to Congress and without providing Congress an opportunity to weigh in on the stated reasons for removal must be reinstated.

## ARGUMENT

### I. THE ROLE OF AN INSPECTOR GENERAL IS TO ENSURE THE *FAITHFUL* EXECUTION OF LAWS PASSED BY CONGRESS BY EXECUTIVE BRANCH OFFICIALS.

Article II of the Constitution invests the President with the power and duty to "take care that the laws be faithfully executed," Art. II, § 3, and the President takes an oath to "faithfully execute the office." Art. II, § 1. That duty of faithful execution extends to all subordinate officials of the executive branch and requires them to adhere to the laws enacted by Congress, even if those laws conflict with the preferences or self-interest of the official, or the policy choices of the President.[2]

Inspectors general play no role in carrying out presidential policies or exercising discretion consistent with executive policy. While it would be an overstatement to say that IGs have absolutely no administrative or policymaking functions, those functions are limited to the administration of the OIG itself.

---

[2] A recent law review article investigating the origins of the "faithful execution" provisions of Article II concluded that both the oath and the "take care" clause imposed fiduciary-like limits on executive power.

> Our first finding, consistent with usage reported in contemporaneous dictionaries, is that faithful execution was repeatedly associated in statutes and other legal documents with true, honest, diligent, due, skillful, careful, good faith, and impartial execution of law or office. Second, the faithful execution duty was often imposed to prevent officeholders from misappropriating profits that the discretion inherent in their offices might afford them. Third, the duty was imposed because of a concern that officers might act ultra vires; the duty of faithful execution helped the officeholder internalize the obligation to obey the law, instrument, instruction, charter, or authorization that created the officer's power.

Andrew Kent, et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2118 (2019).

Congress passed the 1978 Inspector General Act ("IGA") "to create *independent* and objective units:

>   (1) to conduct and supervise audits * * *;
>
>   (2) to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations; and
>
>   (3) to provide a means for keeping the head of the establishment and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action."

Pub. L. 95–452, § 2, 92 Stat. 1101 (1978) (emphasis added). Congress required that Inspector General audits "comply with standards established by the Comptroller General," a legislative branch official. *Id.* § 4(b)(1)(A).

Congress also specified that Inspectors General be appointed "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." *Id.* § 3. The duties of Inspectors General include semi-annual reports to the agency head for transmission to Congress, and more generally to keep Congress and the agency head fully informed of any fraud, abuse, or other serious problems and deficiencies related to the federal administration of programs. IGs also serve to recommend corrective action, when necessary, to address waste, fraud, and abuse, and to report on the progress of such corrective measures. *Id.* §§ 4–5. The function of the offices Congress created in the IGA is to hold other executive branch personnel to the faithful

4

execution of the laws passed by Congress in accord with congressional standards and to report as necessary to Congress on their compliance with that constitutional duty.[3] To put it simply, IGs are watchdogs whose job is to protect programs and laws enacted by Congress.

Although each IG is part of the executive branch and under the general authority of the agency head, "Congress certainly intended that the various OIG's would enjoy a great deal of autonomy." *NASA v. FLRA*, 527 U.S. 229, 240 (1999); *id.* at 254-57 (Thomas, J., dissenting) (describing the extent of IG independence); *see also* S. Rep. No. 95–1071, at 7 (1978) (describing the IG as "an individual whose independence is clear and whose responsibility runs directly to the agency head and ultimately to the Congress.").

