**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROBERT P. STORCH, *et al.*, | |
| *Plaintiffs*, | No. 1:25-cv-00415 |
| v. | |
| PETE HEGSETH, *et al.*, | Judge Ana C. Reyes |
| *Defendants*. | |

**BRIEF OF *AMICUS CURIAE* HON. ERIC J. SOSKIN,
FORMER INSPECTOR GENERAL OF THE DEPARTMENT OF TRANSPORTATION,
IN SUPPORT OF DEFENDANTS**

**TABLE OF CONTENTS**

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...................................................... 1

I.    Under Article II, At-Will Removal Is the Overwhelming Default Rule. ........................... 4

II.   The Narrow Exceptions to the Removal Power Do Not Apply Here. ............................. 6

  A.  An IG Is Not a Multi-Member, Balanced, Expert Commission Under *Humphrey's Executor*. ................................................................................................. 7

  B.  IGs Are Principal Officers and Exercise Broad Executive Powers. ............................... 7

  1. Statutory Structure Demonstrates That IGs Are Principal Officers ................................ 8

  2. IGs Do Not Function as "Inferior Officers" in Their Exercise of Authority .................... 9

  3. IGs Exercise Broad Executive Powers and Do Not Have "Narrowly Defined Duties" ..12

  4. IGs Are Not Employees .......................................................................................16

III.  The Thirty-Day-Notice Statute Does Not Change the Analysis. ................................... 17

IV.   Plaintiffs' Equitable Relief Would Be Improper and Ineffective. ................................. 20

CONCLUSION ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Collins v. Yellen*,
   594 U.S. 220 (2021)................................................................6, 18, 19

*Comm.on Oversight and Gov't Reform v. Sessions*,
   156 F. Supp. 3d 101 (D.D.C. 2016) ...............................................1

*Edmond v. United States*,
   520 U.S. 651 (1997)......................................................................8

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)....................................................................20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   537 F.3d 667 (D.C. Cir. 2008) ......................................................7

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)............................................................4, 5, 22

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)....................................................................21

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935)....................................................................20

*INS v. Chadha*,
   462 U.S. 919 (1983)......................................................................5

*Lucia v. SEC*,
   585 U.S. 237 (2018)....................................................................16

*Mississippi v. Johnson*,
   71 U.S. 475 (1866)......................................................................20

*Myers v. United States*,
   272 U.S. 52 (1926)............................................................5, 7, 20

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017)......................................................................9

*PHH Corp. v. CFPB*,
   881 F.3d 75 (D.C. Cir. 2018) ........................................................5

*In re Sawyer*,
   124 U.S. 200 (1888)....................................................................21

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)..........................................5, 6, 7, 8, 12, 15, 16, 18

*Trump v. United States*,
   603 U.S. 593 (2024)..........................................................6, 12, 15, 22

*U.S. Nuclear Regul. Comm'n v. Fed. Lab. Rels. Auth.*,
   25 F.3d 229 (4th Cir. 1994) ....................................................3, 16

*United States v. Art Metal-U.S.A., Inc.*,
   484 F. Supp. 884 (D.N.J. 1980) ................................................14

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ............................................................................................8

*Wiener v. United States*,
  357 U.S. 349 (1958) .......................................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1958) .......................................................................................15

**Constitution and Statutes**

U.S. Const. art. II, § 1, cl. 1 .............................................................................4

U.S. Const. art. II, § 3 .......................................................................................4

5 U.S.C. § 403 ......................................................................................8, 17, 18

5 U.S.C. § 403(a) ....................................................................................8, 9, 11

5 U.S.C. § 403(b) .........................................................................................8, 17

5 U.S.C. § 404(a) ..................................................................................9, 13, 14

5 U.S.C. § 406(1) ..............................................................................................13

5 U.S.C. § 406(f) ..............................................................................................15

5 U.S.C. § 406(g) ..............................................................................................11

5 U.S.C. § 408 ..................................................................................................13

5 U.S.C. § 420 ..................................................................................................16

5 U.S.C. § 6329b ..............................................................................................18

7 U.S.C. § 2270 ................................................................................................15

31 U.S.C. § 1105 ..............................................................................................11

42 U.S.C. § 2000e-5 .........................................................................................21

49 U.S.C. § 354 ................................................................................................14

An Act to Regulate the Time and Manner of Administering Certain Oaths, Pub. L.
  No. 1-1, 1 Stat. 23 (1789) ................................................................................2

Pub. L. No. 108-447, 118 Stat. 2809 (2004) ....................................................2

Pub. L. No. 117-286, 136 Stat. 4196 (2022) ..................................................16

**Other Authorities**

*Appointment and Removal of Federal Reserve Bank Members of the Federal
  Open Market Committee*,
  43 Op. O.L.C. 263 (2019) .........................................................................8, 20

CIGIE, *CIGIE Legislative Priorities for the 118th Congress* (Feb. 22, 2023),
  https://www.ignet.gov/sites/default/files/files/
  CIGIELegislativePriorities118thCongress.pdf ..............................................11

CIGIE, *Frequently Asked Questions: Are IGs Independent?*,
  https://www.ignet.gov/content/frequently-asked-questions ...........................10

CIGIE, *The Inspectors General* (July 14, 2014), https://www.ignet.gov/sites/
  default/files/files/IG_Authorities_Paper_-_Final_6-11-14.pdf; .................16, 17

CIGIE, *Presidential Transition Handbook: The Role of Inspectors General and the Transition to a New Administration* (Nov. 2024) (CIGIE Transition Handbook), https://www.ignet.gov/sites/default/files/CIGIE Presidential Transition Handbook - 2024.pdf ............................................................ 9

