**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| ROBERT P. STORCH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-415 (ACR) |
| | ) | |
| PETE HEGSETH, in his official capacity | ) | |
| as Secretary of Defense, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

    I.      Statutory Background .............................................................................. 2

    II.     Factual Background ................................................................................ 5

    III.    Procedural History ................................................................................. 6

LEGAL STANDARD............................................................................................ 7

ARGUMENT ..................................................................................................... 8

    I.      Plaintiffs Fail to Meet Their Burden to Show Irreparable Harm ........................... 9

    II.     Plaintiffs Are Not Likely to Succeed on the Merits.............................................. 14

          A.      The Inspector General Act Authorizes the President to Remove Inspectors General at any Time ....................................................... 15

          B.      If the Inspector General Act Restricts the President's Removal Authority, it Is Unconstitutional ............................................... 19

    III.    The Balance of Equities and Public Interest Weigh Against Injunctive Relief............................................................................................... 24

    IV.    Reinstatement Is an Improper Remedy.................................................... 24

CONCLUSION................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Baker* v. *Carr*,
369 U.S. 186 (1962) ........................................................................... 26

*Berry v. Reagan*,
No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983),
*vacated by* 732 F.2d 949 (D.C. Cir. 1983) ...................................... 11

Order, *Bessent v. Dellinger*,
No. 24A790 (U.S. Feb. 21, 2025) ............................................... 13, 26

*Buckley v. Valeo*,
424 U.S. 1 (1976) .............................................................................. 22

*Burns v. GAO Emps. Fed. Credit Union*,
No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) ..................... 10

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*,
367 U.S. 886 (1961) .......................................................................... 24

\* *Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................................................. 8, 9, 11

*Davis v. Billington*,
76 F. Supp. 3d 59 (D.D.C. 2014) ......................................................... 9

*Dellinger v. Bessent*,
--- F. Supp. 3d ---, 2025 WL 471022 (D.D.C. Feb. 12, 2025) ..... 13, 14

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969) ........................................................... 8

*EEOC v. City of Janesville*,
630 F.2d 1254 (7th Cir. 1980) ........................................................... 10

*English v. Trump*,
279 F. Supp. 3d 307 (D.D.C. 2018) .............................................. 11, 12

*Farris v. Rice*,
453 F. Supp. 2d 76 (D.D.C. 2006) ................................................... 9-10

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .......................................................... 7-8

*Franklin* v. *Massachusetts*,
   505 U.S. 788 (1992) ........................................................................................ 25

*Franks v. Nimmo*,
   683 F.2d 1290 (10th Cir. 1982) ..................................................................... 10

*Free Enter. Fund v. Pub. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................................ 19

*Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ........................................................................................ 26

*Guerrero v. Clinton*,
   157 F.3d 1190 (9th Cir. 1998) ....................................................................... 16

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ........................................................................ 7

*Harkrader v. Wadley*,
   172 U.S. 148 (1898) ........................................................................................ 26

*Harris v. Bessent*,
   --- F. Supp. 3d ---, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ................... 13, 14

*Hetreed v. Allstate Ins. Co.*,
   135 F.3d 1155 (7th Cir. 1998) ..................................................................... 9, 10

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) .......................................................................... 19, 20, 26

*In re Sawyer*,
   124 U.S. 200 (1888) ........................................................................................ 26

*Judicial Watch v. U.S. Secret Service*,
   726 F.3d 208 (D.C. Cir. 2013) ....................................................................... 18

*Kondapally v. USCIS*,
   20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020) .......................... 8

*Levesque v. Maine*,
   587 F.2d 78 (1st Cir. 1978) ............................................................................ 10

*Mackie v. Bush*,
   809 F. Supp. 144 (D.D.C.),
   *vacated sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993) ............ 11, 12

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ................................................................ 17

*Marxe v. Jackson*,
  833 F.2d 1121 (3d Cir. 1987) .............................................................. 10

*Mississippi* v. *Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ............................................................ 2, 25

*Morrison v. Olson*,
  487 U.S. 654 (1988) ....................................................................... 20, 21

\* *Myers v. United States*,
  272 U.S. 52 (1926) ...................................................... 14, 17, 22, 26

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ......................................................... 8

\* *Nat. Res. Def. Council ("NRDC") v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ................................................. 1, 16, 17

*Nichols v. Agency for Int'l Dev.*,
  18 F. Supp. 2d 1 (D.D.C. 1998) ......................................................... 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................... 7

*Parsons* v. *United States*,
  167 U.S. 324 (1896) ......................................................................... 27

*Phillip v. Fairfield Univ.*,
  118 F.3d 131 (2d Cir. 1997) ............................................................... 9

*Public Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440 (1989) ......................................................................... 18

*Rubino v. City of Mount Vernon*,
  707 F.2d 53 (2d Cir. 1983) ............................................................... 10

\* *Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................... *passim*

\* *Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ................................................................. *passim*

iv

*Shurtleff* v. *United States*,
   189 U.S. 311 (1903) ...............................................................26-27

*United States v. James Daniel Real Property*,
   510 U.S. 43 (1993) ..................................................................... 16

*Walpin v. Corp. for National & Community Services*,
   630 F.3d 184 (D.C. Cir. 2011) ................................................... 17

*Walton* v. *House of Representatives*,
   265 U.S. 487 (1924) ................................................................... 26

*White* v. *Berry*,
   171 U.S. 366 (1898) ................................................................... 26

*Wiener* v. *United States*,
   357 U.S. 349 (1958) ................................................................... 26

*Winter v. NRDC*,
   555 U.S. 7 (2008) ......................................................................... 7

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ..................................................... 9

**Constitutional Provisions**

* U.S. Const. art. II, § 1, cl. 1. ............................................................ 2, 19

U.S. Const. art. II, § 1, cl. 3 ............................................................... 19

**Statutes**

5 U.S.C. § 401 ...................................................................................... 3, 5

5 U.S.C. § 402 .............................................................................. 3, 20, 21

* 5 U.S.C. § 403 ............................................................................... *passim*

5 U.S.C. § 403 note ................................................................................. 4

5 U.S.C. § 404 ................................................................................. 20, 21

5 U.S.C. § 405 ................................................................................... 3, 21

5 U.S.C. § 406 ................................................................................... 3, 21

5 U.S.C. § 415 ......................................................................................... 3

5 U.S.C. § 6329b ................................................................................. 1, 5, 10, 11

20 U.S.C. § 1682 ........................................................................................ 15

42 U.S.C. § 2000d-1 ............................................................................... 15-16

Pub. L. No. 95-452, 92 Stat. 1101 (1978), (*codified at* 5 U.S.C. § 401, *et seq.*) ................. 2, 4, 23

