IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT P. STORCH, et al.,

　　　　*Plaintiffs,*

　　v.

PETE HEGSETH, in his official capacity as Secretary of Defense, et al.,

　　　　*Defendants.*

Case No. 1:25-cv-00415-ACR

**BRIEF OF THE STATE OF FLORIDA AND 19 STATES
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS
AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

JAMES UTHMEIER
　*Attorney General of Florida*

JEFFREY PAUL DESOUSA
　*Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
　*Chief Deputy Solicitors General*
DARRICK W. MONSON
　*Assistant Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amicus *State of Florida*

[Additional counsel listed inside cover page]

February 24, 2025

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

JOHN MCCUSKEY
Attorney General
State of West Virginia

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* the State of Florida and 19 States verify that no party to this brief

is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

ADDITIONAL COUNSEL ........................................................................... i

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF *AMICI CURIAE* ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................. 1

ARGUMENT ............................................................................................... 4

I.    The President has absolute authority to remove Inspectors
      General appointed by the President with the advice and consent
      of the Senate. ................................................................................... 4

II.   By threatening the separation of powers, "independent" executive
      officers and agencies in turn threaten state sovereignty. ................. 9

III.  Federal courts lack equitable authority to reinstate public
      officials. ......................................................................................... 12

CONCLUSION ........................................................................................... 19

CERTIFICATE OF COMPLIANCE ............................................................. 20

CERTIFICATE OF SERVICE ..................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Thetford*, 529 F.2d 695 (5th Cir. 1976) ........................................................ 17

*Abbott v. Thetford*, 534 F.2d 1101 (5th Cir. 1976) ...................................................... 17

*Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341 (1951) ....................................... 18

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979) ............................................ 11

*Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 491, 34 Eng. Rep. 190 (Ch. 1810) ........................................................................................................................... 13

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................................. 16

*Beebe v. Robinson*, 52 Ala. 66 (1875) .......................................................................... 15

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ....................... 16

*Bessent v. Dellinger*, No. 24A790 (U.S.) ............................................................... 12, 16

*Beth Israel Hosp. v. NLRB*, 437 U.S. 483 (1978) ........................................................ 12

*Bond v. Floyd*, 385 U.S. 116 (1966) ............................................................................. 17

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................ 1, 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) ......................................................... 7

*Chamber of Commerce of U.S. v. NLRB*, 723 F. Supp. 3d 498 (E.D. Tex. 2024) .......................................................................................................................... 11

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793) ......................................................... 9

*Cochran v. McCleary*, 22 Iowa 75 (1867) ................................................................... 15

*Collins v. Yellen*, 594 U.S. 220 (2021) .......................................................................... 7

*Delahanty v. Warner*, 75 Ill. 185 (1874) ..................................................................... 15

*Dellinger v. Bessent*, No. 25-5028 (D.C. Cir.) ............................................................. 16

*Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020) (mem.) .......................... 18

*Edmond v. United States*, 520 U.S. 651 (1997) ............................................................. 6

*Fineran v. Bailey*, 2 F.2d 363 (5th Cir. 1924) ............................................................ 16

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ..................................... 9

*Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) ......................................................... 13

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................. 18

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) ................................................................................................................ 13, 17

*Hagner v. Heyberger*, 7 Watts & Serg. 104 (Penn. 1844) ..................................... 14, 15

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ....................................... 5, 10

*In re Sawyer*, 124 U.S. 200 (1888) ................................................................... passim

*Morrison v. Olson*, 487 U.S. 654 (1988) ...................................................................... 6

*Myers v. United States*, 272 U.S. 52 (1926) .............................................................. 7, 8

*Nixon v. United States*, 506 U.S. 224 (1993) .............................................................. 17

*Props. of the Vills., Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept. 24, 2024) .............................................................................................................. 11

*Republica v. Cobbett*, 3 U.S. 467 (Pa. 1798) ............................................................... 9

*Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 18, 2024) ...................... 11

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) .............. passim

*Sheridan v. Colvin*, 78 Ill. 237 (1875) ...................................................................... 15

*State ex rel. McCaffery v. Aloe*, 54 S.W. 494 (Mo. 1899) ........................................... 15

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................... 17

*Storch v. Hegseth*, No. 1:25-cv-415 (D.D.C.) ............................................................ 12

