# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT P. STORCH, et al., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | Civil Action No. 1:25-cv-415 |
| v. ) | |
| ) | Judge Ana C. Reyes |
| PETE HEGSETH, in his official capacity as ) | |
| Secretary of Defense, et al., ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**BRIEF OF TENNESSEE AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

i

**TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE ............................................................................................... 1
INTRODUCTION .......................................................................................................................... 2
ARGUMENT .................................................................................................................................. 2
   I.    Article II generally requires plenary presidential supervision of executive officials. ........ 2
   II.   The statutory scheme governing IGs renders them principal officers. ............................... 6
CONCLUSION ............................................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bond v. United States*,
564 U.S. 211 (2011) ...................................................................................................................1

*Bowsher v. Synar*,
478 U.S. 714 (1986) ...................................................................................................................1

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........................................................................................................1, 4, 6

*Edmond v. United States*,
520 U.S. 651 (1997) ...................................................................................................................8

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................................................4, 5, 6

*Freytag v. Comm'r Internal Revenue*,
501 U.S. 868 (1991) ...................................................................................................................9

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) ...................................................................................................6

*Lucia v. SEC*,
585 U.S. 237 (2018) ...................................................................................................................7

*Morrison v. Olson*,
487 U.S. 654 (1988) ...................................................................................................................2

*Myers v. United States*,
272 U.S. 52 (1926) ............................................................................................................3, 5

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ............................................................................................................5, 6

*Trump v. Untied States*,
603 U.S. 593 (2024) ............................................................................................................5, 6

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ......................................................................................................3, 7, 8, 9

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
No. 1:24-cv-02577, 2024 WL 5056358 (D.D.C. Dec. 10, 2024) ............................................4

*Whitman v. Am. Trucking Assocs.*,
    531 U.S. 457 (2001) ................................................................................................................ 3

**Constitution and Statutes**

U.S. Const.
    art. I, § 1 ................................................................................................................................ 3
    art. II, § 1 ............................................................................................................................... 3
    art. II, § 2, cl. 2 ...................................................................................................................... 7
    pmbl. ...................................................................................................................................... 3

5 U.S.C. § 403(a) ........................................................................................................................ 9

29 U.S.C. § 153(a) ...................................................................................................................... 4

26 Stat. 826-30 (1891) ................................................................................................................ 4

**Other Authorities**

Todd Garvey, Cong. Rsch. Serv., R46762, *Congress's Authority to Limit the
    Removal of Inspectors General* 32-34 (2021), https://perma.cc/4YVX-SE3Z ........................ 7

*The Federalist* (Clinton Rossiter ed., 1961)
    No. 70 ................................................................................................................................ 2, 3
    No. 78 ................................................................................................................................ 2, 4

2 Henry de Bracton, *On the Laws and Customs of England* 32 (Samuel E. Thorne
    trans., 1977), https://tinyurl.com/yc2xa8sy; ......................................................................... 4

Local Civ. Rule 7(o)(1) ............................................................................................................... 1

Michael W. McConnell, *The President Who Would Not Be King* (2020) ................................ 4

Saikrishna Prakash, *New Light on the Decision of 1789*,
    91 Cornell L. Rev. 1021 (2006) ............................................................................................. 4

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* (2008) ............................. 5

**INTERESTS OF AMICUS CURIAE**

The State of Tennessee files this amicus curiae brief under Local Rule 7(o)(1) in support of Defendants' opposition to Plaintiffs' Motion for a Preliminary Injunction.

The balance of powers between the States and the Federal Government "preserves the integrity, dignity, and residual sovereignty of the States," allowing States to "function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011). And "[t]he declared purpose of separating and dividing the powers of government, of course, was to 'diffus[e] power the better to secure liberty.'" *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). Allowing Congress to thwart presidential supervision of high-level Executive Branch officers presents an especially grave danger to the States and their citizens by vesting executive power in those lacking the political accountability and responsiveness Article II contemplates.

Tennessee and other States have already suffered harm at the hands of putatively independent Executive Branch officials. In at least one case, Tennessee is caught between a live dispute between President Trump—who has ordered an executive agency enforcement document rescinded—and Executive Branch officials who claim power to buck direct presidential instructions. *See* Pls.' Resp. to Notice of Executive Order and Unopposed Mot. to Vacate Hr'g, *Tennessee v. EEOC*, No. 3:24-cv-224-CEA-DCP (E.D. Tenn. Jan. 22, 2025). Tennessee thus has an interest in pushing against positions that further enable a "headless fourth branch of government" to pursue executive actions no democratically elected actor has endorsed. *City of Arlington v. FCC*, 569 U.S. 290, 314 (2013) (Roberts, C.J., dissenting) (citation omitted).

