# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT P. STORCH; MICHAEL MISSAL;
CHRISTI A. GRIMM; CARDELL K.
RICHARDSON, SR.; SANDRA D. BRUCE;
PHYLLIS K. FONG; LARRY D. TURNER;
HANNIBAL "MIKE" WARE;

                         Plaintiffs,

       v.

PETE HEGSETH, *in his official capacity as
Secretary of Defense*; DOUGLAS A.
COLLINS, *in his official capacity as
Secretary of Veterans Affairs*; ROBERT F.
KENNEDY, JR., *in his official capacity as
Secretary of Health and Human Services*;
MARCO RUBIO, *in his official capacity as
Secretary of State*; DENISE L. CARTER, *in
her official capacity as Acting Secretary of
Education*; BROOKE ROLLINS, *in her
official capacity as Secretary of Agriculture*;
VINCENT MICONE, *in his official capacity
as Acting Secretary of Labor*; KELLY
LOEFFLER, *in her official capacity as
Administrator of the Small Business
Administration*; DONALD J. TRUMP, *in his
official capacity as President of the United
States*;

                        Defendants.

Civil Case No. 1:25-cv-00415-ACR

# PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................. 3

I.    DEFENDANTS FAIL TO UNDERMINE PLAINTIFFS' SHOWING OF LIKELY SUCCESS ON THE
      MERITS .......................................................................................................... 3

      A.    The IG Act's Plain Language Says The President "Shall" Notify Congress,
            With Specific Reasons, At Least 30 Days Before Removing An IG ......................... 3

      B.    The IG Act's Removal Restrictions Are Constitutional ........................................... 6

II.   THE REMAINING FACTORS FAVOR INJUNCTIVE RELIEF ........................................... 9

      A.    Irreparable Harm ........................................................................................ 9

      B.    Balance Of Equities And The Public Interest .................................................... 16

III.  THE INJUNCTION PLAINTIFFS SEEK IS APPROPRIATE AND WITHIN THIS COURT'S POWER ..... 18

CONCLUSION ......................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Berry v. Reagan*, 1983 WL 538 (D.D.C. Nov. 14, 1983) ......................................................10, 11

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................................7

*Committee on the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc) ...........................................................18

*Dellinger v. Bessent*, --- F.Supp.3d ---, 2025 WL 471022 (D.D.C. Feb. 12, 2025) ............................................................................................................................10, 12, 13

*Doe v. Securities and Exchange Commission*, 114 F.4th 687 (D.C. Cir. 2024) ...........................5

*English v. Trump*, 279 F.Supp.3d 307 (D.D.C. 2018) ..................................................................13

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) ...........................................................................................................................7, 8

*Harris v. Bessent*, --- F.Supp.3d ---, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ...............11, 12, 13

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) .......................................................10

*In re Sawyer*, 124 U.S. 200 (1888) ............................................................................................20

*Jones v. District of Columbia*, 177 F.Supp.3d 542 (D.D.C. 2016) ...............................................15

*Mackie v. Bush*, 809 F.Supp. 144 (D.D.C. 1993) ..................................................................10, 11

*Morrison v. Olson*, 487 U.S. 654 (1988) ....................................................................................7

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ..............................................................4

*Sampson v. Murray*, 415 U.S. 61 (1974) ........................................................................11, 13, 14

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) .........................8

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ................................................................19, 20

*Southwest Airlines Company v. Saxon*, 596 U.S. 450 (2022) ........................................................3

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ...............................................................19, 20, 21

*Taucher v. Brown-Hruska*, 396 F.3d 1168 (D.C. Cir. 2005) .........................................................6

*Trudeau v. Federal Trade Commission*, 384 F.Supp.2d 281 (D.D.C. 2005) .................................15

*United States v. Morrison*, 529 U.S. 598 (2000) ...........................................................6

*Walpin v. Corporation for National and Community Service*, 630 F.3d 184 (D.C. Cir. 2011) ...........................................................................................................5, 8

*Wannall v. Honeywell, Inc.*, 775 F.3d 425 (D.C. Cir. 2014) ......................................20

*White v. Berry*, 171 U.S. 366 (1898).........................................................................20

*White v. Four Seasons Hotel & Resorts*, 244 F.Supp.3d 1 (D.D.C. 2017) .....................5

*Wiener v. United States*, 357 U.S. 349 (1958) ..........................................................21

## STATUTES

5 U.S.C.
    App. §(6)(f) ...........................................................................................................8
    §402 ....................................................................................................................9
    §403 ............................................................................................................. *passim*
    §404 .................................................................................................................6, 7

Inspector General Act .......................................................................................... *passim*

## OTHER AUTHORITIES

Hall, Grace, *'Rogue Bureaucrat': Inspector General Fired After Defying Trump*, https://www.msn.com/en-us/news/politics/rogue-bureaucrat-inspector-general-fired-after-defying-trump/ar-AA1znn6M ..........................................15

Hansler, Jennifer, *USAID IG Fired Day After Report Critical of Impacts of Trump Administration's Dismantling of the Agency*, https://www.cnn.com/2025/02/11/politics/usaid-inspector-general-fired-trump/index.html..................................................................................................17

House Report No. 110-354 (2007)..........................................................................5, 9

