UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT P. STORCH, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> PETE HEGSETH, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-415 (ACR) |

**MEMORANDUM OPINION**

On May 28, 1972, U.S. Senators George McGovern and Hubert Humphrey—the two men running to become the Democratic Party's Presidential nominee—made last-minute preparations for their first televised debate, scheduled for that evening. The man they hoped to replace, President Richard M. Nixon, was halfway around the world in Russia. That day, he became the first American President to speak directly to the Soviet people by delivering a televised address from the Grand Kremlin Palace.

While the Senators debated and the President spoke, a few men broke into the headquarters of the Democratic National Committee at the Watergate complex in Washington, D.C. They copied documents and planted listening devices. Weeks later, they broke in again. This time, police—contacted by an alert security guard—apprehended them before they escaped. Two *Washington Post* reporters began digging. Had the men acted on behalf of President Nixon?

The Nixon administration falsely claimed ignorance. And the rest, as they say, is history.[1] A President resigning in disgrace, a public insistent on change and, relevant here, a legislature scrambling to shore up public trust.

In 1978, Congress enacted the Inspector General Act (IGA). Pub. L. No. 95-452, 92 Stat. 1101 (codified at 5 U.S.C. § 401 *et seq.*) (amended 2022). The Act created an Office of Inspector General (OIG), led by an Inspector General (IG), in each of several federal agencies to combat bureaucratic waste, fraud, and abuse. *See* 5 U.S.C. § 402(b)(2). Congress required that each IG be appointed "without regard to political affiliation and solely on the basis of integrity and demonstrated ability . . . ." *Id.* § 403(a). And it gave IGs the broad mandate to "promote economy, efficiency, and effectiveness" and "prevent and detect fraud and abuse" in agency programs and operations. *Id.* § 402(b)(2). Congress required that IGs keep it "fully and currently informed about problems and deficiencies relating to the administration of those programs and operations . . . ." *Id.* § 402(b)(3); *see id.* § 404(a)(5).

Fast forward about four decades. On May 15, 2020, President Trump fired two IGs for "loss of confidence." Compl. ¶ 62 (citing source). As the IGA requires, President Trump provided Congress 30 days' notice of the terminations. *Id.* Because the two IGs President Trump fired handled issues relating to his first impeachment, a bipartisan group of Senators asked for the reasons underlying the terminations. *Id.* None came. In response, Congress

---

[1] Innumerable books address the Watergate scandal. A couple: ALL THE PRESIDENT'S MEN (1974) recounts the events by the two men who broke the story, Carl Bernstein and Bob Woodward; WATERGATE: A NEW HISTORY (2023), by Garrett M. Graff, provides an up-to-date, comprehensive overview of the scandal. Also worth highlighting, a "historically accurate" Watergate board game in which players can "[c]hoose to play as the Nixon Administration, desperately maneuvering to maintain control and keep the truth hidden. Or become the relentless Journalist, utilizing your investigative skills to build a case to expose the President's involvement." *Watergate* (Capstone Games 2019) (board game).

enacted the Securing Inspector General Independence Act of 2022,[2] which requires the President to also provide Congress "the substantive rationale, including detailed and case-specific reasons," for an IG's removal. Pub. L. No. 117-286, 136 Stat. 4196; 5 U.S.C. § 403(b)(1)(A).

That brings us to this matter. On January 24, 2025, four days into his second term, President Trump fired many IGs. He did not first notify Congress and he did not provide any rationale, much less a substantive one containing detailed and case-specific reasons for the firing. Plaintiffs, eight of the fired IGs,[3] sued Defendants, their respective agency heads and the President,[4] alleging that President Trump violated the IGA by failing to provide the required notice and rationale. They seek, along with back pay and benefits, to be reinstated pending the President's compliance with the IGA. Defendants counter that the IGA is an unconstitutional intrusion into the President's removal powers under Article II of the U.S. Constitution. In any event, they argue, being denied the opportunity to serve out the 30-day notice period is not irreparable harm.

President Trump violated the IGA. That much is obvious. And Plaintiffs raise compelling arguments that the violation must be remedied through reinstatement to their

---

[2] Together, the Court refers to the Inspector General Act of 1978 and its 2022 amendments as the "Inspector General Act" or "IGA."

