**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT P. STORCH, *et al.*,

Plaintiffs,

v.

PETE HEGSETH, *in his official capacity as Secretary of Defense*, *et al.*,

Defendants.

Civil Case No. 1:25-cv-00415-ACR

ORAL ARGUMENT REQUESTED

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

I. Inspectors General And The Act ........................................................................ 3

II. The Purported Removals Of Plaintiffs As Inspectors General .......................... 8

III. This Lawsuit ..................................................................................................... 10

LEGAL STANDARD ................................................................................................ 11

ARGUMENT ............................................................................................................ 11

I. Plaintiffs' Purported Terminations Violated The Inspector General Act ........... 11

II. The Inspector General Act Is Constitutional ..................................................... 12

A. The Act's Notice-And-Reasons Requirement Does Not Infringe The President's Removal Power ........................................................................................ 12

B. *Slaughter* Does Not Change The Constitutional Analysis .............................. 16

1. Inspectors General Do Not Exercise The Binding Executive Power Addressed In *Slaughter* ........................................................................................ 17

2. The Inspector General Act's Procedural Requirements Do Not Impermissibly Restrict The President's Removal Authority ........................................... 19

3. Inspectors General Are Inferior Officers With Narrowly Defined Duties ........... 20

III. Plaintiffs Are Entitled To Judgment And Effective Relief ................................ 22

A. Declaratory Judgment ....................................................................................... 22

B. Plaintiffs Are Entitled To Back Pay .................................................................. 25

CONCLUSION ......................................................................................................... 27

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Admiral Insurance Co. v. Niagara Transformer Corporation*,
57 F.4th 85 (2d Cir. 2023) .......... 24

*America's Community Bankers v. Federal Deposit Insurance Corporation*,
200 F.3d 822 (D.C. Cir. 2000) .......... 26

*American Federation of Government Employees v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .......... 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*Aulenback, Inc. v. Federal Highway Administration*,
103 F.3d 156 (D.C. Cir. 1997) .......... 23

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 26, 27

*Bowsher v. Synar*,
478 U.S. 714 (1986) .......... 12

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 18

*Burlington Northern Railroad Co. v. Office of Inspector General, Railroad Retirement Board*,
983 F.2d 631 (5th Cir. 1993) .......... 21

*C.F. Folks, Ltd. v. DC Jefferson Building, LLC*,
308 F.Supp.3d 145 (D.D.C. 2018) .......... 23

*Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 22

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 13

*Comans v. Executive Office of the President*,
480 F.Supp.3d 1036 (E.D. Va. 2026) .......... 20

*Comey v. United States Department of Justice*,
--- F.Supp.3d ---, 2026 WL 3203254 (S.D.N.Y. Oct. 26, 2026) .......... 20, 24

*District of Columbia v. Trump*,
810 F.Supp.3d 19 (D.D.C. 2025) ..... 22

*Edmond v. United States*,
520 U.S. 651 (1997) ..... 21

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) ..... 12

*Hubbard v. Environmental Protection Agency*,
982 F.2d 531 (D.C. Cir. 1992) (en banc) ..... 26, 27

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ..... 25

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ..... 22

*Morgan Drexen, Inc. v. Consumer Financial Protection Bureau*,
785 F.3d 684 (D.C. Cir. 2015) ..... 23, 24

*Morrison v. Olson*,
487 U.S. 654 (1988) ..... 12, 13, 20

*Myers v. United States*,
272 U.S. 52 (1926) ..... 12, 25

*Parsons v. United States*,
167 U.S. 324 (1896) ..... 25

*Preiser v. Newkirk*,
422 U.S. 395 (1975) ..... 23

*Seila Law LLC v. Consumer Financial Protection Bureau*,
5 91 U.S. 197 (2020) ..... *passim*

*Shurtleff v. United States*,
189 U.S. 311 (1903) ..... 25

*Trump v. Cook*,
609 U.S. 528 (2026) ..... 14

*Trump v. Slaughter*,
609 U.S. 422 (2026) ..... *passim*

*United States v. Iannone*,
610 F.2d 943 (D.C. Cir. 1979) ..... 19

*United States v. Perkins*,
116 U.S. 483 (1886) .......... 20, 27

*United States v. Wickersham*,
201 U.S. 390 (1906) .......... 27

*Walpin v. Corporation for National & Community Service*,
630 F.3d 184 (D.C. Cir. 2011) .......... 19

*Wiener v. United States*,
357 U.S. 349 (1958) .......... 25

## STATUTES

5 U.S.C.
§402 .......... 5, 18, 24
§403 .......... *passim*
§404 .......... *passim*
§405 .......... 4
§406 .......... 18
§422 .......... 17, 21
§702 .......... 26

15 U.S.C.
§45 .......... 17
§53 .......... 17
§57a .......... 17

28 U.S.C.
§516 .......... 18
§2201 .......... 22, 24, 25

Pub. L. No. 100-504, 102 Stat. 2515 (1988) .......... 5

Pub. L. No. 110-409, 122 Stat. 4302 (2008) .......... 5, 6

Pub. L. No. 114-317, 130 Stat. 1595 (2016) .......... 5

Pub. L. No. 117-263, 136 Stat. 2395 (2022) .......... 7

Pub. L. No. 117-286, 136 Stat. 4196 (2022) .......... 1

## RULES

Federal Rule of Civil Procedure 56 .......... 11

## OTHER AUTHORITIES

*Authority of the Inspector General to Conduct Regulatory Investigations*, 13 Op. O.L.C. 54 (1989) .......... 18

Clines, *Reagan Reappoints Five to Be Inspectors General*, N.Y. Times (Mar. 27, 1981), https://timesmachine.nytimes.com/timesmachine/1981/03/27/057452.html?pageNumber=36 .......... 6

D'Esposito, (@USLaborIG), X (Apr. 3, 2026, at 08:40), https://x.com/USLaborIG/status/2040046793652580597 .......... 15

H.R. Rep. 110-354 (2007) .......... 6

Léon & Piper, *Oversight Diminished: Federal Watchdogs Are Conducting Less Oversight As Their Staffs Shrink*, Partnership for Public Service (July 29, 2026, updated Aug. 12, 2026), https://ourpublicservice.org/know-the-facts/resource-library/publications/trump-inspector-general-oig-conducting-less-oversight-staff-shrink .......... 15

*Nominee for Inspector General, Department of Health and Human Services: Hearing Before Senate Committee on Finance*, 119th Cong. 1-2 (2025) (statement of T. March Bell) .......... 15

Purifoy, *Labor Inspector General D'Esposito Bucks Impartiality Standards*, Bloomberg Law (May 27, 2026), https://news.bloomberglaw.com/daily-labor-report/labor-inspector-general-desposito-bucks-impartiality-standards .......... 15