Senator Rob Portman, then the ranking minority member of the Homeland Security and Governmental Affairs Committee, described the IGs as "Congress' first line of defense against waste, fraud, and abuse" at the agencies, whose work is vital to congressional oversight. *Safeguarding Inspector General Independence and Integrity: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*, 117th Cong. 3 (2021) (opening statement of Sen. Portman). Importantly, the work of IGs has consistently resulted in greater program efficiency and improvements, with potential savings of $53 billion in 2020 alone. *Id.* at 45 (statement of Allison Lerner, Chairperson, Council of the Inspectors General on Integrity and Efficiency). For decades, it has been routine for members of Congress from both parties to relay questions and

---

[3] TODD KARP, CONG. RSCH. SERV., R46762, CONGRESS'S AUTHORITY TO LIMIT THE REMOVAL OF INSPECTORS GENERAL 3 (2021) ("The overriding purpose of the IG office is to promote "economy, efficiency, and effectiveness" in agency operations, mainly by rooting out waste, fraud, and abuse. Each IG is charged with the obligation of keeping both the head of the agency and Congress "fully and currently informed about problems and deficiencies" that may require "corrective action."").

concerns about the workings of executive branch agencies to the IG for investigation and reports, in furtherance of congressional oversight.[4]

## II. THE REMOVAL NOTICE PROVISION REQUIRES CONSULTATION WITH CONGRESS BEFORE REMOVAL.

In 2008, Congress amended the IGA to require the President to give 30-day notice to Congress before removing an IG, to "allow for an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General." S. Rep. No. 110–262, at 4 (2008). Dissatisfied with removals by Presidents Obama and Trump based on an unspecified "loss of confidence" in various IGs, Congress again amended the IGA in 2022 to require the President to provide "a substantive rationale" for removing an IG, to provide "much-needed protections for Inspector General independence." *Safeguarding Inspector General Independence and Integrity: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*, 117th Cong. 3–4 (2021) (opening statement of Sen. Portman). "The 30-day notice period and the provisions that we want to include within that are so that there is some rationale that Congress and the American people can understand is really important." *Id.* at 12. As the January 28, 2025 letter from Senators Grassley and Durbin to President Trump protesting removals of IGs states: "The communication to Congress must contain more than just broad and vague statements, rather it must include sufficient

---

[4] For example, members of the Virginia congressional delegation from both parties requested an investigation into GSA's decision to locate the new FBI headquarters in Maryland. Sarah Vogelsong, *Virginia members of Congress ask for investigation into site pick for new FBI headquarters*, Virginia Mercury, (Nov. 15, 2023, 7:57 PM), https://virginiamercury.com/2023/11/15/virginia-members-of-congress-ask-for-investigation-into-site-pick-for-new-fbi-headquarters/.

Another example is when Senators Hatch, Baucus, and Grassley requested a report on spinal fusion surgery from the HHS OIG. Press Release, Office of U.S. Senator Chuck Grassley, Senators: Report Confirms Financial Incentives of Physician Owned Distributorships Leads to Increased Surgeries (Oct. 24, 2013) (https://www.grassley.senate.gov/news/news-releases/senators-report-confirms-financial-incentives-physician-owned-distributorships).

facts and details to assure Congress and the public that the termination is due to real concern about the Inspector General's ability to carry out their mission." Dkt. 14, Waxman Decl., Exh. B.[5]

The mandatory notice provision does not strip the President of his ultimate authority to remove an IG or substantively limit the President's grounds for removal, but it does require the President to first consult with Congress, and to articulate a substantive justification for removal.[6] "Congress intended that the thirty-day notice requirement provide an opportunity for a more expansive discussion of the President's reasons for removing an inspector general." *Walpin v. Corp. for Nat. and Community Service*, 630 F.3d 184, 188 (D.C. Cir. 2011). "[I]f Congress believes an IG removal to be unwarranted, the provision gives Congress a 30-day period to dissuade the President or a DFE head—through the use of Congress's legislative powers and other levers of influence—from taking the announced course of action." TODD KARP, CONG. RSCH. SERV., R46762, CONGRESS'S AUTHORITY TO LIMIT THE REMOVAL OF INSPECTORS GENERAL 6 (2021). Members of Congress have questioned the removal of IGs in the past, sometimes resulting in their reinstatement. *See* BEN WILHELM, CONG. RSCH. SERV., IF11546, REMOVAL OF INSPECTORS GENERAL: RULES, PRACTICE, AND CONSIDERATIONS FOR CONGRESS (2025).