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 29, 2025) ........................................................................ 10

HHS OIG, *Fall 2024 Semiannual Report to Congress* (2024), https://oig.hhs.gov/documents/sar/10084/Fall_2024_SAR_508.pdf ..................... 14

HHS OIG, *FY 2025 Justification of Estimates for Congress* (2024), https://oig.hhs.gov/documents/budget/9814/FY%202025%20OIG%20Budget.pdf ........................................................................................................ 15

HHS OIG, *Spring 2024 Semiannual Report to Congress* (2024), https://oig.hhs.gov/documents/sar/9905/Spring_2024_SAR.pdf .......................... 14

*Inspector Gen. Legis.*, 1 Op. O.L.C. 16 (1977) ........................................................................................ 19

Jacob Knutson, *Ex-Trump Official Says DOJ Investigating Him Over Potential Felony Violations*, Axios (Sept. 15, 2022), https://www.axios.com/2022/09/15/trump-doj-jeffrey-clark-phone-federal-probe ................................................. 15

Letter from William P. Barr, Acting Deputy Att'y Gen., to William M. Diefenderfer, Deputy Dir., OMB (July 17, 1990) ............................................... 14

Memorandum of January 20, 2025, *Return to In-Person Work*, 90 Fed. Reg. 8251 (Jan. 28, 2025) ...................................................................................................... 10

*Nominal*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/nominal ..................................................................... 9

Testimony of IG Mark Lee Greenblatt, *Hearing Before the Subcomm. on Gov't Operations & the Fed. Workforce of the H. Comm. on Oversight & Accountability: Oversight of the Council of the Inspectors General on Integrity and Efficiency*, 118th Cong. (July 23, 2024), https://oversight.house.gov/wp-content/uploads/2024/07/Greenblatt-Testimony.pdf .......................................................................................................... 11

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

In 2020, *amicus curiae* the Hon. Eric J. Soskin was nominated by President Trump, and confirmed by the United States Senate, to be the 7th Inspector General (IG) of the United States Department of Transportation (DOT). This followed the voluntary retirement of IG Soskin's predecessor several months earlier. From 2006 to 2020, Mr. Soskin held civil service positions in the Department of Justice, including "Trial Attorney," "Senior Counsel," "Senior Trial Counsel," and "Counsel to the Assistant Attorney General." Mr. Soskin's legal specialties while at DOJ included constitutional law, administrative law, and national security law, and he represented Presidents of both parties, Cabinet officials, and Executive Branch and Legislative Branch agencies in litigation in federal district court.

As a longtime practicing constitutional lawyer, IG Soskin takes a particular interest in the proper interpretation of the United States Constitution, including with respect to the separation of powers prescribed in the Constitution's text. During his nomination, IG Soskin became particularly attuned to specific constitutional issues related to IGs after considering the responsibilities of the position in which he sought to serve, public discussions around the President's ability to exercise the authority to determine an "acting Inspector General" in a time of vacancy, and his review of this Court's opinion in *Committee on Oversight and Government Reform v. Sessions*, 156 F. Supp. 3d 101 (D.D.C. 2016) (assessing whether disclosure of material subject to executive privilege to an Office of IG constitutes waiver of such privilege).

As a sworn principal officer of the United States during his tenure as Inspector General, IG Soskin repeatedly sought to advance this interest by educating other IGs, others in the DOT

---

[1] The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amicus* contributed money that was intended to fund preparing or submitting this brief.

Office of Inspector General (OIG), and members of the public at large about the Constitution. For example, during his tenure, IG Soskin personally administered the oath of office required by Article VI, clause 3 of the Constitution to nearly every new employee who started at OIG. In doing so, he took care to educate each oath-taker about the meaning of the oath and its history, including its origin in the Constitution and the very first Public Law after ratification, An Act to Regulate the Time and Manner of Administering Certain Oaths, Pub. L. No. 1-1, 1 Stat. 23 (1789). In addition, IG Soskin regularly educated the staff of the DOT OIG on matters relating to American history and the Constitution, including, but not limited to, personally carrying out the requirement in Pub. L. No. 108-447, 118 Stat. 2809 (2004), for agency-wide training on the Constitution each September 17 (Constitution Day), *id.* div. J, tit. 1, § 111, 118 Stat. at 3344. Building on this, in 2024, IG Soskin developed, introduced, and taught a training program for all federal law enforcement officers at DOT OIG (and numerous associated personnel) on the origins and meaning of provisions of the First Amendment, Second Amendment, and Fourth Amendment of the Bill of Rights.

IG Soskin's efforts to uphold the Constitution in its correct interpretation extended to his engagement with the Plaintiffs in this action through the Council of Inspectors General for Integrity and Efficiency (CIGIE). CIGIE is the government agency responsible for providing training to personnel serving in various OIGs, coordinating among OIGs, and, increasingly, carrying out other activities under the direction of a Chair elected from among the ranks of federal IGs by the vote of those IGs. IG Soskin regularly sought to inform other IGs about the constitutional imperative that principal officers exercising authority under the Constitution be democratically accountable and subordinate to the head of the Executive Branch—the President. IG Soskin expressed particular concerns about the vesting of investigative authority in CIGIE committees, and proposals by the

Plaintiffs in this action and other IGs to vest additional investigative authority in CIGIE and/or its committees in ways that would sever democratic and Executive Branch accountability for that authority. And IG Soskin (among others) repeatedly described to other IGs, individually and as a group, that IG actions to advance the policy priorities of a particular administration, or the appearance of favoritism in their support for the priorities of one administration over another administration, would place at risk the constitutionally legitimate basis of IG independence: the tradition, founded in presidential respect rather than in law, of Presidents permitting IGs to remain in office through changes in administration.