Pub. L. No. 110-409, 122 Stat. 4302 (2008) .................................................... 4

Pub. L. No. 114-317, 130 Stat. 1595 (2016) .................................................... 3

Pub. L. No. 117-263, 136 Stat. 2395 (2022) .................................................... 4

**Other Authorities**

Department of Defense Office of Inspector General, All DoD OIG Reports,
    https://www.dodig.mil/reports.html/ ........................................................ 12

H.R. Rep. No. 95-584 (1977) ...................................................................... 4

*Inspector General Legislation*, 1 Op. O.L.C. 16 (1977) .................................. 23

Jack Goldsmith, Lawfare, Trump Fired 17 Inspectors General—Was It Legal?,
    https://www.lawfaremedia.org/article/trump-fired-17-inspectors-general-was-it-legal
    (Jan. 27, 2025) ...................................................................................... 21

Office of Inspector General, United States Department of State, Reports,
    https://www.stateoig.gov/reports ............................................................. 12

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. June 2024 update) ................... 8

## INTRODUCTION

There is no dispute about a central fact that dooms Plaintiffs' request for a preliminary injunction:  the President has clear statutory authority to remove Inspectors General, without any showing of cause.  Plaintiffs claim only that the President must wait until 30 days after providing notice to Congress to exercise this authority.  But the statute requires no such thing.

Plaintiffs cannot meet any of the requirements for a preliminary injunction, but the Court need look no further than their failure to show irreparable harm.  Loss of government employment generally does not qualify as irreparable harm, absent a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974).  This case presents the opposite of an extraordinary case for preliminary relief.  Even under Plaintiffs' theory, if the Court reinstated them, the President could remove them again within 30 days, and they could be placed on non-duty status in the interim.  *See* 5 U.S.C. § 403(b)(1)(A); *id.* § 6329b(b)(2)(A)(iv).  Plaintiffs' interest in such a brief reinstatement is too slight to qualify as irreparable harm.

In any event, Plaintiffs are unlikely to succeed on the merits, for two reasons.  *First*, the President had authority to remove them under the clear terms of the statute, which provides:  "An Inspector General may be removed from office by the President."  5 U.S.C. § 403(b)(1)(A). Although the next sentence states that the President shall notify Congress 30 days before removing an Inspector General, the statute contains no language making the President's removal authority contingent on complying with the congressional notice provision.  Rather, such congressional reporting provisions are for the benefit of Congress and do not confer judicially enforceable rights upon other parties.  *See Nat. Res. Def. Council ("NRDC") v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988) (opinion of Ginsburg, R.B., J., Starr, J., and Sentelle, J.).

*Second*, if the notice provision were construed to restrict the President's authority to remove Inspectors General, it would unconstitutionally infringe on the President's Article II

authority.  "[T]he President's prerogative to remove executive officials" follows from Article II's vesting of "all of" "the 'executive Power'" in the President.  *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 214 (2020) (quoting U.S. Const. art. II, § 1, cl. 1).  Supreme Court precedent "left in place" just two narrow "exceptions to the President's unrestricted removal power": one for members of multi-member commissions that exercise quasi-legislative and quasi-judicial powers, and another for certain inferior officers with limited duties.  *Id.* at 215.  Inspectors General, who perform executive functions and have broad statutory authority, fit within neither exception.

The balance of the equities weighs decisively against preliminary relief.  Even the short-term reinstatement of eight executive officers whom the President has chosen to remove would be an extraordinary intrusion on the President's Article II authority.  It is in the government's interest and the public's interest for these Inspector General positions to be filled by individuals who have the President's confidence.  On the other side of the balance is Plaintiffs' weak interest in being reinstated, only for the President to have the undisputed authority to remove them again in short order.

Finally, Plaintiffs' requested remedy of an injunction requiring their reinstatement would exceed this Court's equitable authority and violate the longstanding separation-of-powers principle that courts lack jurisdiction to enjoin the President in the exercise of his official duties.  *See*, *e.g.*, *Mississippi* v. *Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).

## BACKGROUND

## I.    Statutory Background

In the Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101, (*codified at* 5 U.S.C. § 401, *et seq.*), Congress created the position of Inspector General and Offices of the Inspector General (OIGs) in agencies throughout the federal government.  OIGs and the Inspectors General who lead them are charged with "conduct[ing] and supervis[ing] audits and investigations

relating to the programs and operations" of federal agencies, and "recommend[ing] policies," in order "(A) to promote economy, efficiency, and effectiveness in the administration of those programs and operations; and (B) to prevent and detect fraud and abuse in those programs and operations." 5 U.S.C. § 402(b). Each Plaintiff served as what is sometimes called an establishment Inspector General; such Inspectors General are appointed by the President and confirmed by the Senate. *Id.* § 403(a); *see also id.* § 401(1) (listing the "establishment(s)" with an establishment Inspector General).[1]

The Inspector General Act and subsequent enactments grant Inspectors General broad authority to conduct audits and investigations. *See* Inspector General Empowerment Act, Pub. L. No. 114-317 §§ 5-6, 130 Stat. 1595, 1603-04 (2016). Inspectors General are authorized "to have timely access to all records, reports, audits, reviews, documents, papers, recommendations or other materials" available to their agency, 5 U.S.C. § 406(a)(1)(A), and may "request such information and assistance as may be necessary for carrying out the[ir] duties and responsibilities . . . from any Federal . . . agency," *id.* § 406(a)(3). They may take deposition testimony and hire staff, experts, and consultants. *Id.* § 406(a)(5), (7), (8). Ultimately, their findings regarding any serious problems, abuses, or deficiencies are presented to the relevant agency's head and made available to Congress. *See id.* § 405(e).

Establishment Inspectors General "shall report to and be under the general supervision of" the agency head or "the officer next in rank below such head," *id.* § 403(a), but that general supervision is limited by statute. In particular, the agency head or officer next in rank shall not

---

[1] Congress also defined a list of "designated Federal entit[ies]," such as Amtrak and the Consumer Product Safety Commission, and created Inspector General positions for those entities. 5 U.S.C. § 415(a)(1)(A). Unlike establishment Inspectors General, who are appointed by the President, designated Federal entity Inspectors General are appointed by the head of such entity. *See id.* § 415(c).

"prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." *Id.*

The Inspector General Act provides, as it has since its original enactment, that an establishment Inspector General "may be removed from office by the President." 92 Stat. at 1102, § 3(b); 5 U.S.C. § 403(b)(1)(A).[2]  The House Report for the Inspector General Act explained that this provision "would specifically allow the President to remove any Inspector General at any time." H.R. Rep. No. 95-584, at 9 (1977).

Since the enactment of the Inspector General Act, the law has also contained a provision, immediately following the grant of statutory removal authority to the President, providing for the President to notify Congress of such removals.  As originally enacted, the congressional notification provision read:  "The President shall communicate the reasons for any such removal to both Houses of Congress." 92 Stat. at 1102, § 3(b).

Congress subsequently amended the notice provision.  *See* Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302, § 3(a); Securing Inspector General Independence Act of 2022, Pub. L. No. 117-263, 136 Stat. 2395, 3222, § 5202(a).  The statute now provides:

> An Inspector General may be removed from office by the President.  If an Inspector General is removed from office or is transferred to another position or location within an establishment, the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal or transfer to both Houses of Congress (including to the appropriate congressional committees), not later than 30 days before the removal or transfer.  Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal.

5 U.S.C. § 403 note; 5 U.S.C. § 403(b)(1)(A).  The 2022 amendment also provided that during an interval between the President notifying Congress of an upcoming removal of an Inspector General and the removal, "the President may place an Inspector General on non-duty status," provided that

---

[2] Congress amended 5 U.S.C. § 403(b) in 2022.  *See* 136 Stat. at 3222, § 5202(a); 5 U.S.C. § 403 note.  Citations to § 403(b) in this brief are to the as-amended version.

the President meets certain procedural requirements.  5 U.S.C. § 403(b)(1)(A).  One of the determinations that can justify placing an Inspector General on non-duty status is a determination by the President that the Inspector General's continued presence on duty "otherwise jeopardize[s] legitimate Government interests."  *See id.*; *id.* § 6329b(b)(2)(A)(iv).  In neither of the amendments to the notice provision did Congress amend the sentence stating:  "An Inspector General may be removed from office by the President."  5 U.S.C. § 403(b)(1)(A).

## II.    Factual Background

Until January 24, 2025, Plaintiffs served as Inspectors General of the Departments of Defense, Veterans Affairs, Health and Human Services, State, Education, Agriculture, and Labor, and the Small Business Administration.  Compl. ¶ 5, ECF No. 1.  Each of these is an establishment Inspector General position, subject to removal by the President.  5 U.S.C. §§ 401(1), 403(b)(1)(A).  On January 24, 2025, President Trump removed Plaintiffs from their positions.  Compl. ¶ 4.  President Trump communicated these removals through emails sent on January 24, 2025, from Director of Presidential Personnel Sergio Gor and Deputy Director of Presidential Personnel Trent Morse.  *Id.* ¶ 71; *see also id.* ¶ 4 (acknowledging that these emails constituted "President Trump, acting through" his aides).  Plaintiffs contend that they were blocked from their office facilities either that day, or by January 27 or January 28 at the latest.[3]  All Plaintiffs were given an opportunity to collect their belongings.[4]

Plaintiffs allege, and Defendants do not dispute, that President Trump did not notify Congress 30 days before removing Plaintiffs.  Compl. ¶ 6.  After the removals, the Chairman and

---

[3] *See*, *e.g.*, Decl. of Phyllis Fong ¶ 9, ECF No. 14-6 (access to facilities cut off on January 27, 2025).
[4] *See*, *e.g.*, *id.* ¶ 11 ("I made arrangements with OIG personnel to bring the remaining personal items in my office to my house, and for them to pick up government equipment from my house and return it to USDA.").

Ranking Member of the Senate Judiciary Committee wrote a letter to President Trump "request[ing] that [he] provide Congress with a written communication that contains the 'substantive rationale, including detailed and case-specific reasons' for each of the IG's [sic] removed." ECF No. 14-4, at 3.

### III.    Procedural History

Plaintiffs filed this lawsuit on February 12, 2025, nearly three weeks after they were removed. *See* Compl.  The named Defendants are President Trump and the head of each agency in which Plaintiffs served as Inspectors General, sued in their official capacities (the "Agency Defendants"). *See id.* ¶¶ 30-39.  In Count I, titled "Violation of the Inspector General Act, 5 U.S.C. § 403(b)," Plaintiffs claim that "the purported removals of plaintiffs were not legally effective" because they allegedly "did not comply with the IG Act's requirements." *Id.* ¶ 88.  In Count II, titled "Common-Law Claim Against *Ultra Vires* Government Action," Plaintiffs claim that "President Trump has acted *ultra vires* in purporting to remove plaintiffs as IGs," because "[t]he purported removals did not comply with the IG Act." *Id.* ¶ 93.  In Count III, titled "Mandamus," Plaintiffs argue that they "have a clear right to remain in office unless and until the statutory requirements for removal under 5 U.S.C. §403(b) have been satisfied," *id.* ¶ 98, and claim they "are entitled to a writ of mandamus compelling defendants not to obstruct plaintiffs in their exercise of their duties as IGs of their respective federal agencies," *id.* ¶ 100.  Plaintiffs request a declaration that the President's removals were "legally ineffective," a declaration "that plaintiffs remain the lawful IGs of their respective agencies unless and until the President lawfully removes them in compliance with the statutory procedure set forth in 5 U.S.C. §403(b)," an order "[e]njoining Agency Defendants from taking any further action to obstruct plaintiffs from carrying out their official duties as IGs," an award of "all back pay and benefits owed as a result of their unlawful purported removal," and other equitable relief. *Id.*, Prayer for Relief.

On February 14, 2025, three weeks after they were removed, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 14 ("Motion" or "Mot."). Plaintiffs seek an order providing that "Plaintiffs shall continue to serve as Inspectors General (IGs) of their respective agencies unless and until removed in accordance with the requirements of the Inspector General Act as amended," and enjoining Agency Defendants "from (1) taking any further action to obstruct plaintiffs from carrying out their official duties as IGs of their respective federal agencies unless and until any such plaintiff is removed in accordance with the requirements of the Inspector General Act as amended, and (2) recognizing the authority of any other person as successor to any plaintiff as IG."  Proposed Order, ECF No. 14-1.