*Tappan v. Gray*, 9 Paige Ch. 507 (Ch. Ct. N.Y. 1842) .............................................. 14

*Taylor v. Kercheval*, 82 F. 497 (C.C.D. Ind. 1897) ................................................... 15

*Tesla, Inc. v. NLRB*, 86 F.4th 640 (5th Cir. 2023) ..................................................... 12

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ..................................................... 6, 10

*United States v. Perkins*, 116 U.S. 483 (1886) .......................................................... 6

*Walton v. House of Representatives of Okla.*, 265 U.S. 487 (1924)...................... 13, 16

*Warren v. DeSantis*, No. 4:22-cv-302 (N.D. Fla.) .................................................... 18

*Webster v. Fall*, 266 U.S. 507 (1925) ........................................................................ 17

*White v. Berry*, 171 U.S. 366 (1898) ......................................................................... 16

*Wiener v. United States*, 357 U.S. 349 (1958) ........................................................... 5

## Statutes

42 U.S.C. § 2000e-5.................................................................................................... 12

5 U.S.C. § 401 ............................................................................................................. 2

5 U.S.C. § 402 ............................................................................................................. 6

5 U.S.C. § 403(b) ........................................................................................................ 2, 6

5 U.S.C. § 406 ............................................................................................................. 7

5 U.S.C. § 415.............................................................................................................. 2

Judiciary Act of 1789, 1 Stat. 73 ............................................................................... 17

## Constitutional Provisions

U.S. Const. art. II, § 1................................................................................................ 4

U.S. Const. art. II, § 3................................................................................................ 3, 4, 5

## Rules

Local Civil Rule 7(o)(1) ............................................................................................. 1

## Regulations

Fed. Trade Comm'n, *Dissenting Statement of Commissioner Andrew N. Ferguson* (June 28, 2024) ...................................................................................... 11

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024)................................ 11

**Other Sources**

1 Annals of Cong. 463 (1789) (J. Madison) ........................................................ 4

Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* (1911) .................................................................................................................. 15

Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* (1909) .................................................................................................................. 15

*Inspector General Legislation*, 1 Op. O.L.C. 16 (1977) ..................................... 8

Inspector General, U.S. Dep't of Defense, *Semiannual Report to Congress* (Apr. 1–Sept. 30, 2024) .............................................................. 7

James L. High, *Treatise on the Law of Injunctions* (2d ed. 1880) ................. 15

John Norton Pomeroy, *A Treatise on Equity Jurisprudence* (4th ed. 1918) ..................................................................................................................... 15

Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* (2d ed. 1840) ................................................................................ 14

Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, April 1775 ................................................................. 14

Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397 (2018) ..................................................................................... 14

Office of Inspector General, U.S. Dep't of Defense, *Fiscal Year (FY) 2025 Budget Estimates* ...................................................................... 7

Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985 (2022) ........................ 14

*The Federalist* No. 48 (Madison) (Jacob E. Cooke, ed., 1961) ...................... 5

*The Federalist* No. 70 (Hamilton) (Jacob E. Cooke, ed., 1961) .............................. 5, 10

W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382 (1922) ................................................... 14

## INTEREST OF *AMICI CURIAE*

The Attorney General of Florida, on behalf of the State of the Florida and 19 States, respectfully submits this amicus brief pursuant to Local Civil Rule 7(o)(1) in support of the defendants and in opposition to plaintiffs' motion for a preliminary injunction. President Trump lawfully removed plaintiffs from their posts.

The States ceded sovereign authority to the federal government when they joined the union on the understanding that the power of the federal government was limited, that this power would be divided among multiple branches of government, and that the States and their citizens would be able to hold federal officials democratically accountable for their exercise of that power. Yet when it comes to independent agencies, none of that is true. Federal power is instead consolidated in a select few accountable to no one. And that naturally leads to the expansion of that power.