**INTRODUCTION**

The Framers' genius lies in their choice to separate the legislative, executive, and judicial powers and vest each in its own branch. Article II, for its part, vests the "executive Power" in a single, nationally elected president able to act with "energy" and "dispatch." *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Part and parcel of the President's law-execution duty is the power to supervise those carrying out Article II's chain-of-command. When Congress restricts the President's ability to dismiss agency heads—as it has in the IG Act— it thus violates Article II's vesting of the "executive Power" in the President alone.

Defendants and other *amici* have ably explained why Article II principles and the Supreme Court's precedents cut against granting Plaintiffs' requested relief. Tennessee writes to respond to one of Plaintiffs' counterarguments, in particular: That Inspector Generals do not qualify as "officers" within the Executive Branch. Under the Supreme Court's latest caselaw interpreting the rules for assessing officer-versus-employee status under Article II, the Inspector Generals not only qualify as officers—they exercise powers of principal officers. As such, their statutory insulation from presidential removal is particularly problematic under the Constitution.

**ARGUMENT**

**I.      Article II generally requires plenary presidential supervision of executive officials.**

Our system of government contemplates three powers held by federal officials. The legislative power "prescribes the rules" of the community. *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The executive power is the "sword of the community." *Id.* And the judicial power "declare[s] the sense of the law." *Id.* at 469. The Framers "viewed the principle of separation of" those powers as "the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

2

With that principle in mind, the Framers proposed, and "the People of the United States … ordain[ed] and establish[ed]," the U.S. Constitution's separation-of-powers framework. U.S. Const. pmbl. Article I vests "legislative Powers" in "a Congress of the United States." *Id.* art. I, § 1. Article III vests the "[t]he judicial Power" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *Id.* art. III, § 1. And finally, Article II: "The executive Power shall be vested in a President of the United States." *Id.* art. II, § 1. The Framers understood that "[e]nergy in the executive is a leading character in the definition of good government," while a "feeble executive" leads to "bad government." *The Federalist* No. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961). To satisfy the "necessity of an energetic executive," Article II blends "ingredients which constitute energy in the executive," namely, "unity; duration; an adequate provision for its support; and competent powers." *Id.* at 423-24.

But while the executive power is vested in "a President," U.S. Const. art. II, § 1, as a practical matter "the President alone and unaided could not execute the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926). So the Constitution contemplates that the President will enjoy "the assistance of subordinates" selected through required appointment processes. *Id.* Such subordinate officials include the heads of administrative agencies, which, having no superior other than the President, are principal officers. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021).

The history of the executive power, the text of Article II, and the structure of the Constitution dictate the President's power to remove executive agency heads. To start, agencies exercise executive power. That follows from a process of elimination. Agencies cannot exercise any legislative power because those powers are vested in Congress, U.S. Const. art. I, § 1, and Congress may not delegate those powers, *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001). Agencies cannot exercise the judicial power because they are not the Supreme Court or

inferior courts. *Compare*, *e.g.*, 29 U.S.C. § 153(a) (establishing the National Labor Relations Board "as an agency of the United States") *with, e.g.*, 26 Stat. 826-30 (1891) (establishing "circuit courts of appeals"). Therefore, agency "activities" are "exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const. art. II, § 1).

For centuries of Anglo-American legal history, the executive power has included plenary authority to remove subordinate executive officials. *See generally VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3-4 (D.D.C. Dec. 10, 2024) (collecting historical examples). Henry of Bracton, writing in 13th century England, noted that the king wielded "the sword" of the community. 2 Henry de Bracton, *On the Laws and Customs of England* 32 (Samuel E. Thorne trans., 1977), https://tinyurl.com/yc2xa8sy; *cf. The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The executive … holds the sword of the community."). While "powerful persons" were a part of "the sword" and helped the "defence of the realm and the country," they were "under the king," and they could neither "question" nor "contravene" his "acts." *Id.* at 32-33. The English king's power over subordinates continued up to the American founding: "The king had the prerogative power to remove" executive officers "at will." Michael W. McConnell, *The President Who Would Not Be King* 162 (2020).

That English tradition carried into the United States. During the much-discussed Decision of 1789, the First Congress concluded the President enjoys a "preexisting removal power." Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1026 (2006); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). And that power was not academic for the Founders, as President George Washington "plainly and willingly employed"

4

the "removal power" to "administer the executive branch … in an orderly fashion." Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* 42 (2008).