*Press Gaggle By President Trump Aboard Air Force One En Route to Miami, Florida* (Jan. 25, 2025), The White House, https://www.whitehouse.gov/remarks/2025/01/press-gaggle-by-president-trump-aboard-air-force-one-en-route-to-miami-florida...................................15

*Safeguarding Inspector General Independence and Integrity: Hearing Before the Committee on Homeland Security and Governmental Affairs*, 117th Cong. (2021)................................................................................................................18

Senate Report No. 110-262 (2008) .......................................................................5, 9

Wilhelm, Ben, Congressional Research Service, R45450, *Statutory Inspectors General in the Federal Government: A Primer* (Nov. 13, 2023) ......................................16

# INTRODUCTION

Defendants do not dispute that plaintiffs—non-partisan officials charged with auditing and compliance oversight of major federal departments—were each purportedly removed without President Trump notifying Congress at least 30 days in advance or providing any reason for the removals. These purported removals constituted a plain violation of the Inspector General Act (IG Act). Nor do defendants contest the two basic facts demonstrating irreparable harm and the public interest in preliminary relief: First, the mass purported removals deny plaintiffs the ability to function in their statutory roles unless and until removed in accordance with the IG Act. Second, the public has a strong interest in preserving inspectors general (IGs) as independent watchdogs protecting government integrity, maintaining transparency and oversight of federal spending and public administration, and achieving accountability for waste, fraud, and abuse. The notice-and-reasons requirement the President ignored plays a critical role in furthering that public interest (and in protecting congressional prerogatives), by creating a brief period in which Congress, if it believes that an impending IG removal is unwarranted, can engage in inter-branch discussions or take other action before the removal actually occurs. Again, defendants dispute essentially none of this. That silence speaks volumes.

Instead, defendants offer an atextual reading of the IG Act's removal provision, before attacking the statute's constitutionality and this Court's authority to issue a preliminary injunction. But the IG Act's plain text unambiguously requires the President to provide Congress with a case-specific rationale 30 days before removing an IG. And that modest requirement both reflects an appropriate respect for the separation of powers and comports with the founders' judgment that Congress may impose limitations on the appointment and removal of certain officials. This is true whether IGs are classified as government employees or as "inferior officers" of the United States.

1

Either way, IGs are rightfully protected by the IG Act's notice-and-reasons requirement because their function provides support for congressional legislative and oversight duties that are critical to the exercise of Congress's constitutional authorities.  For similar reasons, plaintiffs' requested injunction would not offend Article II, and precedent demonstrates that the Court can properly enjoin the Agency Defendants or issue mandamus relief.

Defendants' arguments on the remaining injunction factors are no more persuasive. Defendants identify no significant harm to them from an injunction requiring only that they comply with the plain terms of a statute passed by Congress and signed into law by the President.  And their effort to reduce plaintiffs' claims to a "slight" interest in "collecting a couple more government paychecks before being terminated for a second time" (Opp.24) improperly trivializes the harm caused by defendants' decision to ignore the law.  Congress did not view the notice-and-reasons requirement as a mere formality.  It deemed it essential to its core constitutional legislative and oversight duties.  By mandating a 30-day notice period, Congress sought to ensure that it could meaningfully be heard with respect to removal decisions, and thereby safeguard IGs' ability to serve the public by overseeing the use of appropriated funds and supporting congressional oversight.

This Court should order relief to vindicate both Congress's obligations to the public to root out waste, fraud, and abuse in the spending of the country's appropriations, and the principle that executive officials are not free to disregard clear statutory mandates.

Plaintiffs' motion requested (p.21) that the Court, in the alternative, consolidate the request for a preliminary injunction with adjudication of the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).  Plaintiffs reiterate that request, to which defendants have not objected.  Since

defendants' opposition cites no dispute of any material fact, the case seems appropriate for disposition on summary judgment.

## ARGUMENT

### I.    DEFENDANTS FAIL TO UNDERMINE PLAINTIFFS' SHOWING OF LIKELY SUCCESS ON THE MERITS

As defendants recognize (Opp.5), plaintiffs' claims rest on the uncontested fact that "President Trump did not notify Congress 30 days before [purportedly] removing" them as IGs. That failure means the attempted removals violated the IG Act. Defendants do not contend they complied with the statute's notice provision, instead offering two overarching arguments about plaintiffs' likely success on the merits. First, defendants assert (Opp.14) that the IG Act does "not make the President's authority to remove Inspectors General at any time conditional on compliance with the congressional notice provision." That argument cannot be reconciled with the plain statutory text or congressional purpose. Second, defendants argue (Opp.19-23) that honoring the IG Act's clear language would render it unconstitutional. Established precedent is to the contrary, holding that appropriate removal restrictions for employees and inferior officers of the United States are consistent with the separation of powers.

### A.    The IG Act's Plain Language Says The President "Shall" Notify Congress, With Specific Reasons, At Least 30 Days Before Removing An IG

Defendants first make a statutory-interpretation argument, asserting (Opp.15) that under a proper reading of the IG Act, the President can "remove Inspectors General at any time and with no preconditions." That is not correct.

Statutory interpretation "always … begin[s] with the text." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). The IG Act's removal provision is three sentences:

> An Inspector General may be removed from office by the President.
> If an Inspector General is removed from office or is transferred to
> another position or location within an establishment, the President

> shall communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal or transfer to both Houses of Congress (including to the appropriate congressional committees), not later than 30 days before the removal or transfer. Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal.