[3] Plaintiffs are Robert P. Storch, Michael J. Missal, Christi A. Grimm, Cardell K. Richardson, Sr., Sandra D. Bruce, Phyllis K. Fong, Larry D. Turner, and Hannibal "Mike" Ware.

[4] Defendants are Pete Hegseth, in his official capacity as Secretary of Defense; Douglas A. Collins, in his official capacity as Secretary of Veterans Affairs; Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; Marco Rubio, in his official capacity as Secretary of State, Linda McMahon, in her official capacity as Secretary of Education; Brooke Rollins, in her official capacity as Secretary of Agriculture; Lori Chavez-DeRemer, in her official capacity as Secretary of Labor; Kelly Loeffler, in her official capacity as Administrator of the Small Business Administration, and Donald J. Trump, in his official capacity as President of the United States.

positions. "It is decidedly wrong and decidedly contrary to the public interest," Plaintiffs argue, "to have statutory limits designed" to provide "much needed protection . . . against fraud, waste, and abuse flouted by the very official constitutionally charged to take care that Congress's laws be faithfully executed." Tr. (Mar. 27, 2025) at 11:8–14.  Yes, agreed.  But under well-established case law that this Court is bound to follow, Plaintiffs must show irreparable harm.  And they cannot.  Even assuming that the IGA comports with Article II, Plaintiffs' inability to perform their duties for 30 days is not irreparable harm.  Moreover, if the IGs were reinstated, the President could lawfully remove them after 30 days by providing the required notice and rationale to Congress.

Unable to reinstate Plaintiffs to their positions, the Court **DENIES** Plaintiffs' Motion for a Permanent Injunction.

* * * *

Plaintiffs have devoted their careers to public service.  Together they have served our country for over 250 years and have won innumerable awards.  While the Court cannot order Plaintiffs reinstated, it can give them the recognition their decades of government service demands.  All too brief summaries of their work follow here—instead of in the fact section below—to emphasize their contributions.  This recognition is no doubt of little comfort to them now.  The historical record must, however, reflect the unbiased contributions, experience, and skills of the government officials President Trump dismissed without explanation.

Robert P. Storch, the IG of the Department of Defense (DoD) since 2022, has spent more than 36 years in public service, including 24 years as a federal prosecutor.  Compl. ¶ 15; Dkt. 14-7 at 5.  He worked on anti-terrorism coordination following September 11, 2001, and he has held various positions in the Council of the Inspectors General on Integrity and Efficiency (CIGIE).

*Id.* ¶ 16. He has received numerous awards for his government service. *Id.* President Trump presumably agrees he is well-qualified since, in his first term, he appointed Storch as the IG of the National Security Agency. *Id.* ¶ 15.

Michael J. Missal, the IG of the Department of Veterans Affairs (VA) since 2016, has a 15-year career in public service. *Id.* ¶ 17. This includes working as Senior Counsel for the U.S. Securities and Exchange Commission, as Chair of the CIGIE Investigations Committee, as a member of the Pandemic Response Accountability Committee, and as a member of CIGIE's Executive Council. *Id.*

Christi A. Grimm, the IG of the Department of Health and Human Services (HHS) since 2022, has 26 years of public service at HHS's OIG. *Id.* ¶ 18. This includes serving as Acting IG during President Trump's first term and as Chief of Staff, Director of Programs and Operations, and Senior Program Evaluator. *Id.* In addition to her position as a statutory member of CIGIE's Pandemic Response Accountability Committee, Grimm has also served as both the Vice-Chair and later Chair of the Inspections and Evaluation Committee. *Id.* Grimm has received CIGIE and other awards for her work, including recognition by the HHS Secretary and by CIGIE for excellence in management. *Id.* ¶ 19. In 2024, *Modern Healthcare* named her a Top Woman Leader in Healthcare. *Id.*

Cardell K. Richardson, Sr., the IG of the Department of State (DOS) since May 2024, has almost five decades of public service. *Id.* ¶¶ 20, 21. Richardson spent 26 years in active-duty military service in the U.S. Air Force, honorably retiring at the rank of colonel. *Id.* ¶ 21. He then worked for 21 years at the National Geospatial-Intelligence Agency (NGA). *Id.* He served as agency-appointed IG of the NGA during President Trump's first term. *Id.* ¶ 20. Richardson has received several awards for his career in public service, including the Presidential Rank Award,

which is given to high-performing career senior executives for "sustained extraordinary accomplishment." *Id.* ¶ 21.