Rucker, *Trump Ramps Up Retaliatory Purge With Firing Of State Department Inspector General*, Wash. Post (May 16, 2020), https://www.washingtonpost.com/politics/trump-ramps-up-retaliatory-purge-with-firing-of-state-department-inspector-general/2020/05/16/8f8b55da-979a-11ea-82b4-c8db161ff6e5_story.html .......... 6, 7

S.Rep. 110-262 (2008) .......... 6, 14

*Safeguarding Inspector General Independence and Integrity: Hearing Before the Senate Committee on Homeland Security and Governmental Affairs*, 117th Cong. 2 (Oct. 21, 2021) (statement of Sen. Portman) .......... 7

## INTRODUCTION

Four days after starting his second term, President Trump purported to remove *en masse* the inspectors general ("IGs") of seventeen executive agencies, including the eight plaintiffs here, through a set of identical, two-sentence emails sent by White House staff. The emails—sent late on a Friday night—came with no advance notice to Congress or any case-specific reasons. But a federal statute, the Inspector General Act ("Act"), permits a president to remove an IG only if he (1) notifies both houses of Congress at least 30 days before removal, and (2) communicates a "substantive rationale, including detailed and case-specific reasons" for doing so. 5 U.S.C. §403(b). As this Court has recognized, therefore, plaintiffs' purported removals were an "obvious" violation of the Act, meaning plaintiffs are "certain" to succeed in establishing that violation. Dkt.54 ("Op.") at 3, 11-12.[1]

Given defendants' clear violation of the Act, the remaining question here is whether the Constitution requires the Court to disregard Congress's notice-and-reasons requirement. The answer is no. Unlike removal regimes that the Supreme Court has invalidated, the Act leaves removal decisions with the president and permits removal for any reason, imposing neither a fixed term for any IG nor a for-cause (or any other substantive) removal standard. It simply requires that the president notify Congress 30 days in advance and explain the reasons for the contemplated removal. These minimal procedural mandates are critical because they serve Congress's legislative and oversight functions, enable informed interbranch discussion and consideration, and safeguard the independence of an office whose role does not function without it—all while preserving the president's complete authority to remove an inspector general. Under longstanding

[1] As plaintiffs have previously noted, 5 U.S.C. §403(b) was not recodified following the 2022 amendments to the Act, which were made in Public Law Number 117-286, §3(b), *see* 136 Stat. 4196, 4208 (2022).

Supreme Court precedent, these procedural prerequisites are constitutional. And nothing in *Trump v. Slaughter*, 609 U.S. 422 (2026), requires a contrary conclusion. *Slaughter* held invalid a for-cause removal requirement for principal executive officers who exercised broad regulatory, adjudicative, and enforcement authority. That holding does not apply here for three independent reasons.

*First*, IGs do not exercise the sort of binding executive authority at issue in *Slaughter*. The Supreme Court held there that the president "may remove … at will" those "subordinates" "who exercise the President's power." 609 U.S. at 442, 464. That included the commissioners of the Federal Trade Commission ("FTC")—principal officers who, the Court explained, wield three quintessentially executive powers: promulgating rules that carry the force of law, investigating private parties and pursuing in-house adjudications, and filing civil enforcement suits on behalf of the United States. *Id.* at 454-456. But the Court made clear that "not all offices created by Congress necessarily come with executive or even sovereign power attached." *Id.* at 456. And inspectors general occupy precisely the space that *Slaughter* expressly left for another day, exercising none of the binding regulatory, adjudicative, or enforcement powers the Court pointed to in addressing FTC commissioners. IGs do not prescribe rules governing private conduct, oversee binding (or any) adjudications, impose civil penalties, initiate prosecutions or civil lawsuits, or direct agency policy. They instead audit and investigate their agencies' "programs and operations," "recommend corrective action," and "keep the head of the establishment and Congress fully and currently informed" of the programs' "problems." 5 U.S.C. §404(a)(1), (5).

*Second*, unlike the for-cause removal restrictions at issue in *Slaughter*, the Act does not condition removal on any substantive ground. It leaves the removal decision entirely to the president and requires only notice and a reasoned explanation to Congress so that it can properly

exercise its own constitutional oversight function. Nothing about these mild procedural requirements offends the separation of powers.

*Third*, IGs are inferior officers—subject to the general supervision of their agency heads—whose removal protections *Slaughter* did not address, and whose protections are preserved by *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020).

Put simply, the IGs' purported removals impermissibly violated a statutory scheme that Congress has repeatedly strengthened over time (with the agreement of presidents of both parties) to protect the independence of the government's front-line guardians against waste, fraud, and abuse. Plaintiffs are entitled to a declaration that their purported removals violated the Act and so were legally ineffective, and to the back pay owed as a result of their unlawful removal. The Court should grant summary judgment in plaintiffs' favor and provide that relief.

Plaintiffs request oral argument on this motion.

## BACKGROUND

### I. INSPECTORS GENERAL AND THE ACT

A. Inspectors general, who are appointed by the president with the advice and consent of the Senate, help ensure the effective and efficient operation of government. *See* 5 U.S.C. §404(a). They do so by auditing and investigating their agencies' operations and personnel to detect and prevent waste, fraud, and abuse. *Id.* IGs make findings and recommendations based on these oversight activities that agency leaders, the president, and Congress can all draw on to improve agency operations. *Id.*

To maximize Congress's ability to use IGs' work in carrying out its legislative and oversight roles, the Act requires IGs to provide Congress (and their respective agency heads) with semiannual reports "to keep [them] fully and currently informed … concerning fraud and other

serious problems, abuses, and deficiencies." 5 U.S.C. §404(a)(5). For example, each IG prepares semiannual reports describing any "significant problems, abuses, and deficiencies" in agency programs as well as providing recommendations for corrective action, reports that agency heads must transmit to the appropriate congressional committees within 30 days, together with any comments an agency head deems appropriate. *Id.* §405(b)-(c). And whenever an IG "becomes aware of particularly serious or flagrant problems, abuses, or deficiencies," he or she must "report immediately" to the agency head, who in turn must transmit the information to the appropriate congressional committees "within 7 calendar days." *Id.* §405(e). *Every* IG recommendation for corrective action, moreover, must go to the congressional committees of jurisdiction as well as to the agency head. *Id.* §404(e)(1)(A). The Act also requires IGs more generally "to recommend" to Congress and their agency heads "policies … for the purpose of promoting economy and efficiency" and "corrective action concerning the problems, abuses, and deficiencies, and to report on the progress made in implementing the corrective action." *Id.* §404(a)(3), (5).