### III. NOTHING IN ARTICLE II PRECLUDES CONGRESS FROM CONDITIONING THE REMOVAL OF AN INSPECTOR GENERAL ON NOTICE THAT ENABLES INTER-BRANCH CONSULTATION.

As amended in 2022, 5 U.S.C. § 403(b) requires consultation with Congress concerning the President's reasons for dissatisfaction with an IG prior to removal. The President's Article II powers do not invalidate that pre-removal notice requirement. Congress is a co-equal branch of

---

[5] Press Release, U.S. Senate Committee on the Judiciary, Grassley, Durbin Seek Presidential Explanation for IG Dismissals (Jan. 28, 2025) (https://www.judiciary.senate.gov/press/rep/releases/grassley-durbin-seek-presidential-explanation-for-ig-dismissals).

[6] *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 221 n. 5 (2020) (removal provision that requires the President to "communicate" his "reasons" for removing the Comptroller of the Currency" did not prevent the President from removing "the Comptroller for any reason.").

7

government, which creates the offices to which the President and others make appointments. Congress is the source of the laws the President pledges to faithfully execute, and it has constitutional responsibility for oversight of the executive branch, including through investigations, reports and audits by IGs. "[E]ach House has power 'to secure needed information' in order to legislate. *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927. This 'power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.' *Id*. at 174. Without this information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.' *Id.* at 175. The congressional power to obtain information is 'broad' and 'indispensable.' *Watkins v. United States*, 354 U.S. 178, 187, 215 (1957)." *Trump v. Mazars, LLP*, 591 U.S. 848, 862 (2020); *see also Comm. on the Judiciary, U.S. House of Representatives v. McGahn,* 968 F.3d 755, 760 (D.C. Cir. 2020) (en banc) ("The Constitution charges Congress with certain responsibilities, including . . . to conduct oversight of the federal government, . . . ."). The notice and consultation requirements of the IGA appropriately accommodate the prerogatives of both branches.

The IGA is "the most important mechanism for Congress to obtain information and oversight analysis from inside the government on a regular basis." Fernando LaGuarda, *Challenges to the Independence of Inspectors General in Robust Congressional Oversight*, 19 Geo. J. of Law & Pub. Policy 211, 219 (2021). And there is wide bipartisan agreement on the importance of Inspectors General to effective congressional oversight. The current Chairman of the Senate Committee on the Judiciary, Senator Grassley (R-IA), has argued that Congress "cannot perform [its] constitutional mandate of oversight without [inspectors general]." *Id.* at 224. The former Chairman of the House Committee on Oversight and Reform, Rep. Chaffetz (R-UT), agreed that "[i]f [inspectors general] can't do their job, [Congress] can't do [its] job." *Id.* The

8

former Chairman of the Senate Committee on Homeland Security and Governmental Affairs, Senator Johnson (R-WI), has described Inspectors General as Congress's "best partner[s] in rooting out waste, fraud, and abuse." *Id.*

Consultation with Congress about the effect of removal on its oversight function does not impinge on the President's authority to make policy. To the contrary, it enhances the President's political accountability for the actions of the executive branch, giving the public insight into any decision to remove an official who performs such a vital oversight function. The Supreme Court did not regard a similar requirement that the President "'communicate[]' his 'reasons' for terminating the Comptroller [of the Currency] to the Senate" as a constitutionally suspect removal restriction in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 221 n.5 (2020). To be sure, "Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment. To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). But requiring the President to offer a substantive reason for removing an IG does not give Congress control over the executive. The ultimate decision to remove still lies with the President. The notice requirement simply serves to inform Congress—and the public—about the reasons for removing such an official. After all, it is Inspectors General whose job it is to investigate fraud, abuse, and corruption in the government and to report these findings to Congress and the American public. And requiring the President to consider Congress' concerns about any proposed removal is not akin to giving Congress a veto over it. In fact, this requirement aligns with the long "tradition of negotiation and compromise" described in *Trump v. Mazars LLP*, 591 U.S. 848, 861 (2020), in

9

resolving disputes between the executive and legislative branches arising from congressional oversight.