In his engagement with the text of the Constitution and relevant precedents during his tenure, IG Soskin concluded that, as IG, he served as a principal officer of the United States. In his experience, this status is essential to the effective functioning of IGs as independent, objective oversight officials with credibility and stature in the agencies they serve. In their request for a Temporary Restraining Order, Plaintiffs take the position that IGs "are properly classified as federal employees." TRO Mot. (ECF No. 14) at 15. That is not right.

Because Plaintiffs' position threatens to gravely damage the function of IGs, IG Soskin has a specific interest as *amicus* in refuting Plaintiffs' arguments. In particular, adopting Plaintiffs' arguments would undercut the acceptance of findings and recommendations that IGs submit to agency heads by: (1) reversing decades of IG reliance on the judicial conclusion that IGs are subject to nothing more than "nominal" supervision by the agency head, *see U.S. Nuclear Regul. Comm'n v. Fed. Lab. Rels. Auth.*, 25 F.3d 229, 235 (4th Cir. 1994); and (2) reducing the stature of IGs that allows them to command respect on par with, or near-par with, the agency heads themselves. This is what allows an IG to stand in the room with a Cabinet Secretary—an individual who may be a household name in America—with the prestige to protect the OIG's independence

3

by saying "no." These features are what encourage even a Cabinet Secretary to take seriously the work of the OIG and to prioritize—among numerous other responsibilities and the supervision of actual subordinates—the work and recommendations of the IGs. By seeking to disavow the Inspector General's stature as a principal officer and elevate the supervisory role of agency heads, Plaintiffs risk unwittingly diminishing the impact and credibility of all future work carried out by their successors and their staff members.

As is the case for the Plaintiffs in this action, President Trump removed IG Soskin from office on January 24, 2025, as part of a nearly across-the-board removal of then-serving presidentially appointed Inspectors General. Unlike the Plaintiffs, however, IG Soskin does not dispute that the President of the United States has the authority to remove and replace with an appointee of his choosing *any* principal officer of the Executive Branch at any time. Further, IG Soskin has the greatest respect for the dedicated, objective work being carried out by auditors, investigators, inspectors, and evaluators at OIGs throughout the federal government, particularly those at DOT OIG. IG Soskin therefore submits this brief as *amicus curiae* to encourage the Court to vindicate the constitutional structure. This will allow the staff of all Executive Branch OIGs to carry on their work under the leadership of politically accountable appointees selected, or chosen for retention, by the President, and it will avoid damage to the core constitutional principle of accountability to the President, and through the President, to the American people.

## I.    Under Article II, At-Will Removal Is the Overwhelming Default Rule.

"Our Constitution was adopted to enable the people to govern themselves" and "requires that a President chosen by the entire Nation oversee the execution of the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010). Article II does so by vesting the executive power in the President, who must "take Care that the Laws be faithfully executed." U.S.

Const. art. II, § 1, cl. 1; *id.* § 3. Thus, "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020).

These provisions "grant[] to the President" the "general administrative control of those executing the laws, including the power of appointment *and removal* of executive officers." *Myers v. United States*, 272 U.S. 52, 163–64 (1926) (emphasis added). "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter.*, 561 U.S. at 492. Indeed, the President cannot conduct all executive business alone. The President must rely on "executive officers" to assist with that duty. *Id.* at 483. "Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary." *Id.*

Accordingly, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Id.* at 513–14. "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514. Anyone wielding executive power without full accountability to the President would "pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances." *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, J., dissenting).

The Constitution divides "the delegated powers" from the people to the federal government "into three defined categories, legislative, executive and judicial." *INS v. Chadha*, 462 U.S. 919, 951 (1983). And, "as nearly as possible," each branch of government must confine "itself to its assigned responsibility." *Id.* "If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices." *Myers*, 272 U.S. at 116.

As the Supreme Court summarized just last year, "the President's power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress." *Trump v. United States*, 603 U.S. 593, 621 (2024). If anything, that principle applies even more strongly at the beginning of a new Administration. "New Presidents *always* inherit thousands of Executive Branch officials whom they did not select. It is the power to supervise— and, if need be, remove—subordinate officials that allows a new President to shape his administration and respond to the electoral will that propelled him to office." *Collins v. Yellen*, 594 U.S. 220, 277–78 (2021) (Gorsuch, J., concurring in part). Otherwise, there would be "wholly unaccountable government agent[s]" who "assert[] the power to make decisions affecting individual lives, liberty, and property," yet are not accountable to "those who govern." *Id.* at 278.

Plaintiffs seek a preliminary injunction, suggesting that this Court should enter an order preventing any "illegal interference with their official duties." TRO Mot. at 2. But the Court should deny that relief as Plaintiffs are not likely to succeed on the merits of their claims. Inspectors General are "Officers of the United States" within the meaning of Article II, and the President lawfully may remove them at will.

## II. The Narrow Exceptions to the Removal Power Do Not Apply Here.

The Supreme Court has recognized "only two" exceptions to the rule that the President may remove at will any executive officer. *Seila Law*, 591 U.S. at 204. The first is for members of multi-member, balanced, expert commissions that function essentially as adjuncts to Congress; and the second is for inferior officers who have only narrow duties and do not exercise policy or administrative roles. *See id.* These "represent … the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* at 218. Neither exception applies here.