Later that day, this Court held a virtual hearing.  Minute Order (Feb. 14, 2025).  During the hearing, Plaintiffs agreed that they would not continue to pursue a temporary restraining order, and the Court set a briefing schedule on Plaintiffs' request for a preliminary injunction.  Minute Entry (Feb. 14, 2025).

## LEGAL STANDARD

Plaintiff seeks a preliminary injunction—"an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs must do more than merely show the possibility of prevailing on the merits, but rather must show "a substantial likelihood of success on the merits." *Food & Water Watch, Inc.*

*v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).  Plaintiffs also must establish irreparable harm, as failure do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *accord* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. June 2024 update) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.").

Mandatory injunctions that "would change the status quo" are disfavored as "an even more extraordinary remedy" than the typical preliminary injunction, "especially when directed at the United States Government."  *Kondapally v. USCIS*, No. Civ. A No. 20-00920 (BAH), 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (citations omitted); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) ("In this Circuit, 'the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))).  "Plaintiffs seeking this type of relief . . . face 'an additional hurdle' when proving their entitlement to relief," and courts "exercise extreme caution in assessing" such motions.  *Kondapally*, 2020 WL 5061735, at *3 (citations omitted).  "As a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party."  *Id*. (cleaned up).

## ARGUMENT

Plaintiffs fail to satisfy any of the factors necessary for the extraordinary remedy they seek—a preliminary injunction compelling Defendants, including the President, to reinstate them to serve in eight Inspector General positions from which they have been removed, and preventing the Agency Defendants from continuing to recognize the authority of the officials who have served as Inspectors General on an acting basis over the last several weeks.  Each of the preliminary

injunction factors weigh against such extraordinary relief. Plaintiffs' requested remedy of reinstatement that would operate against the President also exceeds courts' authority.

## I. Plaintiffs Fail to Meet Their Burden to Show Irreparable Harm

The "high standard for irreparable injury"—even higher here insofar as Plaintiffs request a mandatory injunction that would alter the status quo, *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)—requires a two-fold showing by Plaintiffs: First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And second, "the injury must be beyond remediation." *Id.* Although Plaintiffs are unlikely to succeed on the merits, as shown below, the Court need not consider the merits because their failure to show irreparable harm is alone sufficient to deny a preliminary injunction. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

Plaintiffs have failed to meet their burden. They principally contend that their ongoing harm stems from their inability to serve as Inspectors General when they claim that their "purported removal by President Trump did not comply with statutory requirements." Mot. 18. But only in a "genuinely extraordinary situation" may loss of employment constitute irreparable harm. *Sampson*, 415 U.S. at 92 & n.68. And this is not such a situation. *See id.* at 89-92 (holding loss of income and damage to reputation do not amount to irreparable harm). Indeed, court after court in this Circuit and others have concluded that loss of employment does not constitute irreparable harm. *See*, *e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65-66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453

F. Supp. 2d 76, 79-80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury").  And to the extent that Plaintiffs attempt to distinguish this case because of the singular nature of an Inspector General appointment, courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury.  *See Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Marxe v. Jackson*, 833 F.2d 1121, 1122 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53, 53-54 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290, 1291 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 2, 4 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. GAO Emps. Fed. Credit Union*, No. 88-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).  As explained below, executive officers challenging their removal by the President have traditionally sought back pay. *See infra*, p. 26.

If anything, given Plaintiffs' legal theories, their claimed harm is less weighty than that of a typical plaintiff who contends he was wrongfully fired.  Plaintiffs concede that even under their view, the President has the right to remove them "30 days" after "notify[ing] Congress" of the "rationale for the termination."  Mot. 1 (quoting 5 U.S.C. § 403(b)).   And they concede that the President has clear statutory authority to "plac[e] an IG on non-duty *immediately* if circumstances warrant," *id.* at 2, such as if the President determines that an Inspector General's continued presence on duty "otherwise jeopardize[s] legitimate Government interests," 5 U.S.C.

10

§ 6329b(b)(2)(A)(iv).  Thus, they claim that to avoid irreparable harm, they must be immediately reinstated, with the expectation that they could be terminated again 30 days later, and potentially placed on non-duty status during those 30 days.  That is hardly the type of "great" irreparable harm, *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, that might constitute the type of "genuinely extraordinary situation" warranting a departure from the general rule that loss of employment is not irreparable harm, *Sampson*, 415 U.S. at 92 & n.68.

Plaintiffs also argue that their purported "deprivation of the statutory right to function" as Inspectors General constitutes irreparable harm.  Mot. 18.  But it is hard to claim that they have any "statutory right to function" when they concede that the statute gives the President authority to immediately place Inspectors General on non-duty status.  *See id.* at 2; 5 U.S.C. § 403(b)(1)(A); *id.* § 6329b(b)(2)(A)(iv).  Plaintiffs rely solely on two district court cases from decades ago that were later vacated, and are plainly distinguishable: *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated by* 732 F.2d 949 (D.C. Cir. 1983), and *Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C.), *vacated sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993).

In *Berry v. Reagan*, President Reagan removed several members of the Commission on Civil Rights, an action that dissolved the Commission and meant that it could not complete a report it was statutorily required to complete by a date certain.  1983 WL 538, at *1, *5.  But Plaintiffs "are not similarly situated" to the plaintiffs in *Berry*, as each OIG "continues to operate" with acting leaders "functioning as acting" Inspectors General.  *See English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018) (distinguishing *Berry* from case in which plaintiff who sought to affirm her entitlement to role as Acting Director of CFPB).  Many of the OIGs at issue have published

multiple reports since Plaintiffs were terminated.[5]  And like in *English*, "any such harm" to Plaintiffs arising solely from their not functioning as Inspectors General "can be remediated in the ordinary course of this case," if the Plaintiffs were correct about the merits of their claims and the relief available.  *Id*.  That stands in contrast to *Berry*, in which "any harm suffered by the commissioners was plainly irreparable because the commission would have expired and they could not have been reinstated to it."  *Id*.

Similarly, in *Mackie v. Bush*, the President sought to remove the majority of the Board of Governors of the Postal Service Board, an action that would "be irrevocably disruptive of the Board's function."  809 F. Supp. at 146.  As noted, the OIGs at issue are perfectly capable of functioning without Plaintiffs.  By the time this Court rules on Plaintiffs' motion, these OIGs will have been in operation for more than a month without Plaintiffs at the helm.  The remedy Plaintiffs seek—reinstatement with the President having undisputed authority to terminate them again within 30 days—would be more disruptive to the OIGs' function than the status quo of the offices continuing to function under existing leadership.  Moreover, in *Mackie*, the district court entered an injunction preventing the removal of the governors *before* their removal was effectuated, *id*. at 148—it did not reinstate an officer who had already been removed, as Plaintiffs request this Court do here.