*Amici* have an interest in ensuring that federal officials exercise their power— power that flows from the States themselves—within constitutional limits. After all, "[s]eparation-of-powers principles" do not just "protect each branch of government from incursion by the others"; they "protect the individual" and state sovereignty as well. *Bond v. United States*, 564 U.S. 211, 222 (2011). The issue here—and the separation-of-powers principles involved in resolving it—go to the heart of the federalist bargain struck by the Framers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Robert P. Storch; Michael J. Missal; Christi A. Grimm; Cardell K. Richardson, Sr.; Sandra D. Bruce; Phyllis K. Fong; Larry D. Turner; and Hannibal

"Mike" Ware all challenge President Trump's authority to remove them from their presidentially appointed positions as Inspectors General of various federal agencies. They ask this Court to reinstate them to these positions.[1] As Inspectors General, plaintiffs were "under the general supervision of" their respective department heads, but no department head could "prevent or prohibit the Inspector[s] General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." 5 U.S.C. § 403(a). As such, they served as principal officers and exercised a significant part of the executive power of the President.

Plaintiffs nevertheless contend that the President's decision to remove them from their posts "was contrary to law and therefore a nullity." Compl. 4 ¶ 6. As plaintiffs read it, the Inspector General Act conditions the President's authority to remove an Inspector General on communicating to Congress the reasons for removal 30 days in advance of carrying out the removal. Pltfs.' Mot. for Prelim. Inj. ("Mot") 1. They furthermore read the Act as constraining the President's ability to suspend an Inspector General during the 30-day period prior to removal (by requiring him to

---

[1] Storch was the Inspector General of the U.S. Department of Defense. Missal was the Inspector General of the U.S. Department of Veterans Affairs. Grimm was the Inspector General of the U.S. Department of Health and Human Services. Richardson was the Inspector General of the U.S. Department of State. Bruce was the Inspector General of the U.S. Department of Education. Fong was the Inspector General of the U.S. Department of Agriculture. Turner was the Inspector General of the U.S. Department of Labor. Ware was the Inspector General of the U.S. Small Business Administration. Each of these Inspector General positions is listed in 5 U.S.C. § 401(1) and is therefore required to be appointed by the President with the advice and consent of the Senate. 5 U.S.C. § 403(a); *compare* 5 U.S.C. § 415 (designating federal entities whose heads appoint Inspectors General for that entity).

determine that the "continued presence of the Inspector General in the workplace poses a threat"). Mot. 8 n.5. Even if plaintiffs' characterization of the Act were accurate, *but see* Defts.' Opp. to Pltfs.' Mot. for Prelim. Inj. 15–19 (explaining why the text of the Act does not protect plaintiffs from removal), its effect is to saddle the President with an Inspector General who does not have his complete confidence for at least 15 days, and to require the President to justify a decision to remove an Inspector General to Congress. These restrictions are all unconstitutional, because they interfere with the President's plenary authority to supervise the executive branch and "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Protecting the President's removal authority from congressional incursions is an important safeguard of state sovereignty. When the States surrendered some of their sovereign power to the federal government upon joining the union, they never would have imagined unaccountable officials wielding that power independent of someone who must answer to the people or the States for its exercise. That was not what the Constitution promised them. Yet when it comes to independent agencies and tenure-protected executive officers, that is precisely what the States get. When independent agencies and tenure-protected officers wield executive power outside the purview of a democratically elected President, it not only usurps the President's authority, it strikes at the core of the compact the States agreed to at the Founding. And state sovereignty and individual liberty suffer.

Nor can this Court grant the relief that plaintiffs seek: an injunction ordering their reinstatement. Just as Congress may not restrain the President's removal

power over executive officials, courts may not order an executive officer's reinstatement. That limit on equity dates to the Founding and runs throughout the precedents of the Supreme Court. The rule ensures effective governance, respects state sovereignty, and yields reasoned jurisprudence. This Court should heed what the Supreme Court held over a century ago: "a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888).

## ARGUMENT

The Court should deny plaintiffs' motion for a preliminary injunction. Core separation-of-powers principles, bolstered by long historical understanding, require that the President have the authority freely to remove executive branch officials, including Inspectors General. That limitation on Congress's power indirectly preserves state sovereignty by ensuring that "independent agencies" are politically accountable should they attempt to intrude in state affairs. And a federal court would in any event lack the authority to reinstate these former Inspectors General to their posts.

## I. The President has absolute authority to remove Inspectors General appointed by the President with the advice and consent of the Senate.