Historical practice surrounding presidential removal power aligns with Article II's plain language, which guarantees the "President's power to remove—and thus supervise—those who wield executive power on his behalf." *Seila Law*, 591 U.S. at 204; *see also Trump v. Untied States*, 603 U.S. 593, 620 (2024) ("[T]he Constitution vests the entirety of the executive power in the President."). And plenary removal also addresses functional concerns. After all, Executive Branch subordinates "act for [the President] under his direction in the execution of the laws." *Myers*, 272 U.S. at 117. By "implication," the President's "power of removing" his subordinates "is essential to the execution of the laws." *Id.* Otherwise, swaths of critical enforcement authority would operate insulated from "a clear and effective chain of command" headed by the President, on whom the public can "pass judgment." *Free Enter. Fund*, 561 U.S. at 498.

Surveying all this, the Supreme Court in *Myers* held that Article II "grants to the President" the power of "removal of executive officers." 272 U.S. at 163-64. *Myers*'s approximately six-dozen pages of analysis included "an exhaustive examination of the First Congress's determination in 1789, the views of the Framers and their contemporaries, historical practice, and [Supreme Court] precedents up until that point." *Seila Law*, 591 U.S. at 214. Writing for the Court, Chief Justice Taft reinforced the President's removal power as a pillar in our constitutional framework—to impede that power "might make impossible that unity and co-ordination in executive administration essential to effective action." *Myers*, 272 U.S. at 134.

The Supreme Court's most recent Article II removal cases reflect this understanding:

- *Free Enterprise Fund* exhaustively detailed Article II's design to permit agencies to be "fully accountable" to the President for their conduct. Applying that rule, the Court held that the Public Company Accounting Oversight Board's "dual for-cause

5

limitations on the removal of Board members contravene the Constitution's separation of powers." 561 U.S. at 492.

- *City of Arlington* acknowledged that *all* agency activities are exercises of the executive power. 569 U.S. at 304 n.4.

- *Seila Law* allowed "for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and [are] said not to exercise any executive power." 591 U.S. at 216.

- In *Collins v. Yellen*, the Court invalidated a provision making the Federal Housing Finance Agency's "single Director" removable only "by the President 'for cause.'" *Id.* at 229 (citation omitted). The "FHFA clearly exercises executive power," so even "'modest restrictions' on the President's power to remove the head of an agency with a single top officer" violates the Constitution. *Id.* at 254, 256 (citation omitted).

Most recently, in last term's *Trump v. United States* decision, the Court noted that the "removal" of certain federal officers "implicates 'conclusive and preclusive' Presidential authority." 603 U.S. at 620-21. A President's exclusive power that "stem[s] … from the Constitution itself" is "conclusive and preclusive." *See id.* at 607 (quoting *Youngstown Sheet & Tube Co.*, 343 U.S. at 585; *id.* at 638 (Jackson, J., concurring)). That includes "the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Id.* at 609 (quoting *Myers*, 272 U.S. at 106). "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609. Therefore, *Trump* determined that Congress cannot regulate a President's removal of those officers by way of criminal sanction. *Id.* at 621.

In short, Article II renders suspect any attempt to insulate officials exercising executive power from at-will presidential removal. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022), *aff'd on other grounds* 603 U.S. 109 (2024).

**II.    The statutory scheme governing IGs renders them principal officers.**

6

The IGs do not and cannot dispute that "when it comes to certain 'Officers of the United States,' U.S. Const. art. II, § 2, cl. 2, 'the President's removal power is the rule, not the exception.'" Pls.' Mot. for a TRO & Prelim. Inj., & Mem. in Supp. of Same at 14 (quoting *Seila Law*, 591 U.S. at 228). But they say that default rule does not govern here because IGs are either "employees" or "inferior officers" whose removal can be insulated. *Id.* at 15. That is mistaken; instead, the IG Act's vesting of non-reviewable investigatory and audit authority most likely renders the IGs "principal Officers" under recent Supreme Court precedent. *See* Br. of Amicus Curiae Hon. Eric J. Soskin, Former Inspector Gen. of the Dep't of Transp., in Supp. of Defs. at 8-11.

The United States amply debunks the notion that IGs are mere employees with "occasional or temporary" duties. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citation omitted); *see* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 20-22. So too, prior writings on the status of statutory IGs have focused the debate on IGs' classification as inferior-versus-principal officers. *See, e.g.*, Todd Garvey, Cong. Rsch. Serv., R46762, *Congress's Authority to Limit the Removal of Inspectors General* 32-34 (2021), https://perma.cc/4YVX-SE3Z ("Principal or Inferior Officer?") (cited at Pls.' Br. 17). But such discussion predates *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), which provides new instruction for assessing Executive Branch officers' status.