5 U.S.C. §403(b). The first sentence specifies *who* may remove or transfer an IG, the second creates prerequisites to any removal or transfer, and the third clarifies that the paragraph does not bar any otherwise lawful personnel actions *other than* "transfer or removal."

Defendants' argument that §403(b) places "no preconditions" on presidential removal of IGs (Opp.15) is impossible to square with the statute's plain text, and in particular it reads the second sentence out of the statute, in violation of the cardinal canon that a statute "should be construed so that effect is given to all its provisions," *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018). The second sentence provides, using the classic mandatory term "shall," that the President must notify Congress with case-specific reasons at least 30 days before any removal or transfer of an IG occurs.

Defendants respond that there is "no grammatical connection between" the first two sentences (Opp.15), and so the second sentence simply provides a standalone reporting requirement rather than a restriction on the President's removal power (Opp.17). That argument is refuted by the paragraph's third sentence, which says that the paragraph does not "prohibit a personnel action otherwise authorized by law, *other than* transfer or removal," 5 U.S.C. §403(b) (emphasis added). That makes clear that the paragraph *does* "prohibit" certain removals or transfers. And the removals or transfers that it prohibits, obviously, are those made without the notice to Congress required by the second sentence.

Defendants counter (Opp.18 n.11) that the third sentence "is best read as negating any inference that in specifically discussing removal and transfer, the provision somehow forecloses

other personnel actions that are authorized by other laws." That cursory argument is not properly presented because it appears "only in a footnote." *Doe v. Securities and Exchange Commission*, 114 F.4th 687, 693 (D.C. Cir. 2024); *White v. Four Seasons Hotel & Resorts*, 244 F.Supp.3d 1, 5 (D.D.C. 2017). In any event, the argument fails. Indeed, it is another example of defendants ignoring (or trying to erase parts of) the plain statutory text. If defendants' reading were correct, then the words "other than transfer or removal" in the third sentence would be unnecessary and meaningless. But Congress included those words, eliminating any uncertainty that the paragraph does prohibit certain removals and transfers. This Court must of course apply and enforce the statute as Congress wrote it and the President signed it into law. That is particularly true given that defendants' argument about the meaning of the IG Act is also inconsistent with relevant legislative history and other sources showing that members of Congress understood (and understand) the IG Act to limit the President's removal power. *See* S.Rep.110-262, at 4, 8 (2008); H.Rep.110-354, at 11 (2007); Senate Amicus Memo. at 6-7 (ECF 20-1); Grassley-Durbin Letter at 1 (ECF No.14-4).

Finally, defendants argue (Opp.16) that "statutes requiring the Executive Branch to report information to Congress do not create judicially enforceable rights in third parties." But as just explained, the IG Act does not simply create a reporting requirement. And the D.C. Circuit's decision in *Walpin v. Corporation for National and Community Service*, 630 F.3d 184 (D.C. Cir. 2011), is inconsistent with defendants' suggestion that an IG removed in violation of the IG Act's removal prerequisites cannot obtain judicial redress. Although *Walpin* denied mandamus relief in that case, it did so on the ground that the President had *complied* with the notice-and-reasons requirement. *See id.* at 187-188. That rationale implicitly assumes that an IG removed in violation

of the IG Act can seek redress. Indeed, there would have been no reason for the court of appeals to decide the case the way it did if the IG had no enforceable rights under the statute.

### B.    The IG Act's Removal Restrictions Are Constitutional

As both the Supreme Court and the D.C. Circuit have long recognized, "acts of Congress are presumed to be constitutional." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir. 2005) (Roberts, J.) (citing *United States v. Morrison*, 529 U.S. 598, 607 (2000)). The IG Act's removal prerequisites would pass constitutional muster regardless, but defendants certainly have not overcome the presumption.

1.    Defendants first make the uncontroversial and undisputed point (Opp.19) that the President generally has the power to remove executive officials. They then spend another page arguing (Opp.19-20) that this case does not fall within an exception plaintiffs never invoked (for obvious reasons): the exception allowing Congress to "give for-cause removal protections to a multimember body of experts" in certain circumstances. None of that does anything to show that the IG Act's removal prerequisites are unconstitutional.

2.    Defendants next argue (Opp.20-21) that IGs do not qualify as either employees or inferior officers with limited duties, either of whose removal Congress can concededly limit. Defendants say IGs are in neither category because IGs: (1) "have broad authority to conduct investigations and audits regarding all the programs of the" agencies where they work, (2) "are charged with 'provid[ing] policy direction' and 'recommend[ing] policies' for agency operations," and (3) are "the head of each Office [of the Inspector General]." Opp.21 (alterations in original) (quoting 5 U.S.C. §§403-404). None of these three contentions has merit.

a.    Merely describing IGs' authority as "broad" is unavailing. This is not a labeling exercise—and if it were, the more appropriate label would be "narrow," since IGs have *only* investigative and auditing authority, with no power to effect any change in an agency's policies.