Sandra D. Bruce, the IG of the Department of Education (DOE) since 2021, has 39 years of public service. *Id.* ¶¶ 22, 23. She has worked for several agencies in many capacities, including the DOE OIG, U.S. Department of Energy, U.S. Postal Service OIG, and the U.S. Army Audit Agency. *Id.* ¶ 23. At the DOE, she held the positions of Deputy IG and then Acting IG during President Trump's first term before President Biden nominated her to the role of IG in December 2021. *Id.* ¶ 22. Bruce also served as Chair of CIGIE's Employee Engagement and Innovation Committee and Chair of the Government Accountability Office, State, and Local Subcommittee of the Pandemic Response and Accountability Committee. *Id.* ¶ 23. During her years of public service, she has won several CIGIE awards, including the Award for Excellence, Special Act Awards, Distinguished Achievement Awards, Exceptional Performance Awards, and Letters of Commendation. *Id.*

Phyllis K. Fong, the IG of the Department of Agriculture (USDA), has a 22-year tenure as the USDA IG. *Id.* ¶ 24. That tenure spans the administrations of Presidents George W. Bush, Obama, Trump (first term), and Biden. *Id*. She served simultaneously as Acting IG of the Federal Housing Finance Agency from August 2021 to March 2022 and, before her USDA IG nomination, she worked as IG of the Small Business Administration during the Clinton and George W. Bush administrations. *Id.* ¶ 25. Fong helped create CIGIE and served as the Council's peer-elected inaugural chair for three consecutive two-year terms. *Id.* Fong also oversaw Recovery Act funds following the 2008 financial crisis as a member of the Recovery Accountability and Transparency Board, in addition to her time on the Council's Pandemic Response Accountability Committee. *Id.* During her time as USDA IG, the USDA OIG received

6

CIGIE's 2024 Alexander Hamilton Award, which is the top award presented in the IG community. *Id.* Fong herself has received several awards for her work, including the Association of Government Accountant's Frank Greathouse Distinguished Leadership Award for outstanding leadership and contributions to financial management in government. *Id.*

Larry D. Turner, the IG of the Department of Labor (DOL) since 2021, has 46 years of public service. *Id.* ¶¶ 26, 27. His service includes 23 years of active-duty military service after which he honorably retired as lieutenant colonel. *Id.* ¶ 27. Turner held positions including Deputy and Acting Assistant IG for Communications and Congressional Liaison in the DoD OIG; and Acting IG, Deputy IG, Liaison Officer to Army Material Command, and Executive Officer to the Executive Director in the Army Installation Management Command. *Id.* He served as Acting IG at the DOL during the first Trump administration and as Deputy IG before that, and he assumed the role of IG at the DOL in December 2021. *Id.* ¶ 26. Turner also held positions on CIGIE's Employee Engagement and Innovation Committee Work Group, in addition to his role as a statutory member of the Pandemic Response Accountability Committee. *Id.* ¶ 27. Some of Turner's many awards include the Civilian Superior Service Award, the Army Civilian Meritorious Service Award, and the DoD Civilian Meritorious Service Award. *Id.*

And Hannibal "Mike" Ware, the IG for the Small Business Administration (SBA) since 2018, has 35 years of public service. *Id.* ¶ 28. Ware's career began in 1990 with his work as an intern auditor for the Department of the Interior's OIG. *Id.* Along with assuming the position of SBA IG following his nomination by President Trump, he has also served as Acting IG of the Social Security Administration since September 2024. *Id.* Prior to obtaining his current role of CIGIE Chair, Ware served as the Chair of CIGIE's Audit Committee for 6 years and the Chair of

the Pandemic Response Accountability Committee's audit subcommittee for 5 years. *Id.* He has received several awards in his career for his commitment to IG principles. *Id.*

The Court thanks each Plaintiff for his or her dedication to public service and outstanding contributions to our country.