IGs do not promulgate binding rules governing private conduct, adjudicate violations, impose civil penalties, or direct the operation of agency programs. *See generally* 5 U.S.C. §404(a). Rather, IGs' authority to "provide policy direction" is limited to "audits and investigations relating to the programs and operations of the" agency an IG oversees. *Id.* §404(a)(1). And although IG audits and investigations are "crucial tools in uncovering corruption and mismanagement in the executive branch," Dkt.20-1 ("Senators Amicus Br.") at 2, IGs do not themselves allege (or prosecute any alleged) criminal violations. Instead, IGs report evidence of violations to the attorney general. 5 U.S.C. §404(d). At all times, moreover, IGs are subject to "general supervision" by the heads of their respective agencies. *Id.* §403(a).

B. Congress has adopted, and over time strengthened, statutory protections to maintain the integrity and value of IG oversight. In 1978 for example—after decades in which it had created IGs for individual agencies—Congress enacted the Act (on a broad bipartisan basis) to "promote economy, efficiency, and effectiveness" and "prevent and detect fraud and abuse" within cabinet departments and major federal agencies. 5 U.S.C. §402(b)(2)(A)-(B). Congress has since amended the Act several times to establish IGs for additional federal agencies and to further enhance and empower IGs by increasing budget appropriations for the Offices of Inspector General. *See* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515; Inspector General Reform Act of 2008, Pub. L. No. 110-409, 122 Stat. 4302; Inspector General Empowerment Act of 2016, Pub. L. No. 114-317, 130 Stat. 1595.

To ensure that IGs work in a scrupulously non-partisan manner, the Act mandates that they be appointed "without regard to political affiliation," i.e., "solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U.S.C. §403(a). And reflecting Congress's judgment that IGs cannot provide effective oversight if they are unduly beholden to the agencies they investigate, the Act provides that IGs "shall not" report to or be supervised by anyone at their agencies other than the agency head or "the officer next in rank below such head." *Id.* Even then, Congress mandated not only that the supervising official exercise only "general supervision" but also that that official cannot "prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation." *Id.*

To further safeguard the integrity and effectiveness of the IGs and to minimize interference with or disruption of their work, Congress has also imposed procedural requirements on an IG's

removal. In 2008, Congress passed the Inspector General Reform Act, which required the president to communicate to Congress in writing his reasons for removing an IG "not later than 30 days before the removal or transfer." Pub. L. No. 110-409, §3(a), 122 Stat. at 4302. The accompanying Senate Report explained that advance notice "would allow for an appropriate dialogue with Congress in the event that the planned transfer or removal is viewed as an inappropriate or politically motivated attempt to terminate an effective Inspector General." S.Rep. 110-262, at 4 (2008). And according to the accompanying House Report, Congress chose that approach over a House-passed bill that would have permitted removal "only for cause, specifically permanent incapacity, inefficiency, neglect of duty, malfeasance, conviction of a felony, or conduct involving moral turpitude." H.R. Rep. 110-354, at 11 (2007).

In the last four-plus decades—since President Reagan fired sixteen IGs upon taking office, only to reinstate five of them after robust bipartisan criticism that the firings politicized these apolitical posts, Clines, *Reagan Reappoints Five to Be Inspectors General*, N.Y. Times (Mar. 27, 1981)[2]—no incoming president has attempted upon taking office to remove *en masse* IGs appointed by his predecessors. Rather, for decades IGs have served across administrations, reflecting their role as non-partisan watchdogs. For example, plaintiff Phyllis Fong had served as IG of the U.S. Department of Agriculture ("USDA") since 2002, spanning the presidencies of two Republicans (George W. Bush and Donald Trump) and two Democrats (Barack Obama and Joe Biden). Fong Decl. ¶1.

In 2020, President Trump departed from the bipartisan tradition by dismissing the confirmed IGs at the State Department and in the intelligence community. *E.g.*, Rucker et al., *Trump Ramps Up Retaliatory Purge With Firing Of State Department Inspector General*, Wash.

---

[2] https://timesmachine.nytimes.com/timesmachine/1981/03/27/057452.html?pageNumber=36.

Post (May 16, 2020).[3] These firings prompted Congress to consider additional statutory protections. At a 2021 hearing, Republican Senator Rob Portman described proposed legislation requiring a "substantive rationale" for removal as providing "much-needed protections for Inspector General independence," explaining that the proposal would preserve the existing 30-day notice period while requiring the president to explain the removal. *Safeguarding Inspector General Independence and Integrity: Hearing Before the Senate Committee on Homeland Security and Governmental Affairs*, 117th Cong. 2 (Oct. 21, 2021) (statement of Sen. Portman).

Congress adopted that stronger requirement in the Securing Inspector General Independence Act of 2022. Pub. L. No. 117-263, div. E, tit. LII, subtit. A, §5202(a)(1), 136 Stat. 2395, 3222. As amended, the Act requires the president to communicate to Congress in writing a "substantive rationale, including detailed and case-specific reasons," at least 30 days before removing an IG. 5 U.S.C. §403(b)(1)(A). The amendments also prohibit the president from placing an IG on non-duty status during the 30-day period before removal unless he determines that the IG's continued presence poses a specified workplace threat and provides Congress with a written explanation no later than the date that the change in status takes effect. *Id.* §403(b)(2)(C). As explained in the earlier-filed amicus brief of senators supporting plaintiffs, the current iteration of the notice-and-reasons requirement "ensures that the President is politically accountable for any decision—like removing an IG—that jeopardizes congressional oversight and good governance," and "appropriate[ly]" balances "Congress' need for information to conduct oversight and the prerogatives of the executive branch." Senators Amicus Br.2-3.

[3] https://www.washingtonpost.com/politics/trump-ramps-up-retaliatory-purge-with-firing-of-state-department-inspector-general/2020/05/16/8f8b55da-979a-11ea-82b4-c8db161ff6e5_story.html.

## II. THE PURPORTED REMOVALS OF PLAINTIFFS AS INSPECTORS GENERAL

Just four days into his second term, President Trump purported to fire seventeen inspectors general, eight of whom are plaintiffs here. Each plaintiff received a substantively identical, two-sentence email—from either the director or deputy director of the Office of Presidential Personnel ("OPP")—stating that the recipient had been removed "effective immediately" due to "changing priorities." Fong Decl. ¶3; Storch Decl. ¶3; Missal Decl. ¶3; Grimm Decl. ¶3; Turner Decl. ¶3; Ware Decl. ¶3; Richardson Decl. ¶3; Bruce Decl. ¶3; Statement of Material Facts Not in Dispute ("SUMF") ¶¶26-45. President Trump later falsely stated at a press conference that removing the IGs without notice to Congress was "a very standard thing to do." Dkt.14-5, Ex. C; SUMF ¶48.