IGs do not make or implement presidential policy, so giving Congress an opportunity to be heard on the removal of an IG does not weaken the President's control over policy. Moreover, the statutory requirement that the IG be chosen without regard to party affiliation means that IGs are seen as reliable and politically independent sources of information about the workings of the executive branch. IGs are, by design and by law, not partisan political appointees who the President must be able to dispose of at will, lest their faults be attributed to the President. Requiring the President to provide reasons for removing an IG enhances his political accountability because it allows the public to weigh the merits of a removal over congressional objection.

In *Walpin*, the D.C. Circuit denied mandamus relief to an Inspector General who claimed he had been removed without proper notice. But the Court based its decision on compliance with the IGA, not its unconstitutionality. The facts of *Walpin* illustrate how the notice provision is meant to trigger consultation between the branches before a removal can be effective. Unlike the Plaintiff IGs in this case who were removed immediately and without any notice or justification, the plaintiff in *Walpin* was placed on administrative leave. He wasn't removed from office until more than thirty days afterward. 630 F.3d at 187. And while the original removal notice was inadequate, "Congress intended that the thirty-day notice requirement provide an opportunity for a more expansive discussion of the President's reasons for removing an inspector general." *See* S. Rep. No. 110–262, at 4 (2008) (notice provision added to "allow for an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General").

An expanded inter-branch consultation is precisely what occurred in *Walpin*. The President's notice to Congress triggered discussion as intended. In response to a letter from Senator Grassley—similar to the one he and Senator Durbin wrote to the President in this case—and inquiries from other Senators, President Obama's staff provided additional detail supporting his decision to remove the IG. 630 F.3d at 186 n.1. *Walpin* illustrates how IG removal is supposed to work, and why requiring the President to notify Congress of the reasons for removing an IG does not intrude on the President's Article II responsibilities.

## IV.  THE REMOVAL OF AN INSPECTOR GENERAL WITHOUT STATUTORY NOTICE TO CONGRESS IS A LEGAL NULLITY.

An Inspector General cannot be lawfully removed without notice to Congress and a thirty-day period of inter-branch consultation.[7] Unlike the situation in *Walpin*, the President did not provide any notice to Congress before removing Plaintiffs, and the President has not responded to Senators Grassley and Durbin's January 28 letter demanding compliance with the section 3(b) of the IGA. By the plain terms of the Act, the President has not yet exercised his statutory removal power, and the thirty-day clock has not begun to run. Accordingly, the Plaintiff Inspectors General are entitled to reinstatement unless and until the President provides sufficient notice and Congress has a thirty-day period to consult with the executive branch about the grounds for removal.

Only immediate reinstatement will avoid irreparable injury to Congress and will protect the vital public interest that Inspectors General serve.

---

[7]  Section 403(b) of the IGA now provides:

> An Inspector General may be removed from office by the President. If an Inspector General is removed from office or is transferred to another position or location within an establishment, the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons for any such removal or transfer to both Houses of Congress (including the appropriate congressional committees), not later than 30 days before the removal or transfer. Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal.

## CONCLUSION

The Plaintiff Inspectors Generals should be reinstated to their respective offices immediately.

February 18, 2025                               Respectfully submitted,

/s/ Aitan Goelman
Aitan Goelman (D.C. Bar No. 446636)
William W. Taylor, III (D.C. Bar No. 84194)*
David Reiser (D.C. Bar No. 367177)*
Tyler Swafford (D.C. Bar No. 1779639)
**ZUCKERMAN SPAEDER LLP**
1800 M St. NW, Suite 1000
Washington, D.C. 20036
(202) 778-1810
agoelman@zuckerman.com
wtaylor@zuckerman.com
dreiser@zuckerman.com
tswafford@zuckerman.com

*Attorneys for Amici Curiae*

*Renewal pending

**CERTIFICATE OF SERVICE**

  I hereby certify that on February 18, 2025, a true and accurate copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

                 /s/ Tyler Swafford
                 Tyler Swafford