**A. An IG Is Not a Multi-Member, Balanced, Expert Commission Under *Humphrey's Executor*.**

*Humphrey's Executor* established a narrow exception for those who sat on "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power," a descriptor the Supreme Court applied to the Federal Trade Commission as it was understood to operate at the time of the Court's decision in 1935. *Seila Law*, 591 U.S. at 216. But even in defining that exception, "*Humphrey's Executor* reaffirmed the core holding of *Myers* that the President has 'unrestrictable power … to remove purely executive officers.'" *Id.* at 217 (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 632 (1935)). In more recent times, the Supreme Court has emphasized the narrowness of the *Humphrey's Executor* exception, and the only fair reading of *Seila Law* is that each requirement must be satisfied to fall within *Humphrey's Executor*. *See id.* at 216.

IGs do not fit within this narrow exception. They do not serve on "multimember bod[ies]," let alone ones "balanced along partisan lines," nor do they perform "legislative and judicial functions." *Id.* Naturally, "a single Director … cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Id.* at 218.[2]

**B. IGs Are Principal Officers and Exercise Broad Executive Powers.**

The Supreme Court has also held that "Congress could provide tenure protections to certain inferior officers with narrowly defined duties" and "no policymaking or administrative authority."

---

[2] The narrow exception in *Humphrey's Executor* is also "inconsistent with the text of the Constitution, with the understanding of the text that largely prevailed from 1789 through 1935, and with prior precedents," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 696 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), and *Humphrey's Executor's* foundations and rationale have been "repudiated [in] almost every aspect," *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part and dissenting in part).

*Seila Law*, 591 U.S. at 204, 218.  Yet, even if that view aligned with the original understanding of Article II—which is debatable—IGs do not fit within this category.

### 1. *Statutory Structure Demonstrates That IGs Are Principal Officers.*

Only the President can remove an IG, *see* 5 U.S.C. § 403(b), or even place one "on non-duty status," *id.* § 403 (Amendments Not Shown in Text).  Although they are statutorily "under the 'general supervision'" of the agency head, Plaintiffs acknowledge this means the agency head can provide only "high-level guidance and not supervision of day-to-day operations or the work of IGs."  Compl. (ECF No. 1) ¶ 49.  That is because the relevant statute mandates that "neither the head of the establishment nor the officer next in rank below the head shall prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation."  5 U.S.C. § 403(a).

In exercising their investigative and other core executive powers, IGs report directly to the President himself, who is the only person who can remove an IG or even put one on non-duty status.  That makes IGs principal officers, not inferior officers.  "Whether one is an 'inferior' officer depends on whether he has a superior" *below* the President.  *Edmond v. United States*, 520 U.S. 651, 662 (1997).  "An inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'"  *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (quoting *Edmond*, 520 U.S. at 663); *see also, e.g.*, *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. 263, 272 (2019) ("To decide whether an officer has a superior, the Supreme Court has considered whether the officer is subject to the policy direction of another official, whether the officer can take 'final' action without the approval of another officer, and whether an executive officer other than the President has the 'power to remove [the] officer[].'") (quoting *Edmond*, 520 U.S. at 664–65).  "That view is consistent with the original meaning of the

term and with the practices of the early Congresses." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 315 (2017) (Thomas, J., concurring).

The head of a department cannot remove an IG. Nor can the head of a department place an IG on non-duty status. In fact, Congress expressly barred agency heads from exercising any oversight of IGs' most important work, particularly the core executive function of carrying out law enforcement investigations. *See* 5 U.S.C. § 403(a). That makes them paradigmatic *principal officers*.

### 2. IGs Do Not Function as "Inferior Officers" in Their Exercise of Authority.

Beyond the statutory independence that Congress conferred on IG audits and to IG investigations, the specifics of how IGs perform their duties confirms that any supervision by officials other than the President is nominal, meaning "trifling" and "in name … only." *See Nominal*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/nominal (accessed Feb. 20, 2025).

For example, IGs exercise near-total control over Executive Branch workforces numbering in the hundreds or even thousands of employees. *See infra* note 3. When it comes to personnel matters, not only do IGs have statutory hiring authority, *see* 5 U.S.C. § 406(a)(7), but OIGs with sufficient size "operate their own personnel offices and determine the recruitment, screening, selection, promotion, and discipline of their employees," CIGIE, *Presidential Transition Handbook: The Role of Inspectors General and the Transition to a New Administration* 8 (Nov. 2024) (CIGIE Transition Handbook), https://www.ignet.gov/sites/default/files/CIGIE Presidential Transition Handbook - 2024.pdf. In the experience of IG Soskin, almost every IG interprets his or her authority to hire and fire as excluding almost any role for the "nominal supervision" provided by an agency head—except in rare situations where the IG has consented to allowing the agency to perform a narrow function for hiring in the interests of efficiency (*i.e.*, because the OIG lacks

9

sufficient size to effectively carry out the function itself).  *See, e.g.*, CIGIE, *Frequently Asked Questions: Are IGs Independent?*, https://www.ignet.gov/content/frequently-asked-questions ("IGs are authorized to … hire and control their own staff and contract resources.").

Control over a federal workforce is an important area of executive authority.  Consider telework and remote work for federal employees, the subject of a first-day presidential order.  *See* Memorandum of January 20, 2025, *Return to In-Person Work*, 90 Fed. Reg. 8251 (Jan. 28, 2025).  For years, most IGs took the position that agency heads lacked authority to decide telework, remote work, and return-to-office policies for IG staff, and that coordination between IGs and affiliated agencies on these issues was a matter of comity rather than authority.  Consistent with this view, many IGs deviated from the telework and remote-work policies set for their affiliated agencies.