Plaintiffs' remaining arguments for irreparable harm are similarly unavailing.  They argue that "absent preliminary relief, plaintiffs' reputations will suffer."  Mot. 18-19.  Reputational harm is not a cognizable irreparable injury.  *See Sampson*, 415 U.S. 91-92.  That problem aside, as

---

[5]  *See*, *e.g.*, Department of Defense Office of Inspector General, All DoD OIG Reports, https://www.dodig.mil/reports.html/ (as of this filing, showing more than 10 reports issued since January 24, 2025); Office of Inspector General, United States Department of State, Reports, https://www.stateoig.gov/reports (as of this filing, showing four reports issued in February 2025).

Plaintiffs' counsel conceded at the February 14, 2025 hearing, the termination emails gave no reason for their termination other than citing "changing priorities," Compl. ¶ 72. It is not clear how such terminations injured Plaintiffs' reputations, nor is it clear how the preliminary injunction they seek would restore their reputations. Plaintiffs seek reinstatement, at which point they concede that the President could terminate them again, 30 days after providing a "substantive rationale, including detailed and case-specific reasons" for doing so. 5 U.S.C. § 403(b)(1)(A). Such a result may well *cause* harm to their reputations, rather than *remedy* any claimed past harm.[6]

It is true that two judges in this district recently granted temporary restraining orders directing the reinstatement of the Special Counsel of the Office of Special Counsel (OSC), and a member of the Merit Systems Protection Board (MSPB), after their removal by President Trump. *See Dellinger v. Bessent*, --- F. Supp. 3d ---, 2025 WL 471022 (D.D.C. Feb. 12, 2025), *application to Supreme Court filed*, No. 24A-790 (U.S. Feb. 18, 2025); *Harris v. Bessent*, --- F. Supp. 3d ---, 2025 WL 521027 (D.D.C. Feb. 18, 2025). The government disagrees with those decisions. The government has sought emergency relief from the Supreme Court in *Dellinger*,[7] and plans to further challenge the court's relief in *Harris*. Yet in any event, the circumstances here are not "extremely similar" to *Dellinger*, as Plaintiffs wrongly argue. Mot. 18. In *Dellinger*, the court

---

[6] One Plaintiff avers that she has "been described by a spokesperson for the administration as a rogue, partisan bureaucrat." Decl. of Christi Grimm ¶ 13, ECF No. 14-9. She does not contend that any Defendant made this statement. In any event, she does not explain how the sought preliminary relief, which could well result in the President terminating her again and providing more fulsome reasons, would remedy any claimed harm to her reputation.

[7] *See* Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Immediate Administrative Stay, *Bessent v. Dellinger*, No. 24A790 (U.S. Feb. 18, 2025). On February 21, the Supreme Court ordered the application "held in abeyance until February 26, when the TRO is set to expire." Order, *Bessent v. Dellinger*, No. 24A790, at 2 (U.S. Feb. 21, 2025). The Supreme Court explained it was doing so in light of the fact that the TRO was set to expire in five days, but did not otherwise address the legal issues presented by the application. *Id.* at 1-2.

found it important that the Special Counsel "was appointed to serve the statutory term of five years" and found that "[t]his case falls outside of the typical paradigm since the OSC is an independent agency." *Dellinger*, 2025 WL 471022, at *10. Likewise, in *Harris*, the court pointed to the statutory term of office and for-cause removal protections for MSPB members. 2025 WL 521027, at *6-7. Here, Plaintiffs do not contend that the OIGs they formerly headed are independent agencies, and Plaintiffs enjoyed neither a statutory term of office nor statutory for-cause removal protection. Therefore, even on their own terms, *Dellinger* and *Harris* provide no support to Plaintiffs.

## II.     Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs are not likely to succeed on the merits for two reasons. First, the President's removal of Plaintiffs did not violate the plain terms of the Inspector General Act. The statute provides: "An Inspector General may be removed from office by the President." 5 U.S.C. § 403(b)(1)(A). The statute does not make the President's authority to remove Inspectors General at any time conditional on compliance with the congressional notice provision. Rather, the notice provision is for the benefit of Congress and creates no judicially enforceable rights in Inspectors General. Second, if the statute were construed to restrict the President's authority to remove Inspectors General, it would infringe on the President's executive authority in violation of Article II. The Supreme Court has recognized only two exceptions to the general rule that the President is constitutionally entitled to remove executive officers. *See Myers v. United States*, 272 U.S. 52, 163-64 (1926). Inspectors General, who perform executive functions and have broad statutory authority, do not fit within either of those narrow exceptions.

### A.    The Inspector General Act Authorizes the President to Remove Inspectors General at any Time

By its plain terms, the Inspector General Act recognizes the President's authority to remove Inspectors General at any time and with no preconditions: "An Inspector General may be removed from office by the President." 5 U.S.C. § 403(b)(1)(A). Plaintiffs argue that because the President did not comply with the congressional notice provision, Plaintiffs' removal violated their rights under the Inspector General Act. But that argument depends on the premises that the President's statutory authority to remove Inspectors General is conditional on compliance with the congressional notice provision, and that Inspectors General may judicially enforce the President's compliance with the congressional notice provision.[8]

Plaintiffs are wrong. The congressional notice provision is in a separate sentence from the removal authorization provision, with no grammatical connection between them. Constitutional concerns aside, it would have been easy for Congress to provide expressly that the President's removal authority is contingent on compliance with the congressional notice provision (such as by providing that the President may not remove an Inspector General, unless he first provides notice to Congress). Congress knows how to make the effectiveness of an executive action conditional on notice to Congress. For example, Congress has authorized agencies to revoke federal financial assistance for violations of certain civil rights laws, but has required the agency head to file a report of such action to congressional committees, and provided: "No such action [revoking federal financial assistance] shall become effective until thirty days have elapsed after the filing of such report." 20 U.S.C. § 1682 (Title IX of the Education Amendments of 1972); 42 U.S.C. § 2000d-

---

[8] Plaintiffs also suggest in a footnote that because the President's aides communicated their removals to them via email, there may have been an improper "delegation" of the President's "removal power." Mot. 11 n.6. But as Plaintiffs rightly concede in their Complaint, they were removed by "President Trump, acting through" emails sent by his aides. Compl. ¶ 4. The fact that the President did not personally send the notification emails raises no delegation concerns.