"'[T]he 'executive Power'—all of it—is 'vested in a President, who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). And "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (J. Madison). That necessarily includes the authority to remove executive officers. Indeed, "lesser officers must remain accountable to the President," for it is his

4

"authority they wield." *Seila Law*, 591 U.S. at 213. Without the power to remove, the President lacks the ability to compel compliance with his directives, *id.* at 213–14, and thus to fulfill his oath to execute the law, U.S. Const. art. II, § 3.

Given the "necessity of an energetic executive," *The Federalist* No. 70, at 472 (Hamilton) (Jacob E. Cooke, ed., 1961), and the legislative branch's historic tendency to "draw[] all power into its impetuous vortex," *The Federalist* No. 48, at 333 (Madison) (Jacob E. Cooke, ed., 1961), it is critical that the President's authority to direct and supervise the executive branch in the performance of its functions be protected from legislative encroachment. As a result, the Supreme Court has recognized only two exceptions to the President's otherwise "exclusive and illimitable power of removal." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935); *see also Seila Law*, 591 U.S. at 215 (referring to the President's "unrestricted removal power"). Neither exception covers the Inspectors General in this case.

The first exception, recognized in *Humphrey's Executor* and later in *Wiener v. United States*, 357 U.S. 349 (1958), is for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. That exception—which has been roundly criticized by multiple members of the Supreme Court, *see, e.g.*, *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring, joined by Gorsuch, J.) ("I would repudiate what is left of this erroneous precedent"), and appears ripe for overruling—does not apply to Inspectors General, who individually serve as the heads of Offices of the Inspector General in each of their respective executive departments.

*See* 5 U.S.C. § 403(a). The Inspectors General furthermore do not in any sense perform "legislative" or "judicial" functions; they are executive officers, responsible "to conduct and supervise audits and investigations relating to the programs and operations of the establishments" in which they serve. 5 U.S.C. § 402(b)(1). Restrictions on removing an Inspector General thus cannot be justified under whatever remains of the doubtful precedent in *Humphrey's Executor*.

The second exception is for certain inferior officers, and it has been applied to only two: a naval cadet engineer, *United States v. Perkins*, 116 U.S. 483 (1886), and the so-called independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988). That narrow exception—representing the "outermost constitutional limit[]" on the President's removal power, *Seila Law*, 591 U.S. at 218—does not apply here. Although they are superficially subject to the "general supervision" of the heads of the executive departments whose activities they are responsible for investigating, 5 U.S.C. § 403(a), that apparent subordination is an illusion, as the very next sentence of the provision states that a department head cannot "prevent or prohibit" an Inspector General from carrying out any audit or investigation. In all practical respects, Inspectors General do not have a superior other than the President. They thus qualify as principal officers under the chief criterion the Supreme Court has used to determine whether an Officer of the United States is principal or inferior. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) ("'[W]hether one is an "inferior" officer depends on whether he has a superior' other than the President." (quoting *Edmond v. United States*, 520 U.S. 651, 662 (1997)).

6

To avoid this conclusion, plaintiffs go so far as to suggest that their status is that of mere "employees." Mot. 15–16. They claim that they do not exercise "*significant* authority pursuant to the laws of the United States." Mot. 15 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). They downplay their authority "to make arrests, conduct searches, and seize evidence," Mot. 15 (citing 5 U.S.C. § 406(f)), as no different than that of an FBI agent. Putting to one side plaintiffs' unexamined assumption that FBI agents do not themselves exercise "significant authority pursuant to the laws of the United States" (a conclusion that would surely come as a surprise to many who have been the subjects of FBI investigations), they ignore the obvious difference between a field agent and a presidentially appointed, Senate-confirmed agency head responsible for hiring and firing a sizable staff, making major decisions regarding the allocation of appropriated funds, and directing the investigative aims of a department-wide auditing agency.[2] It beggars belief that the head of such an important agency would not be directly accountable to the President in the manner that the Constitution prescribes for all officers.