*Arthrex* addressed an Article II challenge to the statutory scheme governing inter partes review of patents by certain administrative judges of the Patent Trial and Appeal Board (PTAB). *Id.* at 8, 10. All agreed that PTAB judges were not appointed through the means required for principal officers under the Appointments Clause. The particular question was thus whether the PTAB Director—himself a "Head[] of Department" subject to presidential appointment and senate confirmation, U.S. Const., art. II, § 2, cl. 2—maintained sufficient supervision over PTAB judges to render their role as "inferior Officers" constitutional. *Id.* at 13. In a holding Plaintiffs nowhere

7

cite, the Supreme Court struck down the constitutionality of the PTAB judges' regime in analysis that directly bears on the IGs at issue here. *Id.*

The *Arthrex* majority started from the Court's prior decision in *Edmond v. United States*, 520 U.S. 651 (1997), which had concluded that judges of the Coast Guard Court of Criminal Appeals were inferior rather than principal officers, *id.* at 666. In explaining that conclusion, *Edmond* observed that "[w]hat is significant is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665. By contrast in *Arthrex*, the Director could *not* countermand any particular PTAB decision affirming or invalidating a patent through inter partes review proceedings. *Arhtrex, Inc.*, 594 U.S. at 14. Instead, the statute made the PTAB's decision the "final word within the Executive Branch." *Id.* at 6. Any further review arose only through challenges to the decision before an Article III court. *Id.* at 9.

The Supreme Court concluded that the statutory "restrictions on review" of patent judges' decisions violated Article II of the Constitution. *Id.* at 15, 17. The core problem, the Court explained, was that "the President can neither oversee the PTAB himself nor 'attribute the Board's failings to those whom he *can* oversee.'" *Id.* at 17 (quoting *Free Enter. Fund*, 561 U.S. at 496). By "reliev[ing] the Director of responsibility for the final decisions rendered by [the judges] purportedly under his charge," the statute governing PTAB proceedings "conflicts with the design of the Appointments Clause to 'preserve political accountability.'" *Id.* at 15, 17 (citation omitted).

Notably, the Supreme Court reached that decision despite the Director's significant "administrative oversight" over the PTAB judges. *Id.* at 14 (citation omitted). The Director for instance had the power to generally supervise the judges' work, "fix[] the rate of pay" judges received, promulgate regulations governing judges' review, and alter judges' job duties. *Id.* Yet

those general supervisory powers were insufficient to shield the judges from the Article II problem that attended their binding authority to invalidate patents through administrative review. Any argument that the Director was "the boss, except when it comes to" the judges' power to "issue decisions on patentability" did not pass Article II muster. *Id.*

The same goes here. Regardless whether agency heads maintain some level of "oversight," *id.* (citation omitted), IGs have the same type of unreviewable power as patent judges when it comes to "initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." 5 U.S.C. § 403(a). Plaintiffs (at 16) counter by noting that IGs fall under the "general supervision" of agency heads. But saying IGs have a "boss, except when it comes to" their core power to investigate and issue coercive process repackages the same supervision-sometimes argument *Arthrex* rejected. *Arthrex*, 594 U.S. at 14. It also bucks the broader rule that an officer subject to the Appointments Clause "does not transform his status under the Constitution" case-by-case depending on whether he might exercise lesser powers "on occasion." *Freytag v. Comm'r Internal Revenue*, 501 U.S. 868, 882 (1991).

All parties appear to agree that presidential removal power is at its apex when it comes to principal officers with decision-making power no other Executive Branch actor can countermand. That dynamic covers statutory IGs because those officials, the Supreme Court's recent precedents support, are principal officers. Article II does not countenance saddling the President with a cadre of officers he cannot effectively supervise wielding invasive investigatory powers in the Executive Branch's name.

## CONCLUSION

The foregoing arguments support denying Plaintiffs' Motion for Preliminary Injunction.

9

Dated: February 24, 2025

                                    JONATHAN SKRMETTI
                                    Tennessee Attorney General
                                    & Reporter
                                    */s/ Whitney Hermandorfer*

                                    WHITNEY HERMANDORFER (DC Bar #888314222)
                                      Director of Strategic Litigation
                                    JOSEPH M. FIORILE*
                                      Strategic Litigation Unit Honors Fellow
                                    Office of the Tennessee Attorney General
                                    and Reporter
                                    P.O. Box 20207
                                    Nashville, TN 37202-0207
                                    (615) 741-3491
                                    whitney.hermandorfer@ag.tn.gov
                                    joseph.fiorile@ag.tn.gov

                                    *Counsel for Amicus Curiae State of Tennessee*

                                    * Active government status

## CERTIFICATE OF SERVICE

     I hereby certify that on February 24, 2025, I electronically filed this brief of Tennessee as amicus curiae with the Clerk of the Court for the U.S. District Court for the District of Columbia by using the CM/ECF system.  Such filing effectuates service under LCvR 5.4(d).  In addition, courtesy copies of the foregoing brief have been emailed to counsel of record for the parties in this case.

February 24, 2025                                                    */s/ Whitney Hermandorfer*
                                                                             WHITNEY HERMANDORFER (DC Bar #888314222)