*See* Mot.15-17 (citing Supreme Court precedent). That is surely more limited than the power of the independent counsel, whose removal the Supreme Court held Congress could limit even though that official had "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice," *Morrison v. Olson*, 487 U.S. 654, 671 (1988).

b.    Defendants selectively excerpt the IG Act to misleadingly imply that IGs "are charged with 'provid[ing] policy direction'" generally. Opp.21 (alteration in original) (quoting 5 U.S.C. §404(a)(1). As a fuller quotation shows, the statute charges IGs with "provid[ing] policy direction *for ... audits and investigations* relating to the programs and operations of the" agency. 5 U.S.C. §404(a)(1) (emphasis added). That does not constitute the "enforcement of public law," *Buckley v. Valeo*, 424 U.S. 1, 141 (1976) (per curiam), or the "authority to formulate policy for the Government or the Executive Branch," *Morrison*, 487 U.S. at 671; it is simply part and parcel of the authority "necessary to operate [an IG's] office," *id.* at 671-672, in service of IGs' specialized non-policymaking function. Indeed, the IG Act explicitly provides that for purposes of another federal statute, IGs do *not* "determine[] policies to be pursued by the United States in the nationwide administration of Federal laws." 5 U.S.C. §403(c). Instead, IGs make recommendations akin to the "purely recommendatory powers" referred to by the Supreme Court in declining to hold that all administrative judges are principal officers. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 507 n.10 (2010). Their role is to help ensure that whatever policies *other* administration officials decided to pursue were implemented without waste, fraud, or abuse.

c.    The fact that each IG is the head of his or her agency's IG office does nothing to show that IGs are the types of officials whose removal Congress cannot limit. What the Supreme

Court has looked to is not whether an official heads a sub-component of his or her agency but whether he or she has a superior within the agency. IGs unquestionably do, reporting to the secretaries of their departments and in some cases to the deputy secretary as well. (Their law-enforcement capabilities, moreover, are subject to supervision by the attorney general, who can "rescind[] or suspend[]" those capabilities upon determining an IG has not complied with Justice Department guidelines. 5 U.S.C. App. §(6)(f).) Plaintiffs' motion explained this (p.16); defendants simply ignore the point.

3.    Finally, defendants argue (Opp.23) that if they are correct that IGs are principal officers with significant policymaking authority, then the IG Act's removal restrictions are unconstitutional because "*any* restriction on the President's removal authority over Inspectors General—whether 30 months or 30 days—is inconsistent with Article II." That too is wrong.

What the Supreme Court has recognized is "the President's unrestricted *removal* power" over certain officials. *E.g.*, *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 215 (2020) (emphasis added). The IG Act does not prevent presidential "removal," *id.*, of any IG, for any reason. It does not even prevent the President from taking an IG off-duty immediately under appropriate circumstances. It simply requires notice to Congress prior to removal and a case-specific explanation. Defendants' position—that Article II is violated by even these "minimal" requirements, *Walpin*, 630 F.3d at 187—is unsupported by precedent, which has invalidated for-cause restrictions on the President's removal authority. *See Seila Law*, 591 U.S. at 238; *Free Enterprise Fund*, 561 U.S. at 484. But unlike a for-cause removal requirement, the IG Act's notice-and-reasons requirement does not substantively limit the circumstances in which an IG can be removed, i.e., limit removal to cases of "inefficiency, neglect, or malfeasance," *Seila Law*, 591 U.S. at 203. In fact, Congress intentionally refrained from placing what it viewed as a

for-cause removal requirement on IGs:  When passing the 2008 IG Act amendments, Congress adopted the Senate's version of the bill—requiring only notice and a statement of reasons as a precursor to removal, S.Rep.110-262, at 4, 8—over the House's version that would have permitted "remov[al] only for cause, specifically permanent incapacity, inefficiency, neglect of duty, malfeasance, conviction of a felony, or conduct involving moral turpitude," H.Rep.110-354, at 11 (2007).  There is simply no sound basis to equate minimal procedural prerequisites to removal with for-cause or similar substantive limitations.

Defendants' extreme position—that any procedural limitations on removal violate Article II—is also unsupported by constitutional first principles or sound policy.  IGs function at the intersection of the legislative and executive branches, as part of their statutory function is to aid Congress in carrying out its constitutional legislative and oversight responsibilities.  They do this by keeping "Congress fully and currently informed about problems and deficiencies relating to" the programs and operations of the agencies, 5 U.S.C. §402(b)(3); *accord* Senate Amicus Memo.4.  Though a minimal condition on the President's removal power, the notice prerequisite allows for "an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General." S.Rep.110-262, at 4 (2008), *quoted in* Senate Amicus Memo.2.  These prerequisites are an appropriate exercise of Congress's Article I power and do not infringe the President's Article II authority.

## II.    THE REMAINING FACTORS FAVOR INJUNCTIVE RELIEF

### A.    Irreparable Harm

Defendants' irreparable-harm argument gets off on the wrong foot, with the contention (Opp.9) that plaintiffs face a particularly heavy burden because they supposedly seek "a mandatory injunction that would alter the status quo."  That is not what plaintiffs seek.  As the D.C. Circuit

has explained, "[t]he status quo is the last *uncontested* status which preceded the pending controversy," i.e., "the last peaceable uncontested status existing between the parties before the dispute developed." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-734 (D.C. Cir. 2022) (quotation marks omitted). Under that controlling definition, the status quo here is the situation *before* the purported removals. The injunction plaintiffs seek would restore that status quo, not alter it. No heightened standard therefore applies (although if it did plaintiffs would still satisfy it).