## I. BACKGROUND

### A. Statutory Background

The IGA created an OIG in each of several federal agencies to combat bureaucratic waste, fraud, and abuse. *See* 5 U.S.C. § 402(b)(2). OIGs have authority to conduct investigations and audits without interference from the head of the agency. *Id.* § 403(a). This structure is "vital to effectuating Congress' intent and maintaining an opportunity for objective inquiries into bureaucratic waste, fraud, abuse, and mismanagement." *Nat'l Aeronautics & Space Admin. v. Fed. Lab. Rels. Auth.*, 527 U.S. 229, 240 (1999).

Congress also created a nonpartisan watchdog—the IG—to head each OIG. 5 U.S.C. § 403(a). Under the IGA, IGs are nominated by the President and confirmed by the Senate[5] "without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." *Id.* Congress gives these neutral IGs the broad mandate to "promote economy, efficiency, and effectiveness" and "prevent and detect fraud and abuse" in agency programs and operations. *Id.* § 402(b)(2). IGs must keep "Congress fully and currently

---

[5] The President, with advice and consent of the Senate, can appoint so-called "establishment Inspectors General," *i.e.*, IGs who oversee agencies rather than private entities, like Amtrak. *See* Dkt. 14-3 at 3; 5 U.S.C. § 403(a). "Designated Federal entities" IGs, by contrast, are appointed by the head of the agency and are not confirmed by the Senate. *See* Dkt. 14-3 at 3. This case concerns only establishment IGs.

informed . . . concerning fraud and other serious problems, abuses, and deficiencies . . . ." *Id.* § 404(a)(5); *see id.* § 402(b)(3).

An IG must submit certain reports to Congress and otherwise answers only to the head of the agency of which his or her OIG is a part. 5 U.S.C. §§ 403, 404. That said, the President does have the power to remove an IG. *Id.* § 403(b). But he cannot do so blithely. Before any removal, Congress has legislated that "the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal or transfer to both Houses of Congress . . . ." 5 U.S.C. § 403(b)(1)(A). And the President must provide this substantive rationale "not later than 30 days before the removal or transfer." *Id.* If, during the 30-day notice period, the President finds that the IG's continued presence "jeopardize[s] legitimate Government interests," he can put the IG "on non-duty status." *Id.* § 403(b)(2)(C); *see id.* § 6329b(b)(2)(A).

### B. Factual Background

The parties do not dispute the relevant facts. Late in the day on Friday, January 24, 2025, the Trump administration fired 17 IGs *en masse*. *See* Compl. ¶ 71. Eight of them—the IGs who served in the DoD, VA, HHS, DOS, DOE, USDA, DOL, and the SBA—then filed this lawsuit. *Id.* ¶ 5.

Each IG's termination message came in a two-sentence email from either Director of Presidential Personnel Sergio Gor or Deputy Director of Presidential Personnel Trent Morse. *Id.* ¶¶ 71–72. The email came without warning. *Id.* ¶ 73. Without the required notice to Congress. *Id.* ¶ 74. And without the required "substantive rationale." *Id.* ¶¶ 71–74. Congress took note. On January 28, 2025, the Chair (a Republican) and Ranking Member (a Democrat) of the Senate Judiciary Committee highlighted in a letter to President Trump his failure to provide Congress

9

with "the legally required 30-day notice and case-specific reasons for removal [of the IGs], as required by law." *Id.* ¶ 79. They requested that he provide this notice and information "immediately." *Id*. To date, crickets.

The firings were also "effective immediately," even though the administration did not make a finding—necessary to put an IG on non-duty status—that any of the IGs "pose[d] a threat" to his or her agency. *Id.* ¶¶ 71–75; 5 U.S.C. § 403(b)(2). Within days, the IGs lost access to their government email accounts, government-issued phones, Personal Identification Verification cards, and government computer systems. *Id.* ¶ 76.