Plaintiffs' access to government equipment, including computers, phones, and access badges, was cut off soon thereafter. Fong Decl. ¶¶6-7; Storch Decl. ¶¶4-5; Missal Decl. ¶5; Grimm Decl. ¶¶4-5; Turner Decl. ¶¶4-5; Ware Decl. ¶6; Richardson Decl. ¶5; Bruce Decl. ¶5; SUMF ¶¶60-101. Ms. Fong attempted to continue working after receiving the termination email, returning to work the following Monday and conducting several meetings before USDA employees cut off her access to IT systems, took possession of her computer and phone, and deactivated her badge, despite her nearly twenty-three years of decorated service as USDA IG. Fong Decl. ¶¶1, 6-7; SUMF ¶¶84-88. Other plaintiffs were allowed, under supervision, to collect their personal belongings from government buildings. Turner Decl. ¶5; Bruce Decl. ¶5; SUMF ¶¶82, 96.

Plaintiffs' removals drew immediate, bipartisan concern from Congress: Within days, the top Republican and Democrat on the Senate Judiciary Committee wrote a joint letter to President Trump stating that "IGs are critical to rooting out waste, fraud, abuse, and misconduct within the Executive Branch bureaucracy." Dkt.14-4, Ex. B; SUMF ¶53. They further observed that

"Congress was not provided the legally required 30-day notice and case-specific reasons for removal, as required by law," and requested that the administration provide that information "immediately." Dkt.14-4, Ex. B; SUMF ¶52.

Plaintiffs, meanwhile, disputed the legality of their purported removals: Hannibal "Mike" Ware, IG at the U.S. Small Business Administration, wrote a letter to OPP in his capacity as chairperson of the Council of the Inspectors General on Integrity and Efficiency, stating that the purported removals were illegal and therefore a nullity. Ware Decl. ¶4; SUMF ¶57. OPP never responded. Ware Decl. ¶5; SUMF ¶59; *see also* Dkt.14-12.

Two of plaintiffs' former agencies, the Departments of State and Education, still have no confirmed IG. *See* 2d Waxman Decl. Ex. 8 (PN962-2, Nomination of Heidi Semann, 119th Cong. (2026))[4]; 2d Waxman Decl. Ex. 7 (PN1022-4, Nomination of Carl Anderson, 119th Cong. (2026))[5]; SUMF ¶¶ 148-149. The other six of plaintiffs' agencies were eventually restaffed with confirmed IGs—five of them in December 2025, nearly a year after plaintiffs' purported removals. *See* 2d Waxman Decl. Ex. 1 (PN141-30, Nomination of Cheryl Mason, 119th Cong. (2025))[6] (Department of Veterans Affairs, confirmed July 2025); 2d Waxman Decl. Ex. 2 (PN55-7, Nomination of Thomas Bell, 119th Cong. (2025))[7] (Department of Health and Human Services, confirmed December 2025); 2d Waxman Decl. Ex. 3 (PN60-8, Nomination of Anthony D'Esposito, 119th Cong. (2025))[8] (Department of Labor, confirmed December 2025); 2d Waxman Decl. Ex.

---

[4] https://www.congress.gov/nomination/119th-congress/962/2.

[5] https://www.congress.gov/nomination/119th-congress/1022/4.

[6] https://www.congress.gov/nomination/119th-congress/141/30.

[7] https://www.congress.gov/nomination/119th-congress/55/7.

[8] https://www.congress.gov/nomination/119th-congress/60/8.

4 (PN141-25, Nomination of William Kirk, 119th Cong. (2025))[9] (Small Business Administration, confirmed December 2025); 2d Waxman Decl. Ex. 5 (PN246-11, Nomination of Platte Moring, 119th Cong. (2025))[10] (Department of Defense, confirmed December 2025); 2d Waxman Decl. Ex. 6 (PN416-12, Nomination of John Walk, 119th Cong. (2025))[11] (Department of Agriculture, confirmed December 2025); SUMF ¶¶ 142-147.

No plaintiff has received any compensation for his or her work as IG following the purported removal. Fong Decl. ¶10; Missal Decl. ¶8; Richardson Decl. ¶8; Bruce Decl. ¶8; Turner Decl. ¶7; Ware Decl. ¶9; Storch Decl. ¶7; Grimm Decl. ¶8; SUMF ¶¶102-125.

## III. THIS LAWSUIT

Plaintiffs filed this action challenging their purported removals; they sought declaratory and injunctive relief as well as back pay and benefits. Dkt.1. Plaintiffs moved for a temporary restraining order and preliminary injunction, which the Court treated as a motion for a permanent injunction. Dkt.14. After receiving briefing and hearing oral argument, the Court denied injunctive relief, concluding that plaintiffs had not established irreparable harm but recognizing that the president's non-compliance with the Act was "obvious" and that plaintiffs were thus "certain" to succeed in establishing the statutory violation. Op.3, 11-12. The Court stayed the case pending the Supreme Court's disposition of *Slaughter*. Op.13. After *Slaughter* was decided, the parties filed pre-motion notices (Dkts.59-60), appeared at a pre-motion conference, and filed a stipulated briefing schedule (Dkt.64).

---

[9] https://www.congress.gov/nomination/119th-congress/141/25?hl=PN141-25&s=6&r=1.

[10] https://www.congress.gov/nomination/119th-congress/246/11?hl=PN246-11&s=7&r=1.

[11] https://www.congress.gov/nomination/119th-congress/416/12?hl=PN416-12&s=8&r=1.

## LEGAL STANDARD

Summary judgment should be granted when "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable factfinder to return a verdict for the non-moving party, and a fact is "material" if it could affect the outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the material facts are undisputed and the remaining questions concern statutory interpretation and constitutionality, those questions are appropriately resolved on summary judgment. *See, e.g.*, *American Federation of Government Employees v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019).

## ARGUMENT

### I. PLAINTIFFS' PURPORTED TERMINATIONS VIOLATED THE INSPECTOR GENERAL ACT

Plaintiffs' purported removals unquestionably violated the Act. As noted, this Court has already deemed it "certain … that Plaintiffs will succeed" on the "obvious" issue of whether the removals violated the statute, adding that it had "no difficulty" rejecting the government's arguments "that the removals complied with" the Act's "text." Op.3, 11-12.

The Court's conclusion was correct under the plain language of the Act, which provides in relevant part:

> An Inspector General may be removed from office by the President. If an Inspector General is removed from office or is transferred to another position …, the President shall communicate in writing the substantive rationale, including detailed and case-specific reasons, for any such removal or transfer to both Houses of Congress (including to the appropriate congressional committees), not later than 30 days before the removal or transfer. Nothing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal.

5 U.S.C. §403(b).

Defendants have never disputed that President Trump failed to satisfy these prerequisites to removing plaintiffs as inspectors general: He did not provide Congress with 30 days' notice prior to any of the purported removals, and he has never communicated to Congress any case-specific reason for any of the purported removals. SUMF ¶52. Plaintiffs were thus never properly removed.