In fact, on the morning of January 24, 2025, just hours before the President's removal actions, numerous IGs—including IG Soskin and many of the Plaintiffs—held a meeting to discuss the implementation of the in-person work order, as well as Executive Order No. 14151 entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 29, 2025) (signed Jan. 20, 2025).  Although IGs were not unanimous in their views at this meeting, the vast majority of IG participants stated that they planned to implement the orders in a manner *independent* from their affiliated agencies, and to communicate their plans directly to the President through White House officials responsible for confirming implementation.  For the thousands of Executive Branch employees who report to Plaintiffs, *see infra* note 3, the *only* line of democratic accountability and control therefore runs directly from the President to the IGs.

The budgetary and financial operations of IGs are also supervised within the Executive Branch *only* by the President, not by agency heads.  31 U.S.C. § 1105(a)(25) provides that the funds appropriated by Congress to IGs are held in separate appropriations accounts for each

establishment OIG.  This requirement provides that the affiliated agency head may not exercise authority to reassign, restrict, or reduce OIG funding once it has been specified in law without undertaking the laborious process of transfer and reprogramming, which typically requires engagement between agencies and the appropriations committees of Congress.

Such budgetary independence is reinforced by the statutory authority for IGs to develop their own budget requests and have those requests conveyed, separate from the agency's requests, to the President's Office of Management and Budget (OMB).  *See* 5 U.S.C. § 406(g).  Indeed, through CIGIE, the Plaintiffs and other IGs have, in recent years, specifically prioritized ensuring this budgetary independence is available to all OIGs, regardless of their size.  *See* Testimony of IG Mark Lee Greenblatt at 7–8, *Hearing Before the Subcomm. on Gov't Operations & the Fed. Workforce of the H. Comm. on Oversight & Accountability: Oversight of the Council of the Inspectors General on Integrity and Efficiency*, 118th Cong. (July 23, 2024), https://oversight.house.gov/wp-content/uploads/2024/07/Greenblatt-Testimony.pdf  (requesting that Congress address the fact that most non-Presidentially appointed OIGs "continue to have their budgets subsumed within their respective agency's budget"); *accord* CIGIE, *CIGIE Legislative Priorities for the 118th Congress* 3 (Feb. 22, 2023), https://www.ignet.gov/sites/default/files/files/ CIGIELegislativePriorities118thCongress.pdf.

In short, IGs cannot be removed by or even put on non-duty status by the heads of their departments.  Agency heads are strictly barred from any oversight of IGs' most important work: their audits and investigations.  *See* 5 U.S.C. § 403(a).  And the nominal supervision of agency heads means that only the President can exercise authority over IGs in their hiring and firing of thousands of staff and their expenditure of billions of dollars of taxpayer funds.  That makes them paradigmatic principal officers.  Under Supreme Court precedent, they must be removable

immediately, for any reason or no reason at all, *see, e.g.*, *Trump*, 603 U.S. 608–09; *Seila Law*, 591 U.S. at 204, and thus Congress has no authority to limit the President's "unrestricted power of removal" under Article II with respect to such "executive officers of the United States," *Trump*, 603 U.S. at 609.

### 3. IGs Exercise Broad Executive Powers and Do Not Have "Narrowly Defined Duties."

Even if they were inferior officers, IGs do not have "narrowly defined duties" that exclude "policymaking or administrative authority"—and thus they remain removable at will by the President. *Seila Law*, 591 U.S. at 204, 218. IGs have sweeping executive powers. The Complaint itself states that just the eight Plaintiff IGs "conduct[] and facilitat[e] oversight with respect to more than $5 trillion dollars of appropriated funds annually (the vast majority of the annual federal budget) and more than 3.5 million federal employees (approximately 80% of the federal workforce)." Compl. ¶ 5. The Complaint further states how many *thousands* of federal employees report to these IGs.[3]

---

[3] Compl. ¶ 15 ("Storch leads approximately 1,865 civilian employees"); *id.* ¶ 17 ("Missal leads approximately 1,180 employees"); *id.* ¶ 19 ("Grimm leads roughly 1,570 employees in HHS OIG, is responsible for overseeing HHS's $2.3 trillion budget, more than 80,000 employees, and more than 100 programs."); *id.* ¶ 20 ("Richardson leads approximately 450 employees and 100 contractors in the Office of Inspector General, responsible for overseeing the department's $75 billion budget and more than 70,000 employees."); *id.* ¶ 22 ("Bruce leads approximately 220 employees in the department's Office of Inspector General and is responsible for overseeing the department's $103 billion budget and over 4,000 employees."); *id.* ¶ 24 ("Fong leads the approximately 440 employees in the Office of Inspector General, which is tasked with overseeing USDA's $340 billion budget and 100,000 employees"); *id.* ¶ 26 ("Turner leads approximately 350 employees in the Office of Inspector General, responsible for overseeing DOL's $25 billion budget and over 16,000 employees."); *id.* ¶ 28 ("Ware has also served as Acting IG of the Social Security Administration, overseeing that agency's $1.5 trillion budget and approximately 60,000 employees. … As SBA IG, Ware oversees approximately 240 employees in the Office of Inspector General.").