1 (Title VI of the Civil Rights Act of 1964).  The Inspector General Act contains no such language providing that the President's removal shall not become effective except upon compliance with the notice provision.  Failure to comply with statutory procedural requirements does not substantively invalidate a government action unless the statute plainly specifies that consequence.  *See United States v. James Daniel Real Property*, 510 U.S. 43, 62-65 (1993) (failure to comply with statutory timing requirements does not invalidate a forfeiture action).

Furthermore, the D.C. Circuit and other courts have long held that statutes requiring the Executive Branch to report information to Congress do not create judicially enforceable rights in third parties.  In *Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988) (opinion of Ginsburg, R.B., J., Starr, J., and Sentelle, J.), the D.C. Circuit held that the Secretary of the Interior's compliance with a statute requiring him to report to Congress the reasons for rejecting proposals regarding an oil and gas leasing program was not judicially reviewable in a challenge to the program raised by California.  The court explained:

> Generally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes.  We decline to take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases, of reviewing petitioners' section 111 claim when Congress has not provided for judicial scrutiny of this aspect of the interbranch relationship.

*Id.* at 319.  The Ninth Circuit later followed *Hodel* in holding that compliance with a congressional reporting requirement was not judicially reviewable, explaining: "Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998).[9]

_____

[9] Under Plaintiffs' theory, even if the President provided notice to Congress and a reason for their removal 30 days before removing them, they could challenge their removal by arguing that the reasons provided were insufficiently "substantive[,] . . . detailed and case-specific."  5 U.S.C. § 403(b)(1)(A).  But as the D.C. Circuit explained, a congressional reporting provision "embodies a requirement that by its nature seems singularly committed to *congressional* discretion in

As in those cases, this case involves a statutory requirement to report information to Congress: "the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal or transfer *to both Houses of Congress (including to the appropriate congressional committees)*, not later than 30 days before the removal or transfer." 5 U.S.C. § 403(b)(1)(A) (emphasis added). This provision does not create a judicially enforceable right for non-congressional parties—such as removed Inspectors General—to challenge compliance with the notice provision. Rather, it creates an obligation to Congress that Congress can pursue through the political process of interbranch relations. Indeed, the bipartisan letter that the Chairman and Ranking Member of the Senate Judiciary Committee sent to President Trump requesting more information about the terminations, *see* ECF No. 14-4, shows that this process is occurring. And, as the D.C. Circuit explained: "It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives." *Hodel*, 865 F.2d at 319.[10]

Even if the Court viewed the Inspector General Act as ambiguous, the constitutional avoidance canon would counsel against adopting Plaintiffs' reading of the statute as providing

---

measuring the fidelity of the Executive Branch actor to legislatively mandated requirements." *Hodel*, 865 F.2d at 318 (footnote omitted).

[10] In *Walpin v. Corp. for National & Community Services*, 630 F.3d 184 (D.C. Cir. 2011), the D.C. Circuit stated that a prior version of the Inspector General Act "provides no right to continued duty performance but only to deferral of 'removal' until thirty days after notice is given." *Id.* at 187. To the extent this passage could be read as suggesting that the statute provides Inspectors General with an enforceable right not to be removed except upon 30 days' notice, it is non-binding dicta. In *Walpin*, the court concluded that the President complied with the congressional notice provision, and that conclusion was sufficient to reject the removed Inspector General's mandamus petition challenging his removal. *Id.* at 187-88. The court therefore had no occasion to consider how it would have ruled if the President had not complied with the notice provision. Dicta regarding the President's removal authority "cannot be regarded as authority," even from the Supreme Court. *Myers*, 272 U.S. at 142 (declining to follow dicta from *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

Inspectors General with absolute protection from removal unless and until the President provides 30 days' notice to Congress. Under the constitutional avoidance canon, courts may "interpret[] statutes to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction." *Judicial Watch v. U.S. Secret Service*, 726 F.3d 208, 226 (D.C. Cir. 2013) (quoting *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989)). As shown below, Plaintiffs' reading not only would create "difficult constitutional questions," but it would violate Article II's vesting of the executive authority in the President. *See infra*, pp. 19-23. And the statute's text "fairly admits" of a construction in which Inspectors General lack a right to judicially enforce compliance with the congressional notice provision as a limit on the President's removal authority. Indeed, that is the most natural reading of the text.[11]

Because the Inspector General Act does not make the President's removal authority contingent on compliance with the congressional notice provision, Plaintiffs are not likely to succeed on any of their claims or in obtaining any of the relief they seek in their Complaint. Plaintiffs raise no standalone claim based on alleged violation of the congressional notice provision. Rather, Plaintiffs acknowledge that "their claims . . . are all based on the same predicate: They were unlawfully removed from office in violation of 5 U.S.C. §403(b)." Mot. 10.[12]

---

[11] Plaintiffs may argue that the last sentence of § 403(b)(1)(A), which states, "Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal," implies that § 403(b)(1)(A) prohibits removing Inspectors General in a way that does not comply with the congressional notice provision. This sentence is best read as negating any inference that in specifically discussing removal and transfer, the provision somehow forecloses other personnel actions that are authorized by other laws. Especially in light of the case law generally precluding judicial review of compliance with congressional reporting requirements, and the constitutional concerns raised by restricting the President's authority to remove Inspectors General, negative implication from this sentence is too thin a reed on which to find that the congressional notice provision confers on Inspectors General a judicially enforceable right to contest their removal.

[12] *See* Compl. ¶ 88 ("the purported removals of plaintiffs were not legally effective"); *id.* ¶ 93 ("President Trump has acted *ultra vires* in purporting to remove plaintiffs as IGs."); *id.* ¶ 98

Likewise, each form of relief sought in the Complaint targets the purported unlawfulness of Plaintiffs' removal.[13] Therefore, Plaintiffs are incorrect that they "will prevail if even one of the . . . requirements" of the congressional notice provision "was not complied with." *Id*. That assertion depends on their unstated and incorrect assumption that the Inspector General Act makes the President's removal authority conditional on compliance with the congressional notice provision.

### B.    If the Inspector General Act Restricts the President's Removal Authority, it Is Unconstitutional

Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id*. § 3). To discharge those responsibilities, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010). "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514.

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 204. First, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Court held that Congress could "give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Second,

---

("Plaintiffs have a clear right to remain in office unless and until the statutory requirements for removal under 5 U.S.C. § 403(b) have been satisfied.").