Inspectors General are therefore covered by the Supreme Court's decisions in *Seila Law*, *Collins v. Yellen*, 594 U.S. 220 (2021), and *Myers v. United States*, 272 U.S. 52 (1926). In *Seila Law* and *Collins*, the Supreme Court held that a single principal

---

[2] As of late 2024, for instance, the Inspector General of the Department of Defense employed a staff of more than 1,860, Inspector General, U.S. Dep't of Defense, *Semiannual Report to Congress* at 2 (Apr. 1–Sept. 30, 2024), https://tinyurl.com/bdrc6pd6, and administered an annual budget in excess of $500,000,000, Office of Inspector General, U.S. Dep't of Defense, *Fiscal Year (FY) 2025 Budget Estimates*, https://tinyurl.com/549nfsj4.

officer serving as the head of an executive agency could not be tenure-protected. In *Myers*, the Court held that even an *inferior* officer appointed by the President with the advice and consent of the Senate (a postmaster first class supervised by the Postmaster General) was subject to the plenary removal authority of the President. Thus, even if plaintiffs were correct in their alternative contention that Inspectors General are inferior officers (they are not), any removal protections in section 3 of the Inspector General Act would not pass constitutional muster.

The Department of Justice's Office of Legal Counsel has corroborated that any restriction on the removal of Inspectors General is unconstitutional. In 1977, as preliminary versions of the Inspector General Act were under consideration in Congress, the Office of Legal Counsel warned that any restriction on the removal of Inspectors General by the President—even a mere requirement that the President communicate to Congress his reasons for removal—would in its view be unconstitutional. *See Inspector General Legislation*, 1 Op. O.L.C. 16 (1977). "[W]e are of the opinion that the requirement that the President notify both Houses of Congress of the reasons for his removal of an Inspector General constitutes an improper restriction on the President's exclusive power to remove Presidentially appointed executive officers." *Id.* at 18. "[T]he power to remove a subordinate appointed officer within one of the executive departments is a power reserved to the President acting in his discretion." *Id. A fortiori*, the even greater restrictions that plaintiffs advocate in their motion contravene the President's authority to remove Inspectors General.

II.    **By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty.**

Whether Congress may shield executive officials from presidential oversight has grave ramifications for *amici* States. Before joining the union, "the several States had absolute and unlimited sovereignty within their respective boundaries." *Republica v. Cobbett*, 3 U.S. 467, 473 (Pa. 1798). By entering a compact under the Constitution, the States "surrendered" some of that sovereignty to the United States. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 435 (1793) (Iredell, J., dissenting). But "in every instance where [their] sovereignty ha[d] not been delegated to the United States, [the States remained] completely sovereign." *Id.* The result was a "system of government" that "differ[ed], in form and spirit, from all other governments, that ha[d] [t]heretofore existed in the world"—a carefully calibrated balance of power between States and the federal government. *Respublica*, 3 U.S. at 473. "[T]he United States ha[s] no claim to any authority but such as the States have surrendered to [it]." *Chisholm*, 2 U.S. at 435 (Iredell, J., dissenting).

When ceding that sovereign power, the States ensured that it would be divided among distinct branches of the federal government. They "viewed the principle of the separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). To protect their sovereignty and preserve individual liberty, the founding States "scrupulously avoid[ed] concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 223. The one exception was the executive branch. Because an "energetic executive" is "essential" to perform that branch's "unique responsibilities," the Framers decided to

"fortif[y]" that power in "one man." *Id.* at 223–24. To mitigate their concerns over power consolidation, they made the executive branch "the most democratic and politically accountable" in the federal government. *Id.* at 224. Only the President and Vice President are "elected by the entire Nation." *Id.* And because of the nature of the electoral college, they are elected not just by the People, but also by the States. This carefully calibrated "allocation of powers"—essential to the compact the States agreed to upon joining the union—protects "libert[y]" and state "sovereignty." *Bond*, 564 U.S. at 221.

Independent agencies threaten that compact. *See, e.g.*, *Seila Law*, 591 U.S. at 246 (Thomas, J., concurring) (observing that cases like *Humphrey's Executor* "laid the foundation for a fundamental departure from our constitutional structure"). They represent one of the founding States' worst fears: the consolidation of power in one or a few democratically unaccountable officials. *See* 591 U.S. at 222–24. Without "a politically accountable officer [to] take responsibility" for the exercise of executive power, "the public [and the States] can only wonder 'on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Arthrex*, 594 U.S at 16 (quoting *The Federalist* No. 70, at 476 (A. Hamilton) (Jacob E. Cooke, ed., 1961)). By eviscerating the "clear and effective chain of command down from the President, on whom all people vote," the actions of independent agencies are deprived of "legitimacy and accountability to the public" and the States. *Id.* at 11 (internal quotation marks omitted).