On the merits, plaintiffs' motion explained (pp.18-19) that plaintiffs face two irreparable harms (either of which suffices to satisfy this factor). First, their purported removals deprive them of the statutory right to function, unless and until removed in accordance with the IG Act, as non-partisan watchdogs in their congressionally created positions. Second, plaintiffs are harmed by the damage that the purported removals, and subsequent statements about plaintiffs and those removals, have done to plaintiffs' reputations. Neither harm can be remedied by money damages alone, and hence each supports preliminary relief. *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). Defendants' contrary arguments fail.

1.      As judges in this district have repeatedly held, plaintiffs have a clear "statutory right to function" in their roles as presidentially nominated, Senate-confirmed officials whose removal violated statutory requirements. *Berry*, 1983 WL 538, at *5; *accord Mackie v. Bush*, 809 F.Supp. 144, 146 (D.D.C. 1993), *vacated as moot sub nom*. 10 F.3d 13 (D.C. Cir. 1993) (per curiam). Two very recent decisions reaffirm that conclusion. First, in *Dellinger v. Bessent*, --- F.Supp.3d ---, 2025 WL 471022 (D.D.C. Feb. 12, 2025) (subsequent history omitted), another judge in this district held that the Special Counsel had established irreparable harm owing to his being removed from his role in contravention of statutory requirements, *see id.* at *13. That was because he had

been "deprived of the ability to perform his statutory functions and fulfill his statutory obligations to current and future whistleblowers … it is Congress that established his position, his duties, and the sole grounds for his removal," and the removal caused irreparable harm in light of the "Congressional determination that his independence is fundamental to the position it created." *Id.* Second, in *Harris v. Bessent*, --- F.Supp.3d ---, 2025 WL 521027 (D.D.C. Feb. 18, 2025), another judge in this district similarly held that the chair of the Merit Systems Protection Board was irreparably harmed by her extra-statutory removal because as an "appointed" and "confirmed … member of an agency charged with acting with a degree of independence from the President[,] … [s]triking at the independence of these officials [by removing them in violation of statutory requirements] accrues harm to their offices, as well," *id.* at *7. The same is true here.

Defendants attempt to distinguish these cases on various grounds, but none of these distinctions bears the weight defendants say. For example, contrary to defendants' assertions (Opp.11-12), *Berry v. Reagan* did not turn on the fact that the members of the Commission on Civil Rights had time-limited commissions or could not complete reports without the removed members; *Berry* also considered whether "the President has the power to remove Commissioners at his discretion" (also at issue here) and the fact that plaintiffs "provide[d] a quasilegislative service to Congress" (also present here). 1983 WL 538, at *5. The Court, moreover, did not find that the commission's time-limited nature was a requirement of irreparable harm. *See generally id.* (That is unsurprising, given that the Supreme Court has contemplated that "a permanent Government employee" could demonstrate irreparable harm from the loss of his or her employment. *Sampson v. Murray*, 415 U.S. 61, 80-81, 91 (1974).) Similarly, *Mackie* was concerned not only that removal could "be irrevocably disruptive of the Board's function" (Opp.12), but also that it would disrupt "*plaintiffs'* legal responsibility for carrying [that function]

out," a concern present here.  809 F.Supp. at 146 (emphasis added).  Finally, *Dellinger* and *Harris* each found irreparable harm not only from the fact that the particular statutory removal conditions were not satisfied (*see* Opp.12-13), but also as a result of—as is the case with plaintiffs—a "loss of the ability to do what Congress specifically directed [them] to do," *Dellinger*, 2025 WL 471022, at *11, i.e., the "foreclose[ure of] [their] ability to carry out the agency's mission" that "Congress has assigned to [them]," *Harris*, 2025 WL 521027, at *8-9.

The through line in all these cases is that "[p]laintiffs were attempting to preserve a status quo in which they had a statutory right to function, … after they were appointed by [the President], with the advice and consent of the Senate, pursuant to the authorizing statute" enacted by Congress. *Dellinger*, 2025 WL 471022, at *12 (quotation marks omitted) (describing *Berry*).  The cognizable irreparable harm, in other words, was that, as the *Dellinger* court put it, the plaintiff "has a statutory mission that his removal has rendered him unable to fulfill ….  And the loss of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief."  *Id.* at *11.  Again, the same is true here.

The harm is not eliminated, moreover, by the fact that some IG offices have produced reports since plaintiffs' removals—and more broadly, that the OIGs continue to function in some capacity without plaintiffs (Opp.11-12, 12 n.5).  As *Dellinger* explained in rejecting much the same argument, "whether the agency is still up and running in some format, with some person at the helm, is not the point ….  [I]n the absence of a leader lawfully appointed to fulfill the statutory duties of the Special Counsel, there would be no way to ensure" that the specific duties Congress and the President entrusted to a particular person are being appropriately carried out.  2025 WL 471022, at *13.  Similarly here, IGs are watchdogs "whose job is to protect programs and laws enacted by Congress," Senate Amicus Memo.5, and the IG role is one for which Congress requires

specific knowledge of "accounting, auditing, [and] financial analysis," 5 U.S.C. §403(a).  Every day that plaintiffs' roles are occupied by individuals not vetted and confirmed by the Senate is a day that this function is not fulfilled by the individual whom the legislative and executive branches have, together, selected as qualified to direct and safeguard the office.  As *Harris* explained, "[b]y vindicating their rights to occupy those offices, these plaintiffs act as much in their own interests as those of their agencies."  2025 WL 521027, at *7.