### C. Procedural Background

On February 12, 2025, Plaintiffs sued the named Defendants in their official capacities. *See* Compl. The named Defendants are President Trump and the heads of the eight federal agencies in which Plaintiffs served as IGs. *Id.* ¶¶ 30–39. The crux of their Complaint is that the President violated the IGA and acted *ultra vires* by dismissing them without providing Congress the required 30-day notice and substantive rationale. They seek to retain their positions as IGs of their respective agencies "unless and until the President lawfully removes them in compliance with the statutory procedure set forth in 5 U.S.C. § 403(b)." *Id.* at 31. They also seek an award of "all back pay and benefits owed as a result of their unlawful purported removal in violation of 4 U.S.C. § 403(b)." *Id.* at 32.

Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction on February 14, 2025. Dkt. 14. After a hearing on the same day, the parties and the Court agreed to construe the initial motion as a combined motion for a permanent injunction.

On May 9, 2025, Plaintiffs filed a Notice of Recent Developments. Dkt. 47. Specifically, President Trump nominated new individuals to serve as IGs for the HHS, DOL, VA, and the

SBA.  *Id.* ¶ 2.  Plaintiffs filed a similar notice regarding a nomination for the DoD IG on June 26, 2025.  Dkt. 48.  On August 1, 2025, Plaintiffs informed the Court that the Senate confirmed a new individual as the IG of the VA, succeeding Plaintiff Michael Missal.  Dkt. 52.

## II.   LEGAL STANDARD

A plaintiff seeking a permanent injunction "must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  They must demonstrate "(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*; *see Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023).

A court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . . ."  *eBay*, 547 U.S. at 391.  The "purpose of an injunction is to prevent future violations" where there is a danger of recurrent harm.  *Anatol Zukerman*, 64 F.4th at 1363 (cleaned up).  When a "less drastic remedy" suffices to address the injury, the "extraordinary relief of an injunction" is not warranted.  *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165–66 (2010).

## III.   ANALYSIS

### A. The President's Removal Powers

On the merits, the Court finds it likely—indeed, certain—that Plaintiffs will succeed in arguing that their terminations violate the IGA.  The IGA provides that an IG may be removed only "by the President," who "shall communicate in writing the substantive rationale, including

11

detailed and case-specific reasons, for any such removal or transfer to both Houses of Congress . . . not later than 30 days before the removal or transfer." 5 U.S.C. § 403(b)(1)(A). And Defendants concede that "President Trump did not notify Congress 30 days before removing Plaintiffs." Dkt. 30 at 12. While Defendants contend *sotto voce* that the removals complied with the text of § 403(b), *id.* at 22–26, the Court has no difficulty concluding otherwise.

Defendants also raise a constitutional question: does Congress have the right to limit the President's power to remove IGs? *Id.* at 26–30. This is a close call under the best of circumstances. Congress can "provide tenure protections to certain *inferior* officers with narrowly defined duties." *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020) (emphasis in original). Those protections cannot be extended, however, "to principal officers who, acting alone, wield significant executive power." *Id.* at 238. IGs do not fit cleanly into either category. On the one (inferior) hand, they operate under the general supervision of their agency head and have no policymaking authority. On the other (principal) hand, they wield significant investigative authority, are appointed by the President, and are confirmed by the Senate.

And the best of circumstances, these are not. The case law on the constitutional contours of Congress's ability to limit the President's removal power is in a state of considerable flux. In recent terms, the Supreme Court has repeatedly declined to extend precedents limiting executive removal power. *See, e.g.*, *Seila Law*, 591 U.S. at 238; *United States v. Arthrex, Inc.*, 594 U.S. 1, 27 (2021). Just this year, several opinions, both from this Circuit and the Supreme Court, imply that these precedents are on thin—and rapidly melting—ice. *See e.g.*, *Dellinger v. Bessent*, 2025

WL 887518 (D.C. Cir. Mar. 10, 2025); *Trump v. Wilcox*, 2025 WL 1464804 (U.S. May 22, 2025); *Trump v. Slaughter*, 2025 WL 2692050 (U.S. Sept. 22, 2025).