## II. THE INSPECTOR GENERAL ACT IS CONSTITUTIONAL

### A. The Act's Notice-And-Reasons Requirement Does Not Infringe The President's Removal Power

1. Article II vests the executive power in the president, including the power to remove executive officers. *Myers v. United States*, 272 U.S. 52, 163-164 (1926); *Seila Law*, 591 U.S. at 213-214. But not every statute that prescribes removal procedures violates Article II; rather, the Supreme Court has explained, the "real question is whether … removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison v. Olson*, 487 U.S. 654, 691 (1988); *see Seila Law*, 591 U.S. at 217 (discussing this test).

The Court's cases fleshing out this test make clear that a restriction on removal authority is invalid under Article II if it does one of two things. The first is giving Congress the authority to determine *whether* to remove an executive officer. For example, the statute invalidated in *Myers v. United States* required the Senate's consent to remove first-class postmasters, 272 U.S. at 161, 176, and the statute in *Bowsher v. Synar*, 478 U.S. 714 (1986), provided that the Comptroller General (who was held to "exercise[] executive functions") was "removable … only by a joint resolution of Congress or by impeachment," *id.* at 720, 726. And the second is limiting the grounds on which the president could remove an officer who exercised executive authority. The statute struck down in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), provided two layers of good-cause protection for members of that board, *id.* at 484,

492. Similarly, *Seila Law* and *Collins v. Yellen*, 594 U.S. 220 (2021), struck down for-cause protection for the single agency heads of the Consumer Financial Protection Bureau and the Federal Housing Finance Agency, respectively, *see id.* at 250-256; *Seila Law*, 591 U.S. at 213. And *Slaughter* struck down for-cause protections for FTC commissioners. 609 U.S. at 454-456. In every case in which the Court has invalidated removal restrictions, then, the stricken restriction had either made Congress an improper arbiter in the removal decision or limited the substantive grounds on which removal could occur.

The Act here gives Congress neither power. The president alone decides whether to remove an IG and chooses the grounds for doing so. Congress cannot veto that decision, and the Act imposes no substantive requirement on the acceptable grounds for removal. 5 U.S.C. §403(b)(1)(A). It requires only that the president give Congress 30 days' advance notice of the removal (with the president able to put an IG on non-duty status during that time if warranted) and a specific explanation for the decision.

2. The Act's modest procedural requirements serve two independent interests that the Supreme Court has recognized as legitimate and as not impermissibly restricting the president's removal authority: keeping Congress abreast of changes that bear on its oversight work and safeguarding the independence of officials on whose work Congress relies.

*First*, the Act's procedural requirements serve a recognized legislative function in light of the IGs' unique role. In *Morrison v. Olson*, the Supreme Court explained that a statutory scheme requiring the attorney general to report to Congress the "grounds" for removing an independent counsel did not "unduly interfer[e] with the role of the Executive Branch" because "receiving reports" is "incidental to the legislative function of Congress." *See* 487 U.S. at 663, 693-694. The Act's reporting requirement serves the identical purpose. IGs are charged with informing

Congress about problems in agency programs and recommending corrective action. 5 U.S.C. §404(a)(5). Requiring the president to timely explain an IG's removal thus gives Congress information about executive action that could disrupt its legislative oversight. The Act's requirements do nothing more than "allow for an appropriate dialogue with Congress," S.Rep. 110-262, at 4 (2008), regarding the removal of an official whose work impacts Congress's legislative and oversight functions. Because the Act's notice-and-reasons requirements leave the removal decision with the president and impose no substantive limits on the reasons for removal, all while simultaneously ensuring that Congress has the information it needs to perform its duties, the Act is constitutional.

*Second*, IG oversight is valuable to Congress, to agency leaders, and to the public—but only if it is independent and credible. An IG who may be removed at any moment, without notice or explanation, faces pressure to soften or forgo findings that might displease the officials whose programs the IG reviews, which is precisely the chilling effect Congress sought to guard against, *see* S.Rep. 110-262, at 4. The Act addresses that risk not by limiting the president's authority to decide whether to remove an IG (underscoring its constitutionality, as elaborated above), but by ensuring that any removal occurs in the open, with Congress informed of the reasons in advance. The Supreme Court recently recognized the importance of procedural protections for an office whose independence Congress sought to preserve. In *Trump v. Cook*, 609 U.S. 528 (2026), it concluded that the statute governing Federal Reserve governors entitles a governor to notice and some opportunity to respond before removal. Because "[n]ot only the *fact* of independence but also the *appearance* of independence is key to" the "design" of the offices of the inspector general, *see id.* at 530, the case for honoring the Act's far more modest procedural requirement is at least as strong here as it was in *Cook*.

Indeed, events since January 2025 show what the statutory process protects. Many of the people serving as IGs at plaintiffs' agencies today have described their roles in partisan terms that the Act forbids (*see* 5 U.S.C. §403(a)). For instance, the person serving as the Health and Human Services Department IG told the Senate he would audit and investigate "to support the initiatives of President Trump and Secretary Kennedy"—later reiterating that the IG should "provide actionable information in support of the President's and Secretary's courageous and innovative change of direction." *Nominee for Inspector General, Department of Health and Human Services: Hearing Before Senate Committee on Finance*, 119th Cong. 1-2 (2025) (statement of T. March Bell). The person serving as the Labor Department IG said he would not "shy away" from being a "conservative Republican," Purifoy, *Labor Inspector General D'Esposito Bucks Impartiality Standards*, Bloomberg Law (May 27, 2026),[12] and reposted the president's call to focus fraud investigations "primarily" on "Blue States" with "CROOKED DEMOCRAT POLITICIANS," D'Esposito (@USLaborIG), X (Apr. 3, 2026, at 08:40).[13] Not surprisingly given all this, oversight output has fallen: Cabinet-department IGs issued 15 percent fewer audit reports and 25 percent fewer investigative reports in the first half of fiscal year 2026 than they averaged from 2020 through 2024, including a 66 percent drop in audit reports at the Department of Education, one of plaintiffs' former offices. Léon & Piper, *Oversight Diminished: Federal Watchdogs Are Conducting Less Oversight As Their Staffs Shrink*, Partnership for Public Service (July 29, 2026, updated Aug. 12, 2026).[14]

---

[12] https://news.bloomberglaw.com/daily-labor-report/labor-inspector-general-desposito-bucks-impartiality-standards.

[13] https://x.com/USLaborIG/status/2040046793652580597.

[14] https://ourpublicservice.org/know-the-facts/resource-library/publications/trump-inspector-general-oig-conducting-less-oversight-staff-shrink.