IGs are empowered to "conduct, supervise, and coordinate … investigations," as well as "other activities … for the purpose of promoting economy and efficiency" within their agencies, and establish "relationships" with "other Federal agencies, State and local governmental agencies, and nongovernmental entities." 5 U.S.C. § 404(a); *see also id.* § 408(c) (powers of the IG of the Department of Defense). To ensure that IGs can exercise these powers effectively, IGs are guaranteed "timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials available to the" agency they serve. *Id.* § 406(a)(1)(A). IGs also have access "to Federal grand jury materials protected from disclosure" within 15 days of requesting it unless the Attorney General makes one of five enumerated findings. *Id.* § 406(a)(1)(C), (h). Still more, IGs "have direct and prompt access to the head of the establishment involved when necessary," *id.* § 406(a)(6), and may "administer to … any person an oath," or designate any OIG employee to administer an oath, which "shall have the same force and effect as if administered … by or before an officer having a seal," *id.* § 406(a)(5). And if an IG needs more employees, the IG can "select, appoint, and employ such officers and employees as may be necessary." *Id.* § 406(a)(7).

These powers extend far beyond matters internal to a specific agency. By statute, IGs can "require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data in any medium (including electronically stored information), as well as any tangible thing and documentary evidence necessary in the performance of the functions assigned by this chapter," and the subpoena can then be enforced "by order of any appropriate United States district court." 5 U.S.C. § 406(a)(4). This subpoena power continues even after an IG has referred a case to the Department of Justice and a criminal prosecution is imminent. *See United States v. Art Metal-U.S.A., Inc.*, 484 F. Supp. 884, 886 (D.N.J. 1980). Confirming this

subpoena process extends to the general public, the statute states that IGs shall not use subpoenas to "obtain documents and information from Federal agencies."  5 U.S.C. § 406(a)(4).

Other provisions make this doubly clear.  For example, the Department of Transportation IG may investigate "any person or entity subject to the laws and regulations of the Department or its operating administrations, whether or not they are recipients of funds from the Department or its operating administrations." 49 U.S.C. § 354.[4]  In IG Soskin's experience, federal and state law enforcement agencies often seek to partner with IGs specifically to draw on the IGs' broad administrative-subpoena powers, and IGs routinely exercise this power unilaterally, without consulting a United States Attorney, local prosecutor, or anyone at all.

IGs have not been shy about exercising their external investigatory powers.  To IG Soskin's knowledge, IGs have investigated Lockheed Martin, Boeing, Toyota, Booz Allen, Pfizer, Merck, and numerous other stalwarts of every sector of the American economy.  Investigative authority is exercised in widespread fashion: the HHS IG alone made 2,754 referrals from investigations to federal, state, and local prosecutorial entities during fiscal year 2024.  *See* HHS OIG, *Spring 2024 Semiannual Report to Congress* 17 (2024), https://oig.hhs.gov/documents/sar/9905/Spring_2024_ SAR.pdf; HHS OIG, *Fall 2024 Semiannual Report to Congress* 19 (2024), https://oig.hhs.gov/ documents/sar/10084/Fall_2024_SAR_508.pdf.[5]  Further, "[o]ver the past 5 fiscal years, OIG collected a yearly average of 575.6 terabytes of digital data. (One terabyte equals one tractor-trailer

---

[4] In 1990, then-Acting Deputy Attorney General William Barr acknowledged instances in which inspectors general could investigate "external parties" who were allegedly involved in improper behavior by those within the executive branch.  Letter from William P. Barr, Acting Deputy Att'y Gen., to William M. Diefenderfer, Deputy Dir., OMB, at 2–3 (July 17, 1990).

[5] From the experience of IG Soskin, the thousands of prosecutorial referrals by the HHS IG are almost certainly joined by thousands of additional instances where the IG considered an allegation and declined to initiate an investigation, or initiated an investigation and determined not to refer the matter to local, state, or federal prosecutors.

full of paper documents)." HHS OIG, *FY 2025 Justification of Estimates for Congress* 35 (2024), https://oig.hhs.gov/documents/budget/9814/FY%202025%20OIG%20Budget.pdf.

IGs also possess significant, traditional law-enforcement powers. As IG Soskin can attest, IGs typically control dozens or hundreds of sworn, badged, law-enforcement officers. *See, e.g.*, Jacob Knutson, *Ex-Trump Official Says DOJ Investigating Him Over Potential Felony Violations*, Axios (Sept. 15, 2022), https://www.axios.com/2022/09/15/trump-doj-jeffrey-clark-phone-federal-probe ("[A] dozen armed agents of the Department of Justice's Office of Inspector General executed a criminal search warrant at [Mr. Clark's] home at around 7 a.m."). "[E]ach Inspector General" may be authorized to "carry a firearm while engaged in official duties," "seek and execute warrants for arrest, search of a premises, or seizure of evidence," and "make an arrest without a warrant while engaged in official duties" upon "reasonable grounds to believe that the person to be arrested has committed or is committing" any federal felony. 5 U.S.C. § 406(f)(1), (3); *see also* 7 U.S.C. § 2270.

The President's removal powers are at their apex when it comes to high-level law-enforcement officials, given their direct relation to the President's core Article II executive powers and Take-Care duties. *See Seila Law*, 591 U.S. at 216 n.2 (enforcement actions "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'") (emphasis in original); *see also Trump*, 603 U.S. at 609 ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 & n.4 (1958) (Jackson, J., concurring) (citing the President's "exclusive power of removal in executive agencies" as an example of "conclusive and preclusive" constitutional authority).