[13] *See id.*, Prayer for Relief, ¶ A (seeking declaration that Plaintiffs' removal was "legally ineffective"); *id.* ¶ B (seeking declaration "that plaintiffs remain the lawful IGs of their respective agencies"); *id.* ¶ C (seeking injunction preventing Agency Defendants "from taking any further action to obstruct plaintiffs from carrying out their official duties as IGs"); *id.* ¶ D (seeking "all back pay and benefits owed as a result of [Plaintiffs'] purported removal").

the Court has held that "Congress could provide tenure protections to certain inferior officers with narrowly defined duties." *Id.* at 204.

Inspectors General do not fit within either of those exceptions. First, Inspectors General in no way resemble commissioners of a multimember body of experts performing legislative and judicial functions, as the Supreme Court found was at issue in *Humphrey's Executor*. An Inspector General is the single head of his or her respective OIG, in contrast to a member of a multimember board or commission. *Cf. Seila Law*, 591 U.S. at 224 (differentiating "[t]he CFPB's single-Director structure" from the multimember commissions at issue in cases such as *Humphrey's Executor*). The Inspector General position also differs in function and authority from the 1930s Federal Trade Commission (FTC), as the Supreme Court described it in *Humphrey's Executor*. There, the Court described the FTC as "act[ing] in part quasi legislatively and in part quasi judicially," and stated that "[t]o the extent that it exercises any executive function," it did so "in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government." 295 U.S. at 628. By contrast, Inspectors General clearly exercise executive power. Among other things, Inspectors General "conduct and supervise audits and investigations relating to" agency operations, in order "(A) to promote economy, efficiency, and effectiveness in the administration of those programs and operations; and (B) to prevent and detect fraud and abuse in those programs and operations." 5 U.S.C. § 402(b). They also "provide policy direction" for agency operations, and "recommend policies" for improving agency efficiency and rooting out misconduct. *Id.* § 404(a)(1), (a)(3). Such activities are plainly executive, rather than legislative or judicial.

An Inspector General's broad duties also exceed the bounds of the exception for certain inferior officers who perform only limited duties, exemplified by *Morrison v. Olson*, 487 U.S. 654

(1988).  In *Morrison*, the Supreme Court concluded that removal protection for an independent counsel who had been appointed by a court of law was constitutional because the independent counsel had "limited jurisdiction" and "lack[ed] policymaking or significant administrative authority."  *Id.* at 691.  While independent counsels' jurisdiction under the (now-expired) statute at issue in *Morrison* was limited to investigating and prosecuting specific matters referred by the Attorney General, *id.* at 660-63, Inspectors General have broad authority to conduct investigations and audits regarding all the programs of the applicable department or administration, in this case the Departments of Defense, Veterans Administration, Health and Human Services, State, Education, Agriculture, and Labor and the Small Business Administration.  *See* 5 U.S.C. §§ 402(b), 405, 406.  Far from "lacking policymaking or significant administrative authority," *Morrison*, 487 U.S. at 691, Inspectors General are charged with "provid[ing] policy direction" and "recommend[ing] policies" for agency operations, 5 U.S.C. § 404(a)(1), (a)(3), (a)(4), and being "the head of each Office [of the Inspector General]," *id.* § 403(a), placing the Inspector General in charge of each OIG's operations and the teams of auditors and investigators who work within the OIG.[14]

    None of Plaintiffs' contrary arguments is persuasive.  Plaintiffs first argue that removal restrictions on Inspectors General are permissible because they "are properly classified as federal

---

[14] One scholar recently opined that "the notice requirement is probably unconstitutional."  Jack Goldsmith, Lawfare, Trump Fired 17 Inspectors General—Was It Legal?, https://www.lawfaremedia.org/article/trump-fired-17-inspectors-general-was-it-legal (Jan. 27, 2025).  He explained that the Supreme Court "has recognized the president's 'unrestricted removal power' over executive branch officials, subject to only 'two exceptions.'  The potentially relevant exception here comes from the shriveled and maybe-dead precedent of *Morrison v. Olson* (1988)." *Id.*  Under *Morrison*, even if an officer is an inferior officer, the President can remove the officer "unless the officer has '*limited* duties and *no* policymaking or administrative authority.'"  *Id.*  He opined that "an IG probably exceeds this standard" because "IG duties cannot plausibly be described as 'limited.'  And the IG has at least some policymaking authority."  *Id.*

21

employees rather than officers under the Appointments Clause." Mot. 15. Yet as Plaintiffs acknowledge, "any appointee" to a continuing position "exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,'" within the meaning of Article II. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). By leading OIGs, providing policy direction to federal agencies, and overseeing audits and investigations of agency operations, *see supra*, pp. 20-21, Inspectors General easily meet this standard.

Plaintiffs next argue that Inspectors General are, at most, "inferior officers—and the Supreme Court has held that Congress may place restrictions on their removal without infringing the President's removal power." Mot. 16. Even if that were true, it would be quite irrelevant. The Supreme Court has long held that the President's unrestricted removal power fully applies to officers appointed by and with the advice and consent of the Senate, regardless of their status as principal or inferior. *See Myers*, 272 U.S. at 158 (upholding the removal of a deputy postmaster appointed by and with the advice and consent of the Senate, even though "a postmaster is an inferior officer"). Further, the Court has not broadly held that Congress can place removal restrictions on inferior officers. Rather, the Supreme Court has recognized that an "exception[]" to the President's "general removal power" for certain "inferior officers *with limited duties and no policymaking or administrative authority* [] represent[s] what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 215, 218 (citation and quotation omitted) (emphasis added). This Court need not decide whether Inspectors General are principal officers or inferior officers, because as explained above, their broad authority exceeds the narrow exception for "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218; *see supra*, pp. 20-21.

Plaintiffs also argue that the removal restrictions they assert exist in the Inspector General Act are "too limited to violate Article II," because they concede that the President may remove an Inspector General 30 days after providing notice to Congress. Mot. 17. Yet the general rule is "the President's *unrestricted* removal power" over executive officers, and Inspectors General fit within neither of the "two exceptions" that Supreme Court precedent has "left in place." *Seila Law*, 591 U.S. at 215 (emphasis added). Therefore, *any* restriction on the President's removal authority over Inspectors General—whether 30 months or 30 days—is inconsistent with Article II.