One need not search long for an egregious example. Just last year, the Federal Trade Commission ("FTC") banned noncompete clauses in employment contracts nationwide. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). In "the most extraordinary assertion of authority in the Commission's history," a few unaccountable commissioners "prohibit[ed] a business practice that has been lawful for centuries" and "invalidate[d] thirty million existing contracts." Fed. Trade Comm'n, *Dissenting Statement of Commissioner Andrew N. Ferguson* 1 (June 28, 2024), https://tinyurl.com/3j8dxrtx. And they did so even though "[c]ommercial agreements traditionally are the domain of state law." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). Nor did the FTC care that 46 states had exercised their sovereign authority to permit noncompete agreements in some form. *See* Ferguson Dissent at 14. But because of the FTC's independence, the States have no one to hold to account for that dramatic intrusion on their sovereignty.[3] The FTC wields extraordinary authority to usurp state sovereignty with no political accountability.

The same is true of the National Labor Relations Board ("NLRB"), which recently adopted a rule that "would treat virtually every entity that contracts for labor as a joint employer" of the contractor's employees while "largely backhand[ing]" the rule's highly "disruptive impact" on an array of industries. *Chamber of Commerce of U.S. v. NLRB*, 723 F. Supp. 3d 498, 516–17 (E.D. Tex. 2024). In another example, the

---

[3] The FTC's authority to promulgate the non-compete rule is being tested in several pending cases. *See Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 18, 2024); *Props. of the Vills., Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept. 24, 2024).

NLRB adopted an "extremely broad rule [that] would make all company uniforms presumptively unlawful" because they could interfere with "employees' right to display union insignia." *Tesla, Inc. v. NLRB*, 86 F.4th 640, 644, 651 (5th Cir. 2023). Of course, setting national labor policy is a "difficult and delicate responsibility" that requires "the balancing of conflicting legitimate interests." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978). But that is the point: the government actors who exercise that responsibility must ultimately account in the chain of command to the States and their citizens. Anything else is not the sovereign authority the States ceded the federal government when they joined the union.

## III.  Federal courts lack equitable authority to reinstate public officials.

Not only are plaintiffs wrong on the merits, they are wrong on the remedy. Federal courts may not reinstate public officers absent an act of Congress. *See, e.g.*, 42 U.S.C. § 2000e-5(g) (authorizing courts to "reinstate[]" employees who suffer discrimination). Plaintiffs have cited no such act. Nor is Congress's silence surprising— orders reinstating public officials hamper effective governance, invade state sovereignty, and beget rushed jurisprudence.

A. Plaintiffs seek relief the courts cannot grant. They request a declaration that their terminations were "legally ineffective" and an injunction preventing defendants "from taking any further action to obstruct plaintiffs from carrying out their official duties." Compl. 31. Yet the only equitable remedies a federal court may grant are those "traditionally accorded by courts of equity." *Bessent v. Dellinger*, No. 24A790, slip op. at 3 (U.S. Feb. 21, 2025) (Gorsuch, J., joined by Alito, J., dissenting)

12

(quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999)). And history teaches that "[a] court of equity has no jurisdiction over the appointment and removal of public officers." *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924); *see also Dellinger*, No. 24A790, slip op. at 4 (Gorsuch, J., dissenting) (finding it "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers" (quoting *Sawyer*, 124 U.S. at 212)).[4]

That rule flows from English common law. Recognizing the critical "distinction between judicial and political power," English courts historically would not wield equity to vindicate a litigant's "political right[]" to office. *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71, 76 & n.20 (1867) (collecting cases); *see Sawyer*, 124 U.S. at 212 (collecting cases, including *Attorney General v. Earl of Clarendon*, 17 Ves. Jr. 491, 498, 34 Eng. Rep. 190, 193 (Ch. 1810)). In *Earl of Clarendon*, for instance, the English Court of Chancery declined to remove public-school officers on the ground that they lacked necessary legal qualifications. 17 Ves. Jr. at 493, 34 Eng. Rep. at 191. According to that court, a court of equity "has no jurisdiction with regard either to the election or the [removal] of" officers. *Id.* at 498, 34 Eng. Rep. at 193. Contemporary English cases tracked that reasoning. *See also* Joseph Story, *Commentaries on Equity*