Defendants next attempt (Opp.9-10) to analogize this case to those holding that generally, "loss of employment does not constitute irreparable harm."  Most of those cases do not involve federal employment, much less plaintiffs who claim the deprivation of their statutory right to function in a presidentially appointed and Senate-confirmed role.  And none supports defendants' position.  For example, in *English v. Trump*, 279 F.Supp.3d 307 (D.D.C. 2018), another judge in this district found that the plaintiff did not have a statutory right to function in her role as interim director of the Consumer Finance Protection Bureau in part because—unlike plaintiffs here—she had *not* been "appointed by [the] President …, with the advice and consent of the Senate, pursuant to the authorizing statute of the Commission," a fact which "affect[ed] … the harm that she can argue would flow from the absence of … relief," *id.* at 335.  And in *Sampson v. Murray*, the Supreme Court denied preliminary relief for a discharged probationary government employee.  415 U.S. at 63, 81.  Plaintiffs are not probationary employees; they are appointed until they are properly removed, "die[], resign[], or [are] otherwise unable to perform the functions and duties of the position," and often serve across multiple presidential administrations.  5 U.S.C. §403(h)(2); Compl. ¶2.  Indeed, both *Dellinger* and *Harris* rejected similar government reliance on *Sampson*, recognizing that the harms alleged here "stem[] directly from 'extraordinary' circumstances as *Sampson* requires."  *Dellinger*, 2025 WL 471022, at *10; *accord Harris*, 2025 WL 521027, at *8.

Finally, defendants argue (Opp.11) that "it is hard to claim that [IGs] have any 'statutory right to function'" when they concededly can be removed with 30 days' notice and statement of reasons to Congress, and when "the statute gives the President authority to immediately place Inspectors General on non-duty status." That argument fails because plaintiffs' "statutory right to function" is the right to function *unless and until removed in accordance with the IG Act*. That right is not undermined because the President can remove IGs in the way the statute contemplates, any more than people's constitutional right not to be deprived of life, liberty, or property without due process of law is undermined by the fact that people can be deprived of those things *with* due process of law. Indeed, a president unwilling to disregard the IG Act's notice-and-reasons requirement might be dissuaded by that requirement from removing an IG. Or a president who provided notice and reasons might be persuaded during a resulting inter-branch dialogue that the contemplated removal should not be carried out.

2.     Plaintiffs have independently suffered and continue to suffer irreparable reputational injury. Mot.18-19. Defendants respond (Opp.12) by citing *Sampson* for the proposition that "[r]eputational harm is not a cognizable irreparable injury" under any circumstances. But *Sampson* explained that the plaintiff's reputational injury *in that case* was insufficient to constitute irreparable harm because "procedural irregularities" in an employee's discharge by themselves do not cause a "significant loss of reputation." 415 U.S. at 91. The Court noted, however, that different "circumstances surrounding an employee's discharge, together with the resultant effect on the employee," could lead to a different conclusion. *Id.* at 92 n.68.

This is such a case. Whereas the *Sampson* plaintiff alleged only that her termination caused her "embarrassment" and that "unrebutted charges against her might remain on the [internal employee] record," 415 U.S. at 89, here White House spokespeople have publicly (and falsely)

referred to plaintiffs "as rogue, partisan bureaucrats," and the President himself has suggested that plaintiffs were purportedly removed because they were "unfair" and/or "not doing the job." Grimm Decl. ¶¶13-14 (ECF No. 14-9); *see also* Hall, *'Rogue Bureaucrat': Inspector General Fired After Defying Trump*, MSN (Feb. 19, 2025); *Press Gaggle By President Trump Aboard Air Force One En Route to Miami, Florida*, The White House (Jan. 25, 2025).[1]  These public statements would be harmful to any government employee, but they are devastating to career oversight professionals whose work requires a reputation for efficacy, fairness, and non-partisanship.  They are thus "concrete and corroborated" harms to plaintiffs' reputation coming from the top tier of government—injuries this Court has recognized as "irreparable."  *Jones v. District of Columbia*, 177 F.Supp.3d 542, 547-548 (D.D.C. 2016); *accord Trudeau v. Federal Trade Commission*, 384 F.Supp.2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006). And relief would mitigate the harm by making clear that the removals (which provided the basis for the reputational smearing plaintiffs have endured) were improper.

Lastly, defendants suggest (Opp.13) that relief in this case might in fact "cause harm to [plaintiffs]' reputations" because the President could simply terminate plaintiffs again under the IG Act—this time with notice and case-specific reasons.  Plaintiffs know of no case-specific reasons warranting dismissal.  But even assuming defendants were correct that the President would remove plaintiffs in the future, whether that future removal would cause additional irreparable injury is irrelevant to whether the improper removal that is the subject of this case did so.

---

[1]    https://www.msn.com/en-us/news/politics/rogue-bureaucrat-inspector-general-fired-after-defying-trump/ar-AA1znn6M;    https://www.whitehouse.gov/remarks/2025/01/press-gaggle-by-president-trump-aboard-air-force-one-en-route-to-miami-florida.