This issue is worthy of resolution. That said, the parties (through no fault of their own) have not briefed this issue sufficiently for the Court to render a decision. At this juncture, then, the Court addresses only the non-merits factors of the permanent injunction. It turns to that inquiry now.

### B. The Permanent Injunction Factors

#### 1. *Irreparable harm*

Plaintiffs' motion for a permanent injunction fails because they cannot show irreparable harm. As the D.C. Circuit has explained, "[m]ere injuries, however substantial . . . are not enough" to prove irreparable harm. *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam). Ordinarily, the loss of a job and the injuries that go along with it "will not support a finding of irreparable injury, however severely they may affect a particular individual."[6] *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Thus, in the typical case in which an employee challenges their firing, the loss of their job does not "constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006). This is "particularly true in cases involving government employment." *English v. Trump*, 279 F. Supp. 3d 307, 334 (D.D.C. 2018).

The Supreme Court has recognized "the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs . . . ." *Sampson*, 415 U.S. at 83 (cleaned up). In government personnel cases, equitable relief such as

---

[6] The Court relies on case law involving preliminary injunctive relief because "the standard for a preliminary injunction is essentially the same as for a permanent injunction . . . ." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

reinstatement is disfavored and requires a "genuinely extraordinary situation." *Id.* at 92 n.68. Irreparable harm exists only where "the circumstances surrounding an employee's discharge, together with the resultant effect on [her] . . . so far depart from the normal situation that irreparable injury might be found." *Id.* Even then, a plaintiff must "make a showing of irreparable injury sufficient in kind and degree to override the[] factors cutting against the general availability of . . . injunctions in government personnel cases." *Id.* at 84. Plaintiffs here cannot make such a showing.

If reinstated, Plaintiffs would remain subject to removal without cause in just 30 days. *See* 5 U.S.C. § 403(b)(1)(A). And in the interim, Plaintiffs could, if certain requirements were met,[7] be placed on non-duty status, rendering them functionally unemployed. These statutory provisions undercut Plaintiffs' claim that deprivation of a "statutory right to function" as IGs constitutes irreparable harm. Dkt. 14 at 23–24. That Plaintiffs hold Presidentially appointed, Senate-confirmed positions does not alter the analysis; their roles are neither protected by a fixed term nor subject to for-cause removal restrictions. *Cf. Cook v. Trump*, 2025 WL 2607761 (D.D.C. Sept. 9, 2025).

Nor is there an "unprecedented" separation-of-powers concern here, or any "unusual actions relating to the discharge itself." *Cf. Perlmutter v. Blanche*, 2025 WL 2627965, *1–2 (D.C. Cir. Sept. 10, 2025). IGs are officials in the Executive Branch, and the President's authority to remove IGs is undisputed. *See* 5 U.S.C. §§ 401(1), 403(b)(1)(A). The question here is whether the President's failure to provide the required 30-day notice and rationale to Congress

---

[7] Before the President can suspend an IG during the 30 days leading up to their removal, two things must happen: (1) the President must decide that keeping the IG at work poses a threat (as described in 5 U.S.C. § 6329b(b)(2)(A)), and (2) the President must send a written report to Congress explaining the reasons for this decision in detail. 5 U.S.C. § 403(b)(2)(C). This is a high bar to meet, but not an impossible one.

constitutes irreparable harm to Plaintiffs. Failing to provide such notice is a statutory violation, not a structural breach or the kind of "extraordinary situation" needed to justify injunctive relief. *See Sampson*, 415 U.S. at 92 n.68.

Plaintiffs cite three district court cases in support of their position—*Dellinger v. Bessent*, 766 F. Supp. 3d 57 (D.D.C. 2025), *vacated as moot by* 768 F. Supp. 3d 33 (D.D.C. 2025); *Berry v. Reagan*, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot by* 732 F.2d 949 (D.C. Cir. 1983); and *Mackie v. Bush*, 809 F. Supp. 144 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993). Each one is distinguishable.