### B. *Slaughter* Does Not Change The Constitutional Analysis

*Slaughter* does not change the foregoing analysis. That decision held that principal officers who exercise the president's executive power, such as the FTC commissioners at issue there, must remain removable at will. 609 U.S. at 441-442. But the Court recognized that "not all offices created by Congress necessarily come with executive or even sovereign power attached," had no "occasion … to define the bounds of what [executive] power entails," and did not "determine the fate of officials not before" it. *Id.* at 456. That includes inspectors general, who are materially different from FTC commissioners. Congress's authority over their removal remains governed by the cases discussed in the prior subsection.

Indeed, any one of three independent distinctions (discussed in detail in the balance of this section) places IGs outside *Slaughter*'s holding. *First*, *Slaughter* addressed officials who wield binding regulatory, adjudicative, and enforcement authority that the Supreme Court described as being within the "heartland of executive power," 609 U.S. at 454-456—rather than the narrower investigative and oversight duties that the Act assigns to IGs, 5 U.S.C. §404(a). *Second*, *Slaughter* invalidated a for-cause removal standard (like those in several of the cases discussed above), while the Act, as discussed, leaves the grounds for removal to the president and requires him only to provide Congress advance notice and an explanation. 609 U.S. at 431, 454; 5 U.S.C. §403(b)(1)(A). *Third*, even if IGs exercise executive power, they are "inferior officers with narrowly defined duties" whose removal Congress may regulate under precedents that *Slaughter* did not overrule. *Seila Law*, 591 U.S. at 204.

In short, *Slaughter* decided only that Congress may not protect a principal officer who exercises broad executive powers from removal without cause. Plaintiffs seek no such protection.

### *1. Inspectors General Do Not Exercise The Binding Executive Power Addressed In* Slaughter

*Slaughter*'s holding rested on the broad powers that FTC commissioners exercise. The FTC, the Court explained, "has accumulated vast rulemaking, enforcement, and adjudicatory powers under more than 80 statutes" that "cover almost every facet of our Nation's economy," 609 U.S. at 431, 454, and it wields those powers against "private parties," including by "collecting civil penalties in the billions of dollars," *id.* at 431. The Court singled out three of the FTC commissioners' powers as falling "well within the heartland of executive power." The FTC "promulgate[s] substantive rules that carry the force of law." *Id.* at 454, 456; 15 U.S.C. §57a(a)(1)(B). It "investigate[s] businesses" and enforces the law "through in-house adjudications" that end in cease-and-desist orders. 609 U.S. at 454; 15 U.S.C. §45(b). And it sues in federal court for injunctions and civil penalties. 609 U.S. at 455; 15 U.S.C. §§45(m)(1)(A), 53(b).

Inspectors general have none of these powers. *First*, IGs do not promulgate rules that carry the force of law. They may "provide policy direction" only "for … audits and investigations relating to the programs and operations of the establishment." 5 U.S.C. §404(a)(1). Otherwise, IGs may only "recommend policies," which the appropriate agency head may accept or reject. *Id.* §404(a)(3)-(4). Congress has forbidden agency heads to transfer "program operating responsibilities" to IGs, *id.* §422(a), and has declared, for purposes of the Hatch Act, that an IG "shall not be considered to be an employee who determines policies to be pursued by the United States in the nationwide administration of Federal laws," *id.* §403(c). A power to recommend actions to others is not the "power to flesh out" statutory regimes through "discretionary actions, largely outside the remit of courts" that *Slaughter* described as "executive through and through." 609 U.S. at 454.

*Second*, while the Act gives IGs investigative tools, it denies them any authority to adjudicate liability or impose penalties. Their investigative tools include subpoenas and (only with the attorney general's authorization) firearms, arrests, and warrants. 5 U.S.C. §406(a)(4), (f)(1). IGs may use these tools, moreover, only to detect and prevent waste, fraud, and abuse. Authority of the Inspector General to Conduct Regulatory Investigations, 13 Op. O.L.C. 54, 64-67 (1989). The executive branch, in other words, has long read the Act to bar IGs from conducting regulatory-compliance investigations of private parties, because such investigations are "program operating responsibilities." *Id.* at 63, 67.

*Third*, the Act does not give IGs general authority to bring civil enforcement actions or criminal prosecutions. Whenever an investigation reveals a possible violation of federal criminal law, the IG must report it to the attorney general. 5 U.S.C. §404(d). And federal law generally reserves litigation on behalf of the United States to the Department of Justice. 28 U.S.C. §516. An IG's findings thus inform the decision whether to seek judicial relief without authorizing the IG to pursue it.

The Act's central assignment is instead investigation and oversight: auditing agency programs, investigating waste and misconduct, and reporting to agency heads and Congress. IGs must keep those recipients "fully and currently informed" about problems in federal programs. 5 U.S.C. §§402(b)(3), 404(a)(5). As *Slaughter* explained, such reporting serves Congress's legislative function; the Court characterized powers "of an investigative and informative nature" as ones that "may 'be regarded as merely in aid of the legislative function of Congress,'" as opposed to the "discretionary power to seek judicial relief" that implicates "executive" power. 609 U.S at 456 (quoting *Buckley v. Valeo*, 424 U.S. 1, 137-138 (1976)). Indeed, *Slaughter* expressly declined "to define the bounds of what [executive] power entails." *Id.* *Slaughter*'s analysis of the

FTC's broad regulatory powers therefore does not render IGs the kind of executive officer who cannot be subject even to the Act's limited removal procedures.

#### 2. *The Inspector General Act's Procedural Requirements Do Not Impermissibly Restrict The President's Removal Authority*

*Slaughter* also involved a removal restriction materially different from that here. The provision in *Slaughter* barred the president from removing an FTC commissioner except for "inefficiency, neglect of duty, or malfeasance in office," so the Court framed the question as whether commissioners may be given "for-cause" "protection from removal." 609 U.S. at 431, 454. The Act confers no such protection.

As explained, see *supra* Part II.A, the Act limits neither the grounds for removal nor the president's unilateral authority to make that decision, and it leaves no court to judge whether his reasons were good enough. *Slaughter*'s statement that officers within the president's "general administrative control" must be removable "at will," 609 U.S. at 456, speaks to the substantive grounds for removal. It says nothing about a requirement that the president timely *explain* his rationale (whatever it is) to Congress before it takes effect. The D.C. Circuit has described such a requirement as "minimal," *Walpin v. Corporation for National & Community Service*, 630 F.3d 184, 187 (D.C. Cir. 2011), and that minimal requirement does not require any court to decide whether a president's stated reasons were persuasive, correct, or sufficient to justify removal. A court need determine only whether the president timely communicated an actual rationale containing detailed, case-specific reasons. 5 U.S.C. §403(b). The Act's "unusual[ly]" modest procedural prerequisites, *United States v. Iannone*, 610 F.2d 943, 947 (D.C. Cir. 1979), thus merely ensure that Congress has timely notice and opportunity to respond if a president seeks to remove officials whose responsibilities are critical to its oversight function. But unlike the FTC commissioners at issue in *Slaughter*, IGs remain removable by the president "at will."