Plaintiffs cannot have it both ways, insisting they occupy only narrow, inferior roles for purposes of removal protection, while at the same time touting their supposedly critical "investigative authorities" and other significantly broad powers.  Compl. ¶ 44.[6]

### 4. *IGs Are Not Employees.*

Plaintiffs claim that IGs "are properly classified as federal employees"—and thus not "officers" at all—because they are allegedly under the "supervision" of Cabinet officers at the head of a department.  TRO Mot. at 15–16.  That is wrong.  As explained above, IGs possess sweeping executive powers and report directly to the President, who is the only person who can remove or even place an IG on non-duty status.  IGs are thus officers (and principal ones, at that), rather than "part of the broad swath of 'lesser functionaries' in the Government's workforce," *Lucia v. SEC*, 585 U.S. 237, 245 (2018), who do not "wield executive power" at all, *Seila Law*, 591 U.S. at 204.

Plaintiffs' argument that IGs are mere employees is also misguided, erroneous, and contradicted by decades of practice in the IG community.  Individual IGs have long relied on the Fourth Circuit's opinion in *United States Nuclear Regulatory Commission v. Federal Labor Relations Authority*, which analyzed the "general supervision" language of the IG Act and described an agency head's supervisory authority over the IG as "nominal."  25 F.3d at 235. CIGIE, too, has embraced this view and encouraged federal IGs to resist anything other than nominal supervision by agency heads.  *See* CIGIE Transition Handbook at 8 n.6; CIGIE, *The Inspectors General* 4 (July 14, 2014),  https://www.ignet.gov/sites/default/files/files/IG_

---

[6] Several Senators filed an *amicus* brief in this case suggesting that Congress is the audience for IG reports.  *See* ECF No. 20-1 at 7–10 (ECF page-stamping).  But 5 U.S.C. § 420(b)(1) requires the near real-time posting of all IG audit, inspections, and evaluations work on the IGs' public websites.  It may have been arguable in 1978 that the external audience for IG oversight reports was primarily Congress, but § 420(b)(1)—added in 2022—means that IGs now write their reports less for Congress and more for the public at large. *See* Pub. L. No. 117-286, § 3(b), 136 Stat. 4196, 4251–52 (2022).

Authorities_Paper_-_Final_6-11-14.pdf; *id.* at 6 ("The statutory independence of IGs raises the fair question of 'Who oversees the IG?'").

This interpretation is the essential bulwark that IGs rely on against meddling by agency heads in their work and efforts to compromise IG independence, which at its core comes from the ability of IGs to report only to *the President*, rather than to an agency head. For decades, IGs have provided the President with views that are independent of a particular agency and unvarnished by the agency head. If this Court were to credit Plaintiffs' contrary arguments and deem IGs to be mere employees, it would overturn well-settled law and longstanding practice.

To conclude that agency heads have more than "nominal" supervision, and indeed, supervisory authority sufficient to sever the President's relationship with individual IGs would radically diminish the very values that Plaintiffs and IG Soskin have spent years promoting in their roles as IGs.

## III.    The Thirty-Day-Notice Statute Does Not Change the Analysis.

Plaintiffs cite a statutory provision from the Inspector General Reform Act (IGRA) stating that only the President can remove an IG, and that "the President shall communicate in writing the reasons for any such removal or transfer to both Houses of Congress, not later than 30 days before the removal." 5 U.S.C. § 403(b). Plaintiffs insist the President therefore must keep an IG in place for 30 days even after the President has fired him—no exceptions. *See* TRO Mot. 10–14. The Court should reject that argument, however, because the statutory requirement is unconstitutional.

The thirty-day waiting period works in tandem with a separate provision stating that the President "may not place an Inspector General on non-duty status during the 30-day period preceding the date on which the Inspector General is removed" unless the President "has made a determination that the continued presence of the Inspector General in the workplace poses a [statutorily defined] threat." 5 U.S.C. § 403 (Amendments Not Shown in Text). This statute

permits the President to place an IG on non-duty status only upon finding that the IG would (i) "pose a threat to the employee or others," (ii) "result in the destruction of evidence relevant to an investigation," (iii) "result in loss of or damage to Government property," or (iv) "otherwise jeopardize legitimate Government interests," *id.* § 6329b(b)(2)(A); *see also* TRO Mot. 5–6. If the President invokes this provision, he must also submit a report to both houses of Congress that includes (i) the "specification of which" type of harm the IG would cause, (ii) the "substantive rationale, including detailed and case-specific reasons, for the determination made" that the IG would cause such harm, (iii) "an identification of each entity that is conducting, or that conducted, any inquiry upon which th[at] determination … was made," and (iv) if such an inquiry "is completed, the findings made during that inquiry." 5 U.S.C. § 403 (Amendments Not Shown in Text).

Taken together, these provisions mean that, for an entire month, the President cannot even place a fired IG into non-duty status absent an extraordinary and unique showing that the IG poses a threat to the workplace, which then must be extensively documented and explained to both houses of Congress.

These clauses, both separately and together, are unconstitutional under Article II. Even requiring *cause* before removing a principal officer violates the Constitution. *See Seila Law*, 591 U.S. at 213–19. But the IGRA goes far beyond that by forcing the President to keep an IG in office for an extra month, even when there is cause for removal. "If anything," the removal restrictions in the IGRA—which purport to require the President to suffer an executive official for an entire month—act as an even "greater constitutional evil" than narrowing the circumstances in which a President can fire a principal officer immediately, as was the case in *Seila Law* and *Collins*. *Collins*, 594 U.S. at 277 (Gorsuch, J., concurring in part). "Because the power of supervising

subordinates is essential to sound constitutional administration, as between presidential hiring and firing 'the unfettered ability to remove is the more important.'" *Id.* at 278. IGRA impermissibly tramples upon the President's unfettered ability to remove an IG because the statute makes immediate removal *impossible*, regardless of whether cause exists.