That the President must have unfettered authority to remove Inspectors General is not a new position. During the Carter Administration, the Department of Justice's Office of Legal Counsel opined that the congressional notice provision in the original Inspector General Act "constitutes an improper restriction on the President's exclusive power to remove Presidentially appointed executive officers" because "the power to remove a subordinate appointed officer within one of the executive departments is a power reserved to the President acting in his discretion." *Inspector General Legislation*, 1 Op. O.L.C. 16, 18 (1977). And that notice provision was narrower than the current version, stating only: "The President shall communicate the reasons for any such removal to both Houses of Congress." 92 Stat. at 1102, § 3(b). Moreover, the restrictions on removal that Plaintiffs read into the Inspector General Act are more intrusive than Plaintiffs suggest. Even though Plaintiffs concede that the President has authority to remove an Inspector General 30 days after giving notice to Congress, in their view, the President has absolutely no authority to remove an Inspector General within that 30-day period, even if an Inspector General commits gross misconduct that would meet any for-cause standard.[15]

---

[15] Plaintiffs note that the statute allows the President to "immediately put[] an IG into a non-duty status when there is reason to do so." Mot. 17. But a 30-day restriction on removal would still hinder and delay a President in putting in place a new Inspector General.

**III.    The Balance of Equities and Public Interest Weigh Against Injunctive Relief**

Granting the extraordinary relief requested would be an unprecedented intrusion into the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 591 U.S. at 203.  Plaintiffs are asking this Court to reinstate *eight* Inspectors General—executive officials whom the President has chosen to remove—in one fell swoop.  That sort of harm to the Executive, and to the constitutional separation of powers, is transparently irreparable.

Moreover, the public interest is better served by Inspectors General who hold the President's confidence, and thus will more effectively serve him in executing his duties as Chief Executive.  And "the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961)).  The public interest is best served by maintaining this traditional deference to the government's internal management of its own personnel.

On the other side of the balance, Plaintiffs' interest is slight, at best.  Plaintiffs concede that if the Court enters the requested injunctive relief, the President could remove them in 30 days and could place them in non-duty status during the interim period.  Mot. 17.  Even if the Court grants Plaintiffs' requested relief, they can have no expectation for continued service beyond collecting a couple more government paychecks before being terminated for a second time.  That entirely reparable interest does not outweigh the harm to the Executive Branch from the forced reinstallation of eight Inspectors General whom the President has determined should no longer serve.

**IV.    Reinstatement Is an Improper Remedy**

That all of the preliminary injunction factors weigh against Plaintiffs is reason enough to deny their Motion.  But the Court should also deny relief because Plaintiffs' requested remedy—

an injunction running against the President that would require him to recognize the reinstatement of officials he has removed—is improper and beyond the Court's equitable authority.

The Supreme Court recognized long ago that a court "has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. (4 Wall.) at 501; *see Franklin* v. *Massachusetts*, 505 U.S. 788, 826-28 (1992) (Scalia, J., concurring in part and concurring in the judgment). The injunction requested by Plaintiffs violates this principle. Plaintiffs request an injunction, applicable to all Defendants including the President, ordering that "Plaintiffs shall continue to serve as Inspectors General (IGs) of their respective agencies unless and until removed in accordance with the requirements of the Inspector General Act as amended." Proposed Order, ECF No. 14-1. Plaintiffs purport to limit the second part of the injunction to the "Agency Defendants" other than the President, enjoining them from obstructing Plaintiffs from carrying out official duties as Inspectors General or recognizing the authority of any other person as Inspector General. *Id.* Even that part of the proposed injunction would, as a practical matter, restrain the President in his exercise of Article II authority. But in any event, the fact that Plaintiffs expressly limited the second part of their proposed injunction to the Agency Defendants makes even clearer that the first part would, by its terms, operate against the President.[16]

---

[16] In dismissing for lack of jurisdiction an appeal of the district court's temporary restraining order reinstating Special Counsel Dellinger, a D.C. Circuit panel stated in a footnote that "the TRO is properly read as not applying directly to the President but rather to the other defendants acting on his behalf." Order, *Dellinger v. Bessent*, No. 25-5028, at 10 n.1 (D.C. Cir. Feb. 15, 2025) (per curiam). The proposed injunction here is unlike the temporary restraining order in *Dellinger* in that it expressly limits only part of the order to the defendants other than the President, creating the clear implication that the remainder of the injunction restrains the President. *See id.* at 4. Moreover, the government disagrees with the panel's decision in *Dellinger* and has sought emergency relief from the Supreme Court. As Judge Katsas's dissent persuasively explains, an order directing the reinstatement of an official whom only the President has "statutory and constitutional authority to appoint" and "remove" "necessarily targets the President." *Id.* at 21 n.2 (Katsas, J., dissenting).

Plaintiffs' requested remedy would also exceed the scope of this Court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy.[17] "[I]t is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Instead, "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law," for instance through suits for back pay. *Id.* Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*[18] Indeed, when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement. See *Wiener* v. *United States*, 357 U.S. 349, 350 (1958) (suit "for recovery of his salary"); *Humphrey's Executor*, 295 U.S. at 612 (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (suit "for his salary from the date of removal"); *Shurtleff* v. *United States*,

---

[17] In dissenting from the order holding in abeyance the government's application to vacate the TRO in *Dellinger*, Justice Gorsuch (joined by Justice Alito) explained: "That limitation would seem to pose a problem here, for courts of equity at the time of the founding were apparently powerless to 'restrain an executive officer from making a . . . removal of a subordinate appointee.'" Order, *Dellinger*, No. 24A790, at 3 (Gorsuch, J., dissenting) (quoting *White v. Berry*, 171 U.S. 366, 377 (1898)).

[18] *See, e.g.*, *Baker* v. *Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *Walton* v. *House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers[.]"); *Harkrader* v. *Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government."); *White*, 171 U.S. at 377 ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another.").

189 U.S. 311, 318 (1903) (suit "for salary"); *Parsons* v. *United States*, 167 U.S. 324, 326 (1896)

(suit "for salary and fees").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.


Dated:  February 21, 2025                    Respectfully Submitted,


                                             BRETT A. SHUMATE
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             CHRISTOPHER R. HALL
                                             Assistant Director, Federal Programs Branch

                                             */s/ Jeremy S.B. Newman*
                                             JEREMY S.B. NEWMAN
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, DC 20005
                                             Tel: (202) 532-3114
                                             Fax: (202) 616-8470
                                             Email: jeremy.s.newman@usdoj.gov

                                             *Attorneys for Defendants*