---

[4] In their motion for preliminary injunction, plaintiffs assert that the President's orders of removal were "*ultra vires* actions" and are "without legal force or effect." Mot. 13. If this is an attempt to sidestep the reality that they seek an injunction reinstating them to posts they no longer hold, it must fail. In many (if not all) of the Supreme Court's reinstatement precedents, the Court similarly declined to issue an injunction to a plaintiff arguing that his removal was "illegal," and thus, "void." *Sawyer*, 124 U.S. at 205. In the end, the Supreme Court's cases turn on whether the requested injunction would require the government to permit the plaintiff to serve in his post despite the asserted removal—exactly what plaintiffs seek here.

13

*Pleadings and the Incidents Thereof* §§ 467–70 (2d ed. 1840) (explaining that traditional equity courts would not adjudicate rights of a "political nature" and citing examples); Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985, 2011–12 (2022).[5]

American courts imported that principle after the Framing. In the early 19th century, courts nationwide denied that equity chancellors could afford a removed official relief, even when the official's ouster was illegal and unauthorized. *Tappan v. Gray*, 9 Paige Ch. 506, 508–09 (Ch. Ct. N.Y. 1842); *see also Hagner*, 7 Watts & Serg. at 105; *Sawyer*, 124 U.S. at 212 (collecting cases). *Hagner* is emblematic. In that case, the Supreme Court of Pennsylvania declined to enjoin a defendant from unlawfully acting as a school director because it possessed no more power than "an English court of chancery." *Hagner*, 7 Watts & Serg. at 106–07. Because chancery courts traditionally "would not sustain the injunction proceeding to try the election or [removal] of

---

[5] Although *Earl of Clarendon* and some other cases cited in *Sawyer* involved corporate officers, those legal entities were historically treated more like governments and public entities. Colonial governments, for instance, were created through corporate charters, with "shareholders" acting like modern-day voters and voting for corporate boards that looked like modern-day state and local governments. Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397, 1416–21 (2018); *see also* Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, April 1775, https://founders.archives.gov/documents/Adams/06-02-02-0072-0015. And as the Pennsylvania Supreme Court noted in *Hagner v. Heyberger*, limits on equitable jurisdiction that applied to "private corporations" apply "*à fortiori*" to "the case of a public officer of a municipal character." 7 Watts & Serg. 104, 105 (Penn. 1844); *see also* W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382, 383–84 (1922) (noting that for both public and private corporations, "creation by and subordination to the state are the only terms upon which the existence of large associations of men can be safely allowed to lead an active life").

corporators of any description," Pennsylvania's high court held that it could not either. *Id.* Other courts took a similar tack throughout Reconstruction.[6]

The Supreme Court later confirmed that historical equitable constraint in *Sawyer*. There, a locally elected officer sought an injunction from a federal court barring local officials from removing him. 124 U.S. at 201. After the local officials were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. The Court explained that a federal court in equity "has no jurisdiction . . . over the appointment and removal of public officials." *Id.* at 210. And a wall of contemporary treatises echoed that understanding.[7] As one 19th-century commentator put it, "[n]o principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 High, *Law of Injunctions* § 1312.

---

[6] *See, e.g.*, *Cochran v. McCleary*, 22 Iowa 75, 91 (1867) ("The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity."); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) ("A court of equity is not a proper tribunal for determining disputed questions concerning the appointment of public officers, or their right to hold office[.]"); *Delahanty v. Warner*, 75 Ill. 185, 186 (1874) (court of chancery had no power to restrain local officials from removing the superintendent of streets from his post); *Beebe v. Robinson*, 52 Ala. 66, 73 (1875) (similar); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897) (similar); *State ex rel. McCaffery v. Aloe*, 54 S.W. 494, 496 (Mo. 1899) (similar).

[7] *See* 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911).

The Supreme Court has doubled down on that rule. A decade after *Sawyer*, the Court reiterated that equity courts may "not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." *White v. Berry*, 171 U.S. 366, 377 (1898). The Court restated the point in *Walton*: While federal courts are "*particularly* . . . without jurisdiction over the appointment and removal of state officers," they no more possess "jurisdiction over the appointment and removal of [other] public officers." 265 U.S. at 490 (emphasis added). And it repeated the principle in *Baker v. Carr*—"federal equity power [may] not be exercised to enjoin a state proceeding to remove a public officer." 369 U.S. 186, 231 (1962); *see also Fineran v. Bailey*, 2 F.2d 363, 363 (5th Cir. 1924) ("It is well settled by the decisions of the Supreme Court that a District Court of the United States has no jurisdiction over the appointment and removal of public officers.").