### B.     Balance Of Equities And The Public Interest

Defendants argue (Opp.24) that the balance of equities and public interest do not support preliminary relief. But defendants offer almost no response to plaintiffs' extended argument on these factors (Mot.19-21), including that the public has an interest in having plaintiffs—individuals with many decades of collective IG experience—remain in office so that they can continue saving the public billions of dollars and preventing governmental abuse. Indeed, fundamental to the design of the IG Act is the enormous value provided by long-tenured IGs, who develop expertise in their agencies' operations crucial to effective audits and establish track records that complaints will be taken seriously and whistleblowers protected. *See* Wilhelm, Congressional Research Service, R45450, *Statutory Inspectors General in the Federal Government: A Primer* at 22 (Nov. 13, 2023).

In response, defendants say only (Opp.24) that "the public interest is better served by Inspectors General who hold the President's confidence, and thus will more effectively serve him in executing his duties as Chief Executive." But the President, by complying with the IG Act's notice-and-reasons requirements, could promptly obtain Inspectors General who hold his confidence while faithfully obeying the law and honoring Congress's legitimate interest in receiving reports prepared by non-partisan watchdogs. As explained, compliance with the notice-and-reason requirements serves the public interest because it allows Congress to weigh in on or otherwise act in response to any impending removal it believes inconsistent with the purposes of the law or the public interest.

Defendants also argue (Opp.24) that the requested relief would harm them because it would constitute an "unprecedented intrusion into the President's ability to exercise" his executive power. But requiring the President to comply with the law is not an "intrusion," certainly not a legally cognizable one. And defendants cannot credibly claim that the public interest would be harmed

by allowing plaintiffs to continue performing their statutorily mandated duties—as they have done for as many as 22 years—unless and until they are lawfully removed.

Finally, defendants offer no response to plaintiffs' argument (Mot.19) that "the public has a paramount interest in preserving the integrity of its federal government." That interest is gravely undermined when officials intended to be impartial watchdogs are instead treated as existing only to serve a particular partisan agenda. That is already taking place: The assertion in the email received by each plaintiff that his or her removal was solely due to "changing priorities," Mot.1, instantly sent the message that non-partisan, objective auditing and investigation is now seen by the administration as an obstacle to new policy goals. Then, as if to reinforce that message, Paul Martin, the IG for the United States Agency for International Development, was purportedly removed the day after he released a report identifying significant concerns arising from the administration's efforts to dismantle that agency. *See* Hansler, *USAID IG Fired Day After Report Critical of Impacts of Trump Administration's Dismantling of the Agency*, CNN (Feb. 11, 2025).[2] As with plaintiffs' purported removals, the President did not communicate any reasons for Mr. Martin's purported removal to Congress, let alone do so at least 30 days in advance. In Mr. Martin's case, as in plaintiffs' cases, if the President had followed the IG Act, Congress would have had the benefit of a 30-day period to engage with the President on the wisdom of the removal and hold him to account for the decision. Instead, the President's purported termination of Mr. Martin and of plaintiffs is having a clear chilling effect, sending a message to current and future IGs and their staffs that exercising independent, non-partisan judgment could cost them their positions, and to the federal workforce that their internal watchdogs may lack their historical

---

[2] https://www.cnn.com/2025/02/11/politics/usaid-inspector-general-fired-trump/index.html.

objectivity and therefore that complainants and whistleblowers are now at greater risk. That regime is assuredly not in the public interest.

Indeed, Congress understood in creating the role that IGs could not serve as the public's "first line of defense against waste, fraud, and abuse" if their recommendations, audits, and investigations were driven by partisan interests rather than objective analysis. *Safeguarding Inspector General Independence and Integrity: Hearing Before the Committee on Homeland Security and Governmental Affairs*, 117th Cong. 3 (2021) (statement of Sen. Portman). That is the very reason it provided "much-needed protections" to insulate IG investigative authority from political influence, requiring, for instance, that IGs be appointed "without regard to political affiliation." *Id.* at 3-4 (Sen. Portman); *id.* at 11 (statement of Allison Lerner, Chair, Council of the Inspectors General on Integrity and Efficiency); 5 U.S.C. §403(a). Again, it is not in the public's interest to have those statutory protections flouted by the official constitutionally charged with taking care that Congress's laws be faithfully executed.

Put simply, Congress enacted the notice-and-reasons requirements to support its constitutional duty to "conduct oversight of the federal government" by preventing waste, fraud, and abuse in the distribution of its appropriations. *Committee on the Judiciary, United States House of Representatives v. McGahn*, 968 F.3d 755, 760 (D.C. Cir. 2020) (en banc). Refusing preliminary relief here would undermine Congress's ability to fulfill these oversight obligations, harming the public's interest in sound and efficient governance.

## III. THE INJUNCTION PLAINTIFFS SEEK IS APPROPRIATE AND WITHIN THIS COURT'S POWER

Defendants argue finally (Opp.24-27) that even if an injunction is warranted under the four factors, it should be denied because it would be "improper and beyond the Court's equitable authority." To the contrary, the injunction plaintiffs seek falls well within this Court's equitable

jurisdiction—and if it didn't, the prerequisites for mandamus would then be satisfied. Either way, this Court has ample authority to enforce compliance with pellucid statutory terms designed to ensure nonpartisan transparency and accountability in government.