Start with *Dellinger v. Bessent*. There, the President removed the Special Counsel purportedly in violation of 5 U.S.C. § 1211(b). *Dellinger*, 766 F. Supp. 3d at 62. The Special Counsel argued that this removal caused him irreparable harm by depriving him of his statutory right to function, and he sought reinstatement, which the court granted, albeit temporarily.[8] *Id.* at 74. In so doing, the court found that the Special Counsel suffered irreparable harm because his "injury stem[med] directly from 'extraordinary' circumstances as *Sampson* requires . . . ." *Id.* at 70. And central to that finding was the statute's explicit protections: it provided the Special Counsel with a fixed term and permitted removal only for cause. *Id.* Although Plaintiffs here claim their removals similarly disrupted their statutory missions, the IGA does not provide

---

[8] Plaintiffs' motion cites the district court opinion granting Dellinger's motion for a temporary restraining order (TRO). *See Dellinger v. Bessent*, 766 F. Supp. 3d 57 (D.D.C. 2025). The district court later granted Dellinger's cross-motion for summary judgment and motion for permanent injunction, effectively reinstating Dellinger as Special Counsel. *Dellinger v. Bessent*, 768 F. Supp. 3d 33 (D.D.C. 2025). The D.C. Circuit granted the government's emergency motion to stay that decision pending appeal. *Dellinger v. Bessent*, 2025 WL 71783 (D.C. Cir. Mar. 5, 2025); *Dellinger v. Bessent*, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025). Dellinger subsequently dropped his lawsuit, and the D.C. Circuit dismissed the appeal as moot and vacated the district court opinion. *Dellinger v. Bessent*, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025).

comparable statutory protections for Plaintiffs. The IGs are neither appointed for a fixed term nor shielded by a for-cause removal provision. Accordingly, *Dellinger* is inapposite.

Consider *Berry v. Reagan* next. In that case, the President's removal of several members of the Commission on Civil Rights effectively dismantled the agency, halting its ability to issue a statutorily mandated report. *Berry*, 1983 WL 538 at *1, *5. The court enjoined the President from removing the Commissioners to preserve the Commission's congressionally authorized function, noting that the "irreparable nature of this injury is evident by the obviously disruptive effect the *denial* of preliminary relief will likely have on the Commission's final activities." *Id.* at *5–6 (emphasis in original). No such institutional collapse is imminent here, as each of the OIGs "continues to operate" with leaders "functioning as acting" IGs. *See English*, 279 F. Supp. 3d at 335. In other words, unlike the Commission in *Berry*, the OIGs will not "shutter[ ]" if the Court denies Plaintiffs' requested reinstatement. *Id.*

*Mackie v. Bush* is also unhelpful. There, the President sought to remove the majority of the Board of Governors of the Postal Service Board—an action the court found "could be irrevocably disruptive of the Board's function." *Mackie*, 809 F. Supp. at 146. Unlike in *Mackie*, no such disruption is apparent here.

*Berry* and *Mackie* also rest on shaky ground. Both cases conflate injury to the plaintiff with injury to the institution, treating alleged harm to the Commission (*Berry*) and Board (*Mackie*) as indistinguishable from the harm to the individual plaintiffs. Likewise here, even if Plaintiffs' absence compromised the OIGs, any resulting harm would affect the *institution*. And it is unclear how such an institutional harm could justify an individual statutory right to

reinstatement, as Plaintiffs claim.[9]  *See English*, 279 F. Supp. 3d at 335; *cf. Cook*, 2025 WL 2607761 at *18.  Even if institutional harm could justify an individual statutory right to reinstatement, however, the nature of the harm alleged here is materially distinguishable from the harm alleged in both *Berry* and *Mackie*, as discussed above.  Therefore, these cases provide little persuasive value.

Plaintiffs also claim that their firings, absent reinstatement, will cause irreparable harm to their reputations.  Dkt. 14 at 23–24.  But it is hard to see how.  If the Court reinstated Plaintiffs, the President could refire each of them by providing the required notice and rationale.  And that "rationale" could well cause the very reputational harm they seek to avoid.  Moreover, Plaintiffs cite no cases in which a court found that reputational injury established irreparable harm.

The Court does not minimize Plaintiffs' legitimate grievances with being fired without explanation, but they cannot satisfy the irreparable-harm factor.  This alone is sufficient to defeat their claim to reinstatement.  *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025).