*3. Inspectors General Are Inferior Officers With Narrowly Defined Duties*

Finally, IGs, unlike FTC commissioners, are inferior officers of the United States. Indeed, defendants did not contend otherwise at the pre-motion conference: Their counsel indicated that defendants would *not* argue that IGs are principal officers, instead maintaining that the Act's requirements are invalid even as applied to inferior officers. *See* Minute Entry (Oct. 14, 2026). *Slaughter* did not address inferior officers and made clear that it was not "determin[ing] the fate of officials not before" it. 609 U.S. at 456. *Slaughter* thus left undisturbed the Court's numerous opinions holding that Congress does not infringe the president's powers when it restricts (even substantively, unlike here) the removal of inferior officers "with narrowly defined duties." *Seila Law*, 591 U.S. at 204; *see also Morrison*, 487 U.S. at 691-692; *United States v. Perkins*, 116 U.S. 483, 485 (1886). Two district judges have since rejected any argument to the contrary. First, a judge in the Eastern District of Virginia recently explained, in rejecting the government's argument that the president could fire without process the Chief Financial Officer of the Federal Emergency Management Agency, that "*Slaughter* … had nothing to say about inferior officers …, and this Court must exercise great caution in translating principles from one context into another without clear direction. Instead, judicial restraint requires this Court to apply the law as it stands." *Comans v. Executive Office of the President*, 480 F.Supp.3d 1036, 1039 (E.D. Va. 2026). Second, a district judge in the Southern District of New York similarly rejected *Slaughter*'s application to inferior officers (there, assistant United States attorneys) as "contrary to an unbroken line of Supreme Court decisions dating back almost two centuries" because "the Supreme Court has never in its history found unconstitutional a congressionally imposed restriction on the removal of an inferior officer who answers … to a principal officer removable by the President at will." *Comey v. United States Department of Justice*, --- F.Supp.3d ---, 2026 WL 3203254, at *15-16 (S.D.N.Y. Oct. 26, 2026).

That IGs are presidentially appointed and require Senate confirmation does not change the conclusion that they are inferior officers. "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond v. United States*, 520 U.S. 651, 662 (1997). Hence, the Supreme Court has recognized, one indication of "an inferior officer" is that "he labor[s] under the general direction of the Secretary of the" agency within which he works. *Seila Law*, 591 U.S. at 220-221 (quotation marks omitted). Here, the Act provides that "[e]ach [IG] shall report to and be under the general supervision of the head of the [agency] involved" or the next-highest-ranking official. 5 U.S.C. §403(a).

IGs are also inferior officers because, as explained, Congress has ensured that they have no authority over agency policymaking, 5 U.S.C. §403(c), and can only "recommend policies" and procedures to promote "economy, efficiency, and effectiveness" by rooting out waste, fraud, and abuse, *id.* §404(a). Put simply, IGs have no power to compel or prohibit agency activity. *See id.* §404(a)(1), (3), (5). They can neither "be delegated any 'program operating responsibilities,'" *id.* §422(a)(2), nor conduct "regulatory compliance investigations or audits," which are the "investigations" and "audits" that are "designed to carry out [the statutory] function directly" and which are "most appropriately viewed as being within the authority of the agency itself," *Burlington Northern Railroad Co. v. Office of Inspector General, Railroad Retirement Board*, 983 F.2d 631, 641-642 (5th Cir. 1993). IGs are thus akin to the independent counsels whom the Supreme Court deemed to be inferior officers—even though the independent counsels (unlike IGs) were authorized to "initiate criminal investigations and prosecutions," which the Court held was a "core executive power," *Seila Law*, 591 U.S. at 219.

## III. Plaintiffs Are Entitled To Judgment And Effective Relief

Plaintiffs seek declaratory relief and back pay, *see* Dkt.1 at 31-32, and they are entitled to both. Indeed, this Court has recognized that plaintiffs "can recover back pay and benefits … if successful on the merits of their claims." Op.17. For the reasons just given, they are likewise entitled to a declaration that their removals were all unlawful.

Nor does it matter that the president himself directed the purported removals. To the extent defendants contend that plaintiffs cannot obtain relief because the president is not an "agency" subject to suit under the Administrative Procedure Act, that contention, as plaintiffs would explain in detail in response, misses the mark. Courts have long exercised review of claims that executive action, including action taken at the president's direction, exceeds statutory or constitutional limits, *see Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1327-1328 (D.C. Cir. 1996), and such review proceeds against the subordinate officials who give effect to the president's directive, *see District of Columbia v. Trump*, 810 F.Supp.3d 19, 38-39 (D.D.C. 2025). The relief plaintiffs seek—a declaration that their purported removals were legally ineffective and payment of the salary and benefits withheld as a result—runs against those officials, not against the president personally.

### A. Declaratory Judgment

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a). In order to issue declaratory relief, a court must first "satisfy the case-or-controversy requirement" within the meaning of Article III of the United States Constitution and the Declaratory Judgment Act. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-127 (2007).

This inquiry focuses on "whether the facts alleged, under all the circumstances, show that there is [1] a substantial controversy, [2] between parties having adverse legal interests, [3] of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (emphasis omitted), *quoted in Aulenback, Inc. v. Federal Highway Administration*, 103 F.3d 156, 161 (D.C. Cir. 1997). All three are present here. *First*, there is "substantial controversy" over the lawfulness of plaintiffs' purported terminations and the constitutionality of the Act, as is clear from the extensive preliminary-injunction and other proceedings in this case to date. *Second*, the parties have adverse legal interests: Defendants contend that they acted lawfully by effectuating the purported removals of plaintiffs from office, including because the Act, insofar as it requires notice and reasons before a president may remove inspectors general, is unconstitutional. *See generally* Dkt.59. Plaintiffs obviously take the opposite view. *Third*, this controversy is sufficiently immediate to warrant a declaratory judgment, including because plaintiffs' claims are not "based on the occurrence of a future or contingent event," *C.F. Folks, Ltd. v. DC Jefferson Building, LLC*, 308 F.Supp.3d 145, 150 (D.D.C. 2018). Thus, the Court may grant declaratory relief.

Where a case or controversy exists, whether to issue a declaratory judgment is within the "discretion" of the court. *Morgan Drexen, Inc. v. Consumer Financial Protection Bureau*, 785 F.3d 684, 697 (D.C. Cir. 2015). In exercising that discretion, courts weigh a non-exclusive list of factors, including whether a declaration "would finally settle the controversy between the parties," "whether other remedies are available or other proceedings pending," "the state of the record," "the degree of adverseness between the parties," and "the public importance of the question to be decided." *Id.* at 696-697. Together, these factors "focus on the usefulness of a declaratory

judgment, the role of such relief in ending the dispute between the parties, and the incentives for parties' behavior." *Id.* at 697.