IGRA's strict limitations on imposing non-duty status during the 30-day termination window are also unconstitutional. By drastically narrowing the bases on which an IG can be placed on non-duty status, the statute effectively ensures that an IG will *actively* remain on the job for 30 days after he has been fired. This amounts to an extraordinary infringement on the President's exercise of executive power under Article II. If even a low-level employee were fired, it would be unfathomable that he could be *required* to keep working for another 30 days. It is even more unjustifiable that a principal officer would be allowed to do so.

IGRA's notification requirements are also unconstitutional. During the Carter Administration, the Office of Legal Counsel concluded that "the requirement that the President notify both Houses of Congress of the reasons for his removal of an Inspector General constitutes an improper restriction on the President's exclusive power to remove Presidentially appointed executive officers." *Inspector Gen. Legis.*, 1 Op. O.L.C. 16, 18 (1977) (citing *Myers*). To be sure, the Office of Legal Counsel later suggested that a statutory requirement that the President merely "communicate the reasons for … removal" of the Department of Defense IG "to both Houses of Congress" would be constitutional under the assumption that it imposes no time limit and is satisfied by "whatever reasons (if any)" the President articulates. *Appointment and Removal of Fed. Res. Bank Members of the Fed. Open Market Comm.*, 43 Op. O.L.C. at 273–74 (citing 22 U.S.C. § 3929(a)(2)). Yet the IGRA imposes far more. Its separate notification requirements for placing an IG on non-duty status during the 30-day termination period are extraordinarily

burdensome and thus impose a substantive restriction on the President's removal power under Article II.  To comply with the IGRA, the President must provide detailed reports about which narrow workplace harm the IG will cause, what investigations are ongoing into that alleged harm, and the results of any completed investigations.  These requirements unconstitutionally restrict the President's "exclusive power of removal."  *Myers*, 272 U.S. at 122.

Because these provisions both separately and especially together squarely interfere with the President's removal power, this Court should hold that they violate Article II.  The President had the constitutional authority to terminate Plaintiffs without any waiting or notification periods.

## IV.    Plaintiffs' Equitable Relief Would Be Improper and Ineffective.

Further, the Court should deny equitable relief.  First off, the Court should reject Plaintiffs' framing that they remain IGs but have simply been blocked from accessing the tools needed to do their job.  Plaintiffs have been terminated from their positions.  There is a reason every significant removal-challenge case arose out of disputes about salary, rather than removed officers asking for injunctions to be reappointed or reinstated.  *See Humphrey's Ex'r*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener v. United States*, 357 U.S. 349, 349–51 (1958) (same).  No such injunctive relief was—or is— available in such circumstances.

Plaintiffs stop short of asking the Court to compel President Trump himself to reappoint or to reinstate them, presumably because it is well settled that the Court lacks jurisdiction to issue such injunctive relief against the President.  *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general," a court "has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.").  The Court doubly lacks power to reinstate Plaintiffs because no statute authorizes a judicial order to

reinstate IGs, *cf.* 42 U.S.C. § 2000e-5(g) (authorizing "reinstatement" as well as "back pay" to remedy employment discrimination), nor was that remedy available in traditional courts of equity, *see In re Sawyer*, 124 U.S. 200, 212 (1888) ("[A] court of equity has no jurisdiction over the appointment and removal of public officers."); *accord Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (limiting equitable remedies to those "traditionally accorded by courts of equity").

Plaintiffs' sole form of requested injunctive relief—"[e]njoining Agency Defendants from (a) taking any further action to obstruct plaintiffs" from carrying out their official duties as IGs and "(b) recognizing the authority of any other person as any plaintiff's successor as IG"—is likely not possible, either.  TRO Mot. at 21.  Even assuming both that this Court has the power to issue such relief and that Plaintiffs somehow could be reinstated without satisfying the Appointments Clause's nomination-and-confirmation requirements, the agency heads themselves still would lack statutory power to reinstall or to restore Plaintiffs as IGs.  The agency heads are statutorily *barred* even from supervising IGs' day-to-day work.  An agency head cannot terminate an IG or put an IG on non-duty status.  IGs report directly to the President, not agency heads, who certainly do not have statutory authority to appoint, reinstate, or restore an IG.  Even if this Court were to conclude that an agency head has some minor role in the matter, that conclusion still makes this an intra-executive-branch dispute between the IG who insists that he remains in his position and the agency head who insists that the IG has been terminated.  Only the President can resolve that dispute between principal officers, as he is the only one to whom both positions report.  The President has already resolved that dispute: he terminated Plaintiffs, in accordance with his Article II authorities.

## CONCLUSION

If Plaintiffs receive their requested relief, the President "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter.*, 561 U.S. at 514. Article II strictly forbids such division of the executive power. Accordingly, "the President's power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress." *Trump*, 603 U.S. at 621. This Court should deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.

February 21, 2025

Respectfully submitted,

*/s/ R. Trent McCotter*
R. TRENT MCCOTTER (D.C. Bar # 1011329)
NICHOLAS CORDOVA (D.C. Bar # 90026063)
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

DANIEL Z. EPSTEIN
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
202-964-3721
daniel.epstein@aflegal.org

JEFFREY S. BEELAERT (D.C. Bar # 995354)
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
208-388-1218
jbeelaert@givenspursley.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 21, 2025, the foregoing was filed electronically with the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Respectfully submitted,

*/s/ R. Trent McCotter*

R. Trent McCotter