Similarly, there is no established historical tradition of equity courts' reinstalling officials, at least not without express statutory authorization. "No English case has been found of a bill for an injunction to restrain the appointment or removal of a municipal officer." *Sawyer*, 124 U.S. at 212. Aside from the outlier case identified by Justice Gorsuch in his dissent in *Bessent v. Dellinger*,[8] we know of no case in which

---

[8] The decision Justice Gorsuch cited was *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983)). As he noted, that decision "involved members of 'a temporary, multi-member agency,'" *Dellinger*, No. 24A790, slip op. at 4 (Gorsuch, J., dissenting) (quoting *Dellinger v. Bessent*, No. 25-5028, slip op. at 8 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)), unlike the Inspectors General here.

a federal court has ordered the reinstatement plaintiffs seek.[9] The lack of historical pedigree for reinstatement suggests that it "was unknown to traditional equity practice," *Grupo Mexicano*, 527 U.S. at 327, and divorced from the "jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)," *id.* at 318–19.

B. Tradition is often grounded in common sense. Here, there are at least three reasons why courts should not wade into the messy business of reinstatement.

*First*, reinstatement hampers effective governance. Like a grain of sand in a gear, forcing the sovereign to retain an official it believes is unfit threatens to halt the levers of government and risks intra-office "chaos." *Nixon v. United States*, 506 U.S. 224, 236 (1993) (questioning what relief a federal court could grant a judge who had been impeached and removed from office); *Abbott v. Thetford*, 529 F.2d 695, 708 (5th Cir. 1976) (Gewin, J., dissenting) (arguing that reinstating a state judicial employee would impair the court's judicial functions), *majority vacated and dissent adopted upon reh'g en banc*, 534 F.2d 1101 (5th Cir. 1976).

---

[9] The only other arguable candidate we have found is *Bond v. Floyd*, in which the Supreme Court held that the Georgia legislature violated the First Amendment in refusing to seat a newly elected member for engaging in anti-Vietnam War speech while the member-elect was a private citizen. 385 U.S. 116, 137 (1966). But *Bond v. Floyd* did not grapple with the limits on the federal courts' remedial authority discussed by *Walton* or *Sawyer*. *See id.* At most, *Bond v. Floyd* represents an implicit "drive-by" ruling that carries "no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). The issue of the equitable authority of the federal courts "merely lurk[ed] in the record," so the holding of *Bond v. Floyd* cannot "be considered as having . . . constitute[d] precedent[]" on the question. *Webster v. Fall*, 266 U.S. 507, 511 (1925).

*Second*, when extended to state officers, reinstatement invades state sovereignty. "The authority of the people of the States to determine" their state officers "goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity" that lies at "the heart of representative government." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 463 (1991). The historical limit on federal reinstatement power preserves "the scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts." *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 349 (1951).

*Finally*, reinstatement encourages rushed jurisprudence. When officials believe that reinstatement lies just behind the courthouse door, they will often seek emergency injunctive relief. *See, e.g.*, *Warren v. DeSantis*, No. 4:22-cv-302 (N.D. Fla.) (in which a district judge ordered an extraordinarily compressed trial schedule of just over three months in a case posing many complex issues of constitutional significance). Those fast-paced proceedings "tend to force judges into making rushed, high-stakes, low-information decisions" on constitutional issues of immense importance. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring).

## CONCLUSION

The Court should deny plaintiffs' motion for a preliminary injunction.

February 24, 2025                    Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
  *Chief Deputy Solicitors General*
DARRICK W. MONSON
  *Assistant Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amicus *State of Florida*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and page-length requirements of Local Civil Rules 5.1(d) and 7(o)(4).

*/s/ Jeffrey Paul DeSousa*
Acting Solicitor General

## CERTIFICATE OF SERVICE

I certify that on February 24, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Jeffrey Paul DeSousa*
Acting Solicitor General