To begin with, much of defendants' argument is trained not on plaintiffs' complaint (which defendants never cite in making this argument) but on plaintiffs' proposed order, which defendants insist (Opp.25) requests an injunction running against the President. The proposed order does no such thing; indeed, defendants concede (*id.*) that by its terms, it would enjoin the "Agency Defendants" only, ECF No. 14-1. The injunction that the complaint and plaintiffs' preliminary-injunction motion request is similarly limited to the Agency Defendants (which is further reason to read the proposed order the same way). Compl.31; Mot.21. In any event, if a proposed order calls for an injunction that a court cannot grant, that in no way precludes the court from granting an appropriate injunction. Defendants do not claim there is any categorical ban on injunctions against agency heads—as opposed to the President—and of course there is not. Defendants' fixation on plaintiffs' proposed order is thus simply a distraction.[3]

As to the relevant question—whether this Court could grant the injunction the complaint and preliminary-injunction motion request—defendants argue (Opp.26-27) that reinstatement of public officials is not a remedy traditionally accorded by courts of equity, and that backpay is the only permissible equitable relief. For starters, plaintiffs do not seek "reinstatement" but rather a

---

[3] An amicus suggests that agency actors can do nothing to "restore" a removed IG. Soskin Amicus Br.21 (ECF No. 29-1). But even putting aside that "restoration" is not the issue here because plaintiffs have not been lawfully removed, the D.C. Circuit has explained that courts could order such officials to "treat[] [a presidentially removed] plaintiff as a member" of the board from which he was removed "and allow[] him to exercise the privileges of that office." *Severino v. Biden*, 71 F.4th 1038, 1042-1043 (D.C. Cir. 2023). Or courts could order such officials—in addition to "de facto" reinstating a presidentially removed official by returning their office resources, treating their work as "official," and restoring their pay—to "deny" recognition to a purported replacement. *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).

declaration that they were never properly removed and (hence) an injunction against interference with their continued performance of their duties.  Defendants offer no argument that that relief is unavailable.

But even taking their "reinstatement" argument on its own terms, it is incorrect.  The D.C. Circuit has held that it may afford relief to removed officials seeking reinstatement by enjoining executive officials to "allow[]" improperly removed officers "to exercise the privileges of [their] office," *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996), such as by "giv[ing]" those officers "access to [their] former office[s]," *Severino v. Biden*, 71 F.4th 1038, 1043 (D.C. Cir. 2023); "includ[ing]" improperly-removed officers in "meetings," *id.*; "permit[ting] [them] to cast votes," *id.*; and "allowing [them] to draw the salary" of the position, *Swan*, 100 F.3d at 980.  Courts may also order subordinate executive officials to "deny[] any such treatment" to the purported replacements of improperly removed officers.  *Id.*

Cases that defendants themselves cite, moreover, acknowledge that "jurisdiction to determine the title to a public office" can be "exercised … [by] *mandamus*," *In re Sawyer*, 124 U.S. 200, 212 (1888); *accord White v. Berry*, 171 U.S. 366, 377 (1898).  Plaintiffs seek mandamus here and have explained why the conditions for it are met.  Mot.14.  Defendants scarcely acknowledge plaintiffs' mandamus request and offer no substantive response to it—thereby waiving any such response, *e.g.*, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).

In other cases defendants cite (Opp.26-27), executive officers challenging their removal did seek backpay rather than reinstatement.  But defendants offer no basis to conclude that those cases reflect a rule prohibiting reinstatement relief.  Rather, requested remedies are determined according to the litigant's needs and "the circumstances of the case, and the mode of procedure, established by the common law or by statute."  *In re Sawyer*, 124 U.S. at 212.  And it is clear why

reinstatement may not have been an appropriate remedy in several cases defendants cite.  To take just one example, in *Wiener v. United States*, 357 U.S. 349 (1958), the commission from which the plaintiff had been removed was abolished before he sued, meaning that his *only* possible remedy was backpay, *see id.* at 350.  These cases cannot be deemed to create a rule against reinstatement—and again, D.C. Circuit precedent precludes any claim that such a rule exists, *see, e.g.*, *Swan*, 100 F.3d at 980.

## CONCLUSION

The Court should enter a preliminary injunction (1) declaring that plaintiffs shall continue to serve in their respective positions as Inspector General, and (2) enjoining Agency Defendants from (a) taking any further action to obstruct plaintiffs from doing so and (b) recognizing the authority of any other person as any plaintiff's successor as IG.  Alternatively—and particularly given defendants' failure to object to this request in plaintiffs' motion (p.21)—the Court should "advance the trial on the merits and consolidate it with the hearing" on the preliminary injunction motion, Fed. R. Civ. P. 65(a)(2).  Since defendants' opposition identifies no material fact in dispute, plaintiffs suggest that disposition on summary judgment would be appropriate.

February 25, 2025

Respectfully submitted,

*/s/ Seth P. Waxman*

Seth P. Waxman (D.C. Bar No. 257337)
David W. Ogden (D.C. Bar No. 375951)
Daniel Volchok (D.C. Bar No. 497341)
Jamie Yood (D.C. Bar No. 1033919)[*]
Hillary Chutter-Ames (D.D.C. Bar ID D00652)
Ann E. Himes (D.C. Bar No. 1767647)[*]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
david.ogden@wilmerhale.com
daniel.volchok@wilmerhale.com
jamie.yood@wilmerhale.com
hillary.chutter-ames@wilmerhale.com
annie.himes@wilmerhale.com

Nicholas Werle[†]
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

[*] *Court admission pending*
[†] *Admitted pro hac vice*