 2. *Adequate remedies*

In wrongful-termination cases, the questions of irreparable injury and the adequacy of legal remedies often overlap or converge.  *See Grundmann v. Trump*, 770 F. Supp. 3d 166, 187 (D.D.C. 2025).  Here, the remedies available at law are sufficient to compensate Plaintiffs.  They can recover back pay and benefits—remedies they seek in their Complaint—if successful on the merits of their claims.  Compl. at 32.  Plaintiffs no doubt prefer the equitable relief of

---

[9] The Court addresses any alleged institutional harms in its analysis of the balance of hardships and the public interest.  While such harms may be relevant to equitable relief, they do not alter the inquiry into whether Plaintiffs face irreparable harm from their removal.

reinstatement to back pay. But the Court cannot conclude that Plaintiffs would be left without adequate opportunity for relief in the absence of an injunction.

   3. *Balance of hardships and public interest*

The third and fourth factors, which consider the balance of hardships and the public interest, respectively, merge when the defendant is the government. *Anatol Zukerman*, 64 F.4th at 1364 (cleaned up). Together they tip, if only slightly, in favor of injunctive relief.

The President's ability to choose and rely on trusted personnel is central to the effective functioning of the Executive Branch. As the Supreme Court explained in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the "Constitution was adopted to enable the people to govern themselves, through their elected leaders." 561 U.S. 477, 499 (2010). To "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the President is vested with the "power to remove—and thus supervise—those who wield executive power on his behalf . . . ." *Seila Law*, 591 U.S. at 204. Without this authority, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514. Thus, limiting that removal power risks undermining core executive functions. This all favors Defendants.

The Watergate scandal—which, recall, is where we started—revealed an equally important public interest: ensuring independent oversight of the Executive Branch. And Congress established IGs to do just that: serve as independent watchdogs within the Executive Branch, tasked with uncovering waste, fraud, and abuse. 5 U.S.C. § 402(b). Their effectiveness depends on their ability to operate free from political pressure or retaliation. Firing IGs without providing Congress any notice or explanation encroaches on this independence. Worse, such actions raise the risk of appearing retaliatory, which can chill the IGs' investigative work. And,

18

as Plaintiffs emphasize, it is of course in the public interest for the President to follow the law. This all favors Plaintiffs.

The Court finds that the combined balance of hardship and public interest factor favors Plaintiffs, but not by much.

## CONCLUSION

The Court recognizes Plaintiffs' exceptional service as IGs, marked by decades of distinguished leadership across multiple administrations. They sacrificed much to take on the role of an IG and its many demands—no doubt including substantial time away from family and far larger paychecks available in the private sector. They deserved better from their government. They still do.

Unfortunately, this Court cannot provide Plaintiffs more. Their theory of harm fails to establish that they have suffered—in a legal sense—an irreparable injury that cannot be compensated with remedies available at law. And in general, a "movant's failure to show any irreparable harm is grounds for refusing to issue a[n] . . . injunction, even if the other three factors merit such relief." *Clevinger*, 134 F.4th at 1236 (cleaned up). Accordingly, the Court

**DENIES** Plaintiffs' Motion for Preliminary Injunction, Dkt. 14, which the Court construes as a Motion for Permanent Injunction.

The Court will not decide the merits of Plaintiffs' claims and whether they are entitled to legal remedies, such as back pay, at this time. Due to the Supreme Court's recent grant of certiorari in *Trump v. Slaughter*, 2025 WL 2692050 (U.S. Sept. 22, 2025), which may bear on the issues presented here, the Court

**STAYS** this case; and

**ORDERS** the parties to file a Joint Status Report within 14 days of the Supreme Court's decision in *Slaughter* addressing whether Plaintiffs plan to seek traditional legal remedies such as back pay, and if so, proposing a briefing schedule for summary judgment. If Plaintiffs elect not to pursue such relief at that time, the Court will enter an Order dismissing this case without prejudice.


Date: September 24, 2025                                              _____
                                                                                                 ANA C. REYES
                                                                                                 United States District Judge