These considerations support granting declaratory relief here. *First*, a declaratory judgment would settle the controversy, by definitively resolving whether in fact defendants violated the Act and, if so, whether the Act is constitutional. *Second*, the record is complete and undisputed, and the parties are fully adverse: Defendants maintain that the removals were lawful and the Act unconstitutional, Dkt.59 at 1-4, and plaintiffs maintain the opposite. *Third*, no other remedy or proceeding counsels against a declaration. Back pay accompanies declaratory relief rather than substituting for it, and the Court's denial of injunctive relief does not foreclose a declaration, because the Declaratory Judgment Act authorizes one "whether or not further relief is or could be sought," 28 U.S.C. §2201(a). *Fourth*, plaintiffs' question is one of immense public importance: Whether the officials Congress charged with protecting the public fisc, by deterring and detecting waste, fraud, and abuse across the federal government, 5 U.S.C. §402(b)(2), may be removed at a president's whim and without a word to Congress is a question of importance to Congress, to the executive branch, and to the public. A district court in another case involving removal of an executive official recently ruled that a declaration would "'serve a useful purpose in clarifying or settling the legal issues involved'" where the government had "invented a new and expansive theory of executive power" and "utilized that theory to remove other Executive Branch employees." *Comey*, 2026 WL 3203254, at *22 (quoting *Admiral Insurance Co. v. Niagara Transformer Corporation*, 57 F.4th 85, 99 (2d Cir. 2023)).

Finally, the unavailability of injunctive relief under the Court's prior ruling (a ruling plaintiffs reserve their right to challenge on appeal) does not foreclose declaratory relief. The

Declaratory Judgment Act expressly provides that a court may issue a declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. §2201(a).

**B. Plaintiffs Are Entitled To Back Pay**

As noted, this Court has already stated that "if successful on the merits of their claims," plaintiffs "can recover back pay and benefits." Op.17. In fact, that conclusion was essential to the Court's denial of injunctive relief. Because it determined that back pay and benefits could adequately compensate plaintiffs for the loss of their positions, the Court held that they had not shown the irreparable injury necessary for reinstatement. Op.17-19. Consistent with its reliance on the availability of that legal remedy to deny equitable relief, the Court should now award back pay and benefits after resolving the merits in plaintiffs' favor.

The government can hardly be heard to argue against back pay now, having told this Court that back pay is a traditional remedy for an officer unlawfully deprived of a federal office, Dkt.30 at 26. And that is correct: For more than a century, officers challenging unlawful presidential removals have sued for, and recovered, the salary attached to the offices they remained legally entitled to occupy. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 350 (1958); *Humphrey's Executor v. United States*, 295 U.S. 602, 612 (1935), *overruled on other grounds by Slaughter*, 609 U.S. 422; *Myers*, 272 U.S. at 106; *Shurtleff v. United States*, 189 U.S. 311, 318 (1903); *Parsons v. United States*, 167 U.S. 324, 326 (1896). Two of the cases just cited each allowed recovery of salary of the office for the period after the president's attempted removal. *See Humphrey's Executor*, 295 U.S. at 618-619, 632; *Wiener*, 357 U.S. at 350-351, 356.

Although the government previously represented that back pay is a "traditional[]" remedy for removal, Dkt.30 at 26, its pre-motion notice suggests (Dkt.59 at 4) that sovereign immunity bars back pay here because the Administrative Procedure Act's waiver of that immunity applies

only to an "action in a court of the United States seeking relief other than money damages," 5 U.S.C. §702. But "money damages" means money awarded as substitute compensation for a loss, not specific relief requiring the government to provide, as an equitable matter, "the very thing to which" the plaintiff was entitled. *Bowen v. Massachusetts*, 487 U.S. 879, 895, 900-901 (1988). Plaintiffs do not seek compensation for some separate consequential injury. They seek the salary and benefits attached to offices they continued legally to hold because no removal satisfying §403(b) occurred.

An order restoring that withheld compensation is specific equitable relief, even though compliance requires the payment of money. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. The D.C. Circuit has applied that rule to hold that "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *America's Community Bankers v. Federal Deposit Insurance Corporation*, 200 F.3d 822, 829 (D.C. Cir. 2000). The compensation of the office of inspector general is fixed by statute, 5 U.S.C. §403(e), and the White House staff emails did not lawfully end plaintiffs' entitlement to that compensation.

Defendants' pre-motion notice also cited (Dkt.59 at 4) *Hubbard v. Environmental Protection Agency*, 982 F.2d 531 (D.C. Cir. 1992) (en banc), in support of their argument that sovereign immunity bars back pay. But there, the plaintiff sought payments associated with a promotion he never received and to which he had no established entitlement. *Id.* at 532-533, 539. Plaintiffs, by contrast, had already been appointed and confirmed, and were indisputably serving as inspectors general. Their entitlement to the prescribed compensation for that service continued unless and until they were lawfully removed. The Supreme Court has held that an officer whose

removal violated statutory restrictions "is still in office, and is entitled to the pay attached to the same." *Perkins*, 116 U.S. at 485. It has likewise upheld recovery of salary during an unlawful suspension where the employee remained ready and willing to serve. *United States v. Wickersham*, 201 U.S. 390, 398-399 (1906). Because no lawful removal ever occurred, plaintiffs are seeking restoration of compensation unlawfully withheld, not damages for a lost employment opportunity.

The en banc decision in *Hubbard* recognizes that distinction. The court treated Hubbard's back pay as money damages precisely because he "had never worked for the EPA and thus was not entitled to any pay." 982 F.2d at 533. But it expressly declined to hold that "back pay must always be viewed as money damages." *Id.* at 533 n.4. It explained that, had Hubbard worked without pay, the money owed for his labor might itself constitute the specific relief to which he was entitled. *Id.* Here, plaintiffs' continued title to their offices supplied the preexisting right to payment. The government's unlawful exclusion of plaintiffs from their duties did not extinguish that right. Their claim therefore seeks to enforce an existing statutory payment obligation, which is specific relief rather than money damages under the distinction that the Supreme Court recognized in *Bowen* v. Massachusetts.

The Court should therefore award each plaintiff the salary and benefits withheld as a result of defendants' implementation of the unlawful removals, subject to an individualized calculation and any legally required offsets.

**CONCLUSION**

The Court should grant plaintiffs' motion for summary judgment and award the declaratory relief, back pay and benefits, and other appropriate relief requested.

October 30, 2026

Respectfully submitted,

*/s/ Seth P. Waxman*
Seth P. Waxman (D.C. Bar No. 257337)
Daniel S. Volchok (D.C. Bar No. 497341)
Jamie Yood (D.C. Bar No. 1033919)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
jamie.yood@wilmerhale.com

Nicholas Werle*
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

* *Pro